UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| JORDAN COLBERT, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 4:18-cv-00793-JM |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| | ) | AMENDED COMPLAINT FOR |
| vs. | ) | VIOLATIONS OF THE FEDERAL |
| | ) | SECURITIES LAWS |
| BANK OZK, GEORGE GLEASON, and GREGORY MCKINNEY, | ) ) | |
| | ) | |
| Defendants. | ) | <u>DEMAND FOR JURY TRIAL</u> |
| | ) | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND OVERVIEW ................................................................. 1

JURISDICTION AND VENUE ....................................................................... 8

PARTIES ................................................................................................ 9

Lead Plaintiff .......................................................................................... 9

Defendants ............................................................................................. 9

Control Person Allegations...................................................................... 11

SUBSTANTIVE ALLEGATIONS ................................................................ 12

RESG is Born and Becomes OZK's Growth Engine ..................................... 13

Defendants Tell Investors RESG's Credits are "Pristine," Reflected in OZK's
    Industry-Leading Risk Ratios............................................................... 14

After RESG Chief Resigns Abruptly, Gleason Reassured Investors About the
    Quality of RESG Credits ..................................................................... 15

OZK Shocks Investors with News of RESG's Poor Credit Management and
    Related Loan Losses........................................................................... 17

Post-Class Period Admissions Demonstrate that OZK Knew of Chronic RESG
    Loan Problems During the Class Period ................................................. 20

Additional Post-Class Period Admissions Revealed the Information Needed to
    Identify the Loans and Their Respective Losses...................................... 20

RESG's 2007 South Carolina Loan Was "Nonperforming" at the Start of the Class
    Period............................................................................................... 22

JTL/Cypress Fails to Repay by the August 2014 Due Date............................ 23

The October 2014 Default ......................................................................... 23

Losses Were Probable on the Nonperforming South Carolina Loan No Later than
    the Beginning of the Class Period, Indicating Impairment, Loss
    Recognition and Non-Accrual Status ..................................................... 24

The October 2016 Default ......................................................................... 25

**Page**

The January 2017 Default.................................................................................... 26

The April 2017 Default........................................................................................ 26

The July 2017 Default ......................................................................................... 27

The January 2018 Default.................................................................................... 28

The July 2018 Default ......................................................................................... 29

October 2018 Default and Ultimate Foreclosure................................................. 29

RESG'S 2008 North Carolina Loan Was "Nonperforming" During the Class
 Period.......................................................................................................... 29

OZK was Required by GAAP and OZK's Accounting Policies to Report the
 RESG Problem Loans as "Nonperforming," to Stop Accruing Interest
 Income, and to Perform Impairment Testing ............................................. 31

Defendants Violated GAAP and OZK's Accounting Policies and Concealed
 RESG's Chronic Credit Problems, Which Were Not Discernable to OZK
 Investors ...................................................................................................... 33

DEFENDANTS' FALSE AND MISLEADING STATEMENTS................................... 34

OZK's Fiscal Year 2015 Financial Results ......................................................... 34

OZK's 1Q16 Financial Results ........................................................................... 35

OZK's 2Q16 Financial Results ........................................................................... 36

OZK's 3Q16 Financial Results ........................................................................... 38

OZK's Fiscal Year 2016 Financial Results ......................................................... 39

March 2017 – the Raymond James Conference ................................................. 41

OZK's 1Q17 Financial Results ........................................................................... 42

OZK's 2Q17 Financial Results ........................................................................... 44

September 2017 – the Raymond James and Barclays Conferences................... 46

OZK's 3Q17 Financial Results ........................................................................... 47

- ii -

**Page**

OZK's Fiscal Year 2017 Financial Results ................................................................... 49

March 2018 – the Raymond James Conference .............................................................. 51

OZK's 1Q18 Financial Results ....................................................................................... 52

OZK's 2Q18 Financial Results ....................................................................................... 54

September 2018 – the Barclays Conference ................................................................... 55

LOSS CAUSATION/ECONOMIC LOSS ....................................................................... 57

RESG Executive Thomas's Abrupt Resignation Partially Revealed RESG's Poor
  Credit Quality ........................................................................................................ 57

Defendants Finally Reveal the Entirety of the Previously Concealed Truth that
  RESG Credit Quality was Poor, with Additional Nonperforming Loans and
  Related Losses ........................................................................................................ 58

Defendants' False and/or Misleading Statements Harmed Lead Plaintiff and the
  Class ........................................................................................................................ 61

ADDITIONAL INDICIA OF SCIENTER ....................................................................... 62

Defendants' Hands-On Management of the RESG Loan Book Infers Scienter .............. 63

Gleason's Admissions of RESG Borrower Concessions During the Class Period
  Infers Scienter ........................................................................................................ 67

The Timing of Defendants' "Modifications" to Mask Chronic Loan Problems at
  Reporting Periods Infers Scienter .......................................................................... 68

The Alleged False/Misleading Statements Misinformed Investors About OZK's
  Most Important Performance Metric ....................................................................... 68

The Magnitude of the Miss and Analysts' Surprise Infers Scienter ............................... 69

OZK's Use of Price-inflated Shares as Merger Currency Infers Scienter ...................... 71

The Timing of Thomas's Abrupt Resignation Infers Scienter ....................................... 72

APPLICABILITY OF THE PRESUMPTION OF RELIANCE ....................................... 72

**Page**

NO SAFE HARBOR ............................................................................... 73

CLASS ACTION ALLEGATIONS ...................................................... 74

    COUNT I ........................................................................... 76

    For Violations of Section 10(b) of the 1934 Act and
        Rule 10b-5 Against All Defendants ........................... 76

    COUNT II ......................................................................... 79

    For Violation of Section 20(a) of the 1934 Act Against
        the Individual Defendants ......................................... 79

## INTRODUCTION AND OVERVIEW

1.      Lead Plaintiff Strathclyde Pension Fund ("Lead Plaintiff") hereby brings this action on behalf of itself and all persons or entities who purchased or otherwise acquired the common stock of Bank OZK (formerly known as Bank of the Ozarks, Inc.) (hereinafter, "OZK" or the "Company") between February 19, 2016 and October 18, 2018 inclusive (the "Class Period"), and were damaged thereby.  Excluded from the Class, as defined below, are Defendants, present or former executive officers of OZK and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).  Lead Plaintiff seeks to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and Rule 10b-5 promulgated thereunder.

2.      Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters.  Lead Plaintiff's information and belief is based primarily upon the independent investigation of its attorneys.  This investigation included, but was not limited to, a review and analyses of: (i) OZK's public filings with the U.S. Securities and Exchange Commission ("SEC") and the Federal Deposit Insurance Corporation ("FDIC"); (ii) transcripts of OZK's public conference calls; (iii) OZK's press releases and other information made available on its website; (iv) analyst reports regarding OZK and other reports or statements made by third parties; (v) media reports regarding OZK; (vi) real property records; (vii) analyses of OZK's stock price movement and pricing and volume data; and (viii) other material and data identified herein.

3.     Counsel's investigation of the facts underlying this action continues, and counsel believes that certain relevant facts known only by Defendants, or exclusively within their custody or control, will provide additional evidentiary support for the allegations set forth herein, after a reasonable opportunity for discovery.

4.     OZK (formerly Bank of the Ozarks, Inc.) was founded in 1903 as a small community bank in Jasper, Arkansas.  In 1979, Defendant George Gleason ("Gleason") purchased a controlling interest and assumed active management of OZK as its Chairman and Chief Executive Officer ("CEO").  OZK became a public company in 1997 and is now headquartered in Little Rock, Arkansas.

5.     In 2003, OZK founded its Dallas-based, Real Estate Specialties Group ("RESG"), an OZK unit that originates most of the OZK's commercial real estate ("CRE") loans.  Since then, RESG has fueled OZK's growth as a commercial lending powerhouse, with a national footprint that extends well beyond its Arkansas roots.

6.     Today, OZK has funded large commercial real estate projects in virtually every major metropolitan area in the country.  In 2018, OZK was the third-largest construction lender in New York City, the largest construction lender in Los Angeles and Miami, and one of the largest in Chicago, Denver, and Seattle, flouting the banking axiom that commercial real estate lending is best done in one's own market.  To reflect the evolution of its business and to achieve its long-term objectives of continued CRE market expansion outside Arkansas, in mid-2018, OZK dropped the name "Bank of the Ozarks" and re-branded itself as "Bank OZK."

7.     This case stems from Defendants' repeated representations to investors that the RESG loan book was "pristine," as reflected by OZK's purportedly industry-leading and record low levels of "nonperforming" loans and related risk ratios, indicating OZK had outstanding credit quality to generate net interest income in both good times and bad.

8.     OZK told investors that "the [k]ey in [d]riving [l]ong-[t]erm [i]ncreases in [n]et [i]nterest [i]ncome" was disciplined credit quality.  To assure investors that OZK's credit quality was "pristine," on investor conference calls Gleason bragged about OZK's "*record*" low risk ratios, saying, for example, that "*[t]hese ratios of non-performing loans and leases, and past due loans and leases, are our best ever as a public company, setting new records for the second consecutive quarter*."  For all of 2016, Gleason said "*[m]ost of our asset quality ratios were at or near record levels throughout the year*."

9.     In 2017, Gleason told investors that OZK's "pristine" credit was evident in OZK having "*only two loans result in losses in 14 years*" and "*RESG's total credit losses since inception are $10.4 million*."  OZK's Director of Investor Relations reemphasized with investors that "*[o]ver our 14-year history, only 2 loans have gone bad for a total net charge-off of $10.4 million*, which is an annualized loss ratio of 7 basis points."  Gleason claimed that "*our CRE portfolio may be the lowest risk CRE portfolio in the industry*."

10.    In 2018, Gleason pointed to RESG's "track record" repeatedly, saying that "[a]nd as a result of that in the 15-year history of Real Estate Specialties Group, *we have not had a single loan, not one loan*, wherein we've gotten at the end of the project and we've not had the project completed with the funds that remained in the loan."

11.     Investors responded positively to Gleason's statements that OZK's loan book was the "lowest risk" and "pristine."  For example, a Stephens Inc. analyst said he was bullish on OZK, because "Excellent credit continues.  *OZRK's credit quality remains in pristine condition*."  Barclays said RESG's historically-low loan charge-offs was a "*strength*," citing "[i]mpressive through-the-cycle asset quality metrics, *with RESG posting just $10.4mn (5bp annual average) in cumulative losses since its 2003 founding*."

12.     But behind this facade of a "pristine" loan book with "record" low risk ratios that never had an incomplete project and had only two loans losses totaling $10.4 million since 2003, during the Class Period, Defendants were concealing from investors *two* nonperforming RESG loans, with *loan losses of $45.5 million* (nearly five times RESG's previous losses), one of which was in chronic default since 2014.

13.     So, it came as a complete surprise to investors and analysts when, on October 18, 2018, OZK announced that its net income for the third quarter of 2018 ("3Q18") was $74.2 million and diluted earnings per common share ("EPS") for 3Q18 were $0.58, *a 22.7% decrease from the third quarter of 2017* ("3Q17").  This was significantly below the expectations of EPS of $0.90 per share projected by 13 analysts surveyed by Thomson Reuters.

14.     OZK reported that the main reason for the earnings miss (about $0.20/share) was due to its incurring combined charge-offs of *$45.5 million on two RESG loans* – almost five times RESG's historical charge-offs.  Defendants did not provide specific details about the loans, but rather generally described them as unrelated projects in South Carolina (the

"SC Loan") and North Carolina (the "NC Loan") and disclosed that the loans had been in OZK's portfolio since 2007 and 2008, respectively.

15.     Analysts were also surprised by the charge-offs that were almost five times the amount of RESG's previous charge-offs over its long history.  But the analysts were even more surprised by news of RESG's poor credit quality, saying that "[t]he bigger impact of these credit losses, however, ***is on sentiment and how the market is likely to perceive the Company's credit quality going forward***."  Another analyst concurred, saying the "***pivotal question[]***" is "***[c]an OZK successfully manage credit risk***?"  Barclays also cited OZK's "***credit issues***" and related earnings impacts would "***meaningfully pressure . . . shares tomorrow***."  Stephens Inc. said that aside from the charge-offs, "OZK's 3Q18 ***results were disappointing due to elevated credit concerns***, slowing loan growth and NIM compression."  Brean Capital called the announcement "***definitely a surprise***" attributing $0.20 of the 3Q18 EPS miss related to RESG credit issues.  In downgrading the stock, with a $32 price target, Morgan Stanley warned, "***[w]e believe the OZK shares will continue to trade at a substantial discount to peers for the foreseeable future***."

16.     After the Class Period, Gleason finally admitted that, contrary to OZK's Class Period statements touting OZK's low levels of nonperforming loans, OZK had for a "***long, long time***" been merely sweeping rental income on the SC Loan.  Gleason also admitted that OZK had been working with the two loans' sponsors, through a series of what Gleason euphemistically called "***forbearance***" agreements, thus providing serial concessions to debtors of the SC Loan and NC Loan to address their ongoing financial difficulties.  These

- 5 -

admissions further discredit OZK's Class Period statements regarding "pristine" and "record" asset quality and low levels of nonperforming loans and charge-offs.

17.     Under Generally Accepted Accounting Principles ("GAAP") and OZK's accounting policies, OZK was required to report the troubled SC Loan and NC Loan as "nonperforming" because OZK had granted concessions to address the two debtors' financial problems.  Similarly, under OZK's accounting policies, "Loans for which the terms have been modified and for which (i) the borrower is experiencing financial difficulties and (ii) we have granted a concession to the borrower are considered troubled debt restructurings ("TDRs") and are included in impaired loans and leases." *See, e.g.*, OZK 2016 Form 10-K at 40.

18.     Instead of being truthful about OZK's actual credit risks, Defendants went on earnings calls to blatantly brag about OZK's record low and industry-leading risk ratios of nonperforming loans, saying it had the best loan loss experience in the industry.  But those statements were materially false when made because, had OZK included the troubled RESG loans as nonperforming and impaired, OZK's actual nonperforming loans and risk ratios would have far exceeded OZK's reported amounts, including those reported by a peer bank, as this chart shows:



19.     As the above chart illustrates, OZK's reported NPA ratios were materially understated because those ratios did not include the SC Loan and/or the NC Loan as "nonperforming" during the Class Period.  When adding those loans as "nonperforming," OZK's actual NPA ratio is much higher than OZK's reported NPA ratios, and even higher than a peer bank, United Community Banks.  Had Defendants been truthful with investors, OZK would have reported far greater credit risk throughout the Class Period.

20.     In addition, the SC Loan was impaired throughout the Class Period and at any point it was probable that OZK would need to charge off the SC Loan by about $20 million. As the following table shows, had OZK charged off an additional $20 million of bad RESG loans during the Class Period, doing so would have been material compared to OZK's reported Net Income and Net Charge-offs:

| Materiality of $20 million additional charge-off during the Class Period (in millions) | | | |
|---|---|---|---|
| Quarter End | Reported Net Income | Reported Charge-offs | Actual quarter's Charge-offs, if $20 million of SC Loan was included |
| 4Q15 | $51.5 | $3.4 | $23.4 |
| 1Q16 | $51.7 | $1.1 | $21.1 |
| 2Q16 | $54.5 | $1.5 | $21.5 |
| 3Q16 | $76.0 | $2.5 | $22.5 |
| 4Q16 | $87.8 | $3.1 | $23.1 |
| 1Q17 | $89.2 | $3.3 | $23.3 |
| 2Q17 | $90.5 | $2.0 | $22.0 |
| 3Q17 | $96.0 | $3.3 | $23.3 |
| 4Q17 | $146.2 | $1.9 | $21.9 |
| 1Q18 | $113.1 | $1.6 | $21.6 |
| 2Q18 | $114.8 | $3.1 | $23.1 |

21.    As a result of Defendants' false and misleading statements about OZK's credit quality, OZK common stock traded at artificially inflated prices during the Class Period, reaching Class Period highs of over $50 per share.  Once the truth about RESG's credit quality and management was fully revealed, the price of OZK shares declined about 50% from its Class Period highs and dropped by $9.33 per share on October 19, 2018 (more than 26%) to close at $25.52 per share, causing economic harm and damages to the Class.

## JURISDICTION AND VENUE

22.    Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

23.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act (15 U.S.C. §78aa(c)), as each of the Defendants either reside, are headquartered, and/or maintain operations in this District.  Defendants' wrongful acts also arose in and

emanated from, in part, this District, including the dissemination of materially misleading statements both into and from this District.

24.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PARTIES

**Lead Plaintiff**

25.     Lead Plaintiff Strathclyde Pension Fund was established in 1974 by Act of Parliament and transferred to Glasgow City Council in 1996. Glasgow City Council, the administering authority for Strathclyde Pension Fund, delegates managing responsibility of the fund to the Strathclyde Pension Fund Committee which oversees over £20 billion in assets for the benefit of approximately 230,000 members. As detailed in the previously filed Certification incorporated herein by reference (ECF No. 9-2), the Strathclyde Pension Fund purchased OZK common stock at artificially inflated prices during the Class Period and suffered damages as a result of the misconduct alleged herein.

**Defendants**

26.     Defendant OZK is incorporated under the laws of Arkansas with its principal executive offices located in Little Rock, Arkansas. OZK's common stock trades on the NASDAQ exchange under the ticker symbol "OZK." Until July 16, 2018, OZK was known as Bank of the Ozarks.

27.     Defendant Gleason has been CEO and Chairman of the Board of Directors (the "Board") of OZK since 1979.  Gleason's wife, Linda Gleason, served as a non-independent director on the OZK Board from 1987 until she retired effective May 7, 2019.  In July 2018, *Arkansas Money and Politics* described Gleason as "a numbers guy of the highest order.  Every day the CEO and Chairman of Bank of the Ozarks – now Bank OZK – surfs a tsunami of data, tracking every conceivable element of bank operations impacting the bottom line in ways great and small. . . .  Numbers, he'll tell you, are everything."  As OZK's Chairman and CEO, Gleason regularly spoke on OZK's behalf, including in press releases, investor conference calls, SEC and FDIC filings.  Gleason caused OZK to issue false or misleading financial reports with the SEC and FDIC, including certifying the issuance of those reports pursuant to §302 and §906 of the Sarbanes-Oxley Act of 2002, SEC Rules 13a-14(a), 13a-15(e)-(f) and 15d-15(e)-(f), and 18 U.S.C. §1350.  Gleason signed and certified OZK's Forms 10-K filed with the SEC for the years ended 2015 and 2016, and with the FDIC for the year ended 2017.

28.     Defendant Gregory McKinney ("McKinney") has served as the Chief Financial Officer ("CFO") and Chief Accounting Officer ("CAO") of OZK since December 31, 2010.  McKinney was Executive Vice President and Controller of OZK from 2003 until December 31, 2010.  McKinney has a bachelor's degree in Accounting and is a Certified Public Accountant.  From 2001 to 2003, McKinney served as Executive Vice President and Controller of Ozarks Bank, a subsidiary of OZK.  As OZK's CFO and CAO, Defendant McKinney regularly spoke on OZK's behalf, including in press releases, investor conference calls, and SEC and FDIC filings.  McKinney caused OZK to issue false or misleading

- 10 -

financial reports with the SEC and FDIC, certifying those reports pursuant to §302 and §906

of the Sarbanes-Oxley Act of 2002, SEC Rules 13a-14(a), 13a-15(e)-(f) and 15d-15(e)-(f),

and 18 U.S.C. §1350.  McKinney signed OZK's Forms 10-Q filed with the SEC for the

quarters ended first quarter of 2016 ("1Q16") through 2Q17, and with the FDIC for the

quarters ended 3Q17 through 3Q18.  McKinney signed and certified OZK's Forms 10-K

filed with the SEC for the years ended 2015 and 2016, and with the FDIC for the year ended

2017.

29.     Defendants Gleason and McKinney are collectively referred to herein as the

"Individual Defendants."  Together, the Individual Defendants and Defendant OZK are

collectively referred to herein as the "Defendants."

**Control Person Allegations**

30.     As alleged herein, the Individual Defendants were responsible for reviewing

and/or disseminating the false and misleading statements, information, and omissions alleged

herein; were aware of, or recklessly disregarded, the fact that the false and misleading

statements and omissions were being issued by the Company; and approved or ratified these

statements, all in violation of the federal securities laws.

31.     Each of the Individual Defendants, by virtue of his high-level position with the

Company, directly participated in the management of the Company, and was directly

involved in the day-to-day operations of the Company at the highest levels.  The Individual

Defendants participated in drafting, preparing, and/or approving the public statements and

communications complained of herein and were aware of, or recklessly disregarded, the

material misstatements and omissions contained therein.  The Individual Defendants, as

- 11 -

senior executive officers of the Company, were able to and did control the content of the various filings with the SEC and/or the FDIC, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

32.     As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the 1934 Act and traded on NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

## SUBSTANTIVE ALLEGATIONS

33.     As a commercial bank, or "spread bank," OZK generates its main source of profits through its interest rate "spread" – the positive difference between paying its depositors a lower rate than the interest rate it extends to borrowers.  OZK thus focused on Net Interest Income ("NII") – that measured the spread – as "the [u]ltimate [r]evenue [m]etric for a '[s]pread' [b]ank."

34.     OZK told investors that "the [k]ey in [d]riving [l]ong-[t]erm [i]ncreases in [n]et [i]nterest [i]ncome" (aka, "the ultimate revenue metric") was disciplined credit quality. OZK's oft-repeated message was that OZK was head and shoulders better than other commercial lenders because OZK's credit quality was priority number one and the credit book was "pristine," thereby making OZK a superior investment.

**RESG is Born and Becomes OZK's Growth Engine**

35.     In 2003, under Gleason's watchful eye, OZK executive Dan Thomas ("Thomas") created a new lending unit, called "Real Estate Specialties Group." RESG was OZK's Dallas-based CRE lender, that would originate CRE loans and put OZK on the map nationally. Thomas's leadership of RESG was credited for OZK's explosive growth and pristine credit quality, with Tim Hicks ("Hicks"), OZK's Executive Director of Investor Relations, telling analysts in 2017 that:

> ***Real Estate Specialties Group is our primary engine for loan growth in nonpurchased loans***.[1]  It was started in 2003 by Dan Thomas, nearly 14 years ago.  Dan has extensive experience in real estate as a CPA and as an attorney and as a real estate developer himself.  He's built this team from the ground up and now has a team – team members of 97 as of today.  And consistent with what Tyler had mentioned, their priorities are: first, asset quality; second, profitability; and third, growth.
>
> Today, RESG loans are 70% of our funded nonpurchased loans and 92% of our unfunded loans.  ***Over our 14-year history, only 2 loans have gone bad for a total net charge-off of $10.4 million***, which is an annualized loss ratio of 7 basis points.

36.     To feed its explosive loan growth, OZK had to increase its deposits and capital by acquiring other banks and issuing stock.  Between 2003 and 2016, OZK paid

---

[1]     Throughout this Complaint, emphasis is added unless otherwise noted.

approximately $1.8 billion to acquire 16 banks (by using 48 million OZK shares as merger consideration, along with cash).

**Defendants Tell Investors RESG's Credits are "Pristine," Reflected in OZK's Industry-Leading Risk Ratios**

37.     To attract capital for OZK's explosive growth, Gleason repeatedly reassured investors that RESG was a very conservative lender, with industry-leading low levels of "nonperforming loans" and "nonperforming assets" and "charge-offs."  Gleason's mantra of "pristine" credit quality was intended to distinguish OZK as a superior investment opportunity relative to its peers.   When an analyst asked during the Raymond James Institutional Investors Conference on March 7, 2017 about the "secret sauce" behind RESG's great success, Hicks replied:

> But our asset managers are managing it from the day we close to the day it's paid off.  So even though we have funded the dollar, our asset managers are remodeling each of those projects on a monthly basis throughout the life of the loan.  ***And that discipline and culture that we have with those asset managers provide us conservative - really conservative metrics and allow us to have pristine asset quality***.

38.     Despite its high concentration of CRE loans, Gleason insisted that OZK – and RESG in particular – was perhaps the most conservative commercial real estate lender in the entire industry:

> Simply stated, we have the lowest risk position in the capital stack.
>
> Likewise, our extremely low loan-to-cost and loan-to-value ratios are probably more conservative than just about every other CRE lender in the country.  Accordingly, we believe ***our CRE portfolio may be the lowest risk CRE portfolio in the industry***.

39.     Investors responded positively to Gleason's statements that OZK's loan book was the "lowest risk" and "pristine."  For example, following the April 11, 2017 earnings

- 14 -

call, a Stephens Inc. analyst said he remained bullish on OZK, because, among other reasons,

"*OZRK's credit quality remains in pristine condition*."

**After RESG Chief Resigns Abruptly, Gleason Reassured Investors About the Quality of RESG Credits**

40.     On July 27, 2017, RESG's lead executive Thomas abruptly resigned, without

explanation.  On this news, shares of OZK dropped $5.65 per share, or 12%, to close at

$40.50 per share on volume of 9.1 million shares. Analysts noted: "The concern is that Mr.

Thomas's departure signals slower loan growth for Ozarks, *or an inability to maintain its*

*excellent credit quality* without Mr. Thomas' leadership."  Morgan Stanley stated that "[o]ne

potential concern with Mr. Thomas leaving the bank is that RESG credit quality could

deteriorate, or *may not maintain its pristine standards going forward*."

41.     On July 28, 2017, a Stephens Inc. analyst, Matt Olney, reacted to Thomas's

resignation by downgrading OZK to equal-weight rating from "overweight" and cutting his

price target to $48 per share from $58 per share (*i.e.*, 17%).

42.     Following the negative stock and analyst reactions to Thomas's resignation,

Gleason assuaged investors' concerns during investor meetings.  On August 7, 2017, Sandler

O'Neill issued a report reiterating its "Buy" rating, reporting that on August 2, 2017 it hosted

Gleason for investor meetings in Montreal and Toronto.  The analyst stated:

> We came away from these meetings with greater perspective around the recent
> departure of leadership in the bank's RESG segment and an affirmed belief
> that the forward trajectory of Ozarks remains extremely high. Besides Mr.
> Thomas' departure, the meetings focused on the remaining RESG team and its
> potential, overall forward loan growth trends, core deposit generation
> capabilities, and the direction of the NIM.

43.     The analyst further reported that Gleason would be "taking up most of the slack from Mr. Thomas's departure," and that Gleason had "always been deeply involved" with [RESG]."  He noted:

> Mr. Gleason commented that 3-4 years ago, Mr. Thomas's departure could have been highly disruptive, but since then, Mr. Thomas built such a deep and talented team that RESG will be able to grow and thrive with the other 107 employees left behind.  At the end of the day, we believe that Mr. Thomas was highly talented, and a very valuable asset, but he was still 1 of 34 people within the RESG team that structured and originated loans – and even if he was the best of those 34, we think along with Mr. Gleason's leadership within the team his departure presents a manageable hurdle. . . . All said, we do not expect to see any tangible disruption from this departure and the bank should continue to meet its growth targets through 2018 at a minimum.

44.     In September 2017, Gleason again reassured analysts that Thomas's resignation was not a red flag about RESG's credit quality, where, in all respects, RESG was "business as usual" with a "strong and deep team."  Gleason added:

> I've said many times that [RESG] is our best unit in every aspect of what we do.  It's our best underwritten loans, our best documented loans, our most precisely closed loans, our lowest leveraged, best sponsors, best projects, best serviced loans to Brannon Hamblen's Asset Management team.  ***So they're our best credits in every respect***.

45.     Gleason's reassurances were materially misleading about Thomas's abrupt resignation not affecting credit quality.  By this time the SC Loan was deeply impaired, the likelihood of loss was probable, and there was significant doubt that OZK would collect payments due under the loan agreement.  Defendants knew or should have known that the debtor had defaulted on the SC Loan for nonpayment by the due date at least four times with no indication of improved credit worthiness.

**OZK Shocks Investors with News of RESG's Poor Credit Management and Related Loan Losses**

46.     On October 18, 2018, OZK disclosed its 3Q18 financial results.  Defendants shocked investors when they disclosed that ***OZK had lost $45.5 million*** on two loans originated by RESG – the SC Loan and the NC Loan.  Defendants' revelations did not specify the loans involved (or itemize their losses), but described the loans generally as "two unrelated projects . . . in South Carolina and North Carolina . . . in our portfolio since 2007 and 2008, respectively."  Defendants said the SC Loan "originated in 2007" was "secured by a regional mall" that included "anchor tenants Sears and JC Penney."  Defendants said the NC Loan "originated in 2008" and was "secured by a multi-phase land, residential lot and residential home project in North Carolina."

47.     Analysts were likewise shocked by these disclosures because Defendants had repeatedly touted the fact that RESG had only had two credits result in losses of about $10.5 million in RESG's ***entire*** 15-year history.  Now, investors were learning that, in fact, OZK had ***double*** the amount of credits resulting in losses with nearly ***five times*** the amount of its prior losses.

48.     Following this disclosure, UBS said the "pivotal question []" was "***[c]an OZK successfully manage credit risk***," adding that these "[l]osses highlight the weakness of an appraisal which ***only confirms what should have been known*** – especially for credits as large as these."  UBS also noted that "[t]hese were 2 cash flowing loans in the portfolio for a decade, ***why were they not restructured in a manner that produced a lower loss content***? . . . We expect a very sharply negative reaction as emergence of credit if not already a widespread performance issue, something that becomes more widely discussed."

- 17 -

49.     Other analysts were similarly caught off guard because the losses called into question OZK's credit risk management, having not received any prior warning that RESG had two nonperforming loans at risk of large losses:

(a)     Morgan Stanley reported on October 19, 2018:

Highly disappointing 3Q18 results.  Bank OZK reported 3Q18 earnings that came in far worse than expected.

\*       \*       \*

*The bigger impact of these credit losses, however, is on sentiment and how the market is likely to perceive the company's credit quality going forward*.

\*       \*       \*

We believe the OZK shares will continue to trade at a substantial discount to peers for the foreseeable future, given *the company seems to have lost investor confidence* after posting a significant drop in net interest income and margin in 3Q18, reduced its loan growth guidance, and *posted a surprise credit loss on two of its RESG loans originated over 10 years ago*.

(b)     Sandler O'Neill reported on October 19, 2018:

Two Large RESG NCOs Drive the Lion's Share of the 3Q18 Miss – OZK took a $26.4M incremental provision on $45.5M in NCOs related to two substandard RESG loans. . . . *These current losses will further sour the well around the shares* and we think that we may need to work through a credit cycle before OZK will be able to *earn back confidence in its current business model*.

50.     In OZK's 3Q18 "management comments," Defendants said that in the second quarter of 2018 ("2Q18"), the two bad RESG loans had accumulated a combined loan loss allowance of $19.1 million.  In 3Q18, OZK added another $26.4 million to the combined allowance, bringing the total combined allowance to $45.5 million.  Then, also in 3Q18, OZK charged off the entire $45.5 million combined allowance ($19.1 million plus $26.4 million), thereby reducing the outstanding loan balances by that amount.  After the charge-

- 18 -

offs, OZK had reduced the 3Q18 combined balance for the two bad RESG loans to $20.6 million.

51.     OZK's 3Q18 "management comments" also indicated that the remaining 3Q18 balances for both the SC and NC Loans ($20.6 million) were now each 80% of the latest appraised values for the underlying collateral.  OZK's comments did not itemize each loan's ending balance or the amount of the appraisal.  On a combined basis, however, it can be deduced from this data that the combined property appraisals for the two loans were about $25.75 million (*i.e.*, the $20.6 million combined loan balance, divided by the 80% loan-to-value ["LTV"] ratio).

52.     OZK's 3Q18 Form 10-Q reported "Total Real Estate Loans" by metropolitan statistical areas ("MSAs"), including MSAs in the Carolinas for "Non-Farm/Non-Residential" (*i.e.*, the category applicable to the SC Loan) and "Construction/Land Development" (*i.e.*, the category applicable to the NC Loan).  The 3Q18 balances, when compared to ending 2Q18 balances for the same MSAs, indicated a reduction (or approximate charge-off) of the SC Loan of about $23 million, and reduction (or approximate charge-off) for the NC Loan of about $22 million.

53.     Aside from these data points, Defendants did not disclose the two loans' beginning balances, whether the beginning balances were fully funded, how much principal had been paid down on the loans (if any), or how much interest had been accrued and/or recognized as income during the life of the loans.

**Post-Class Period Admissions Demonstrate that OZK Knew of Chronic RESG Loan Problems During the Class Period**

54.     On January 18, 2019, Gleason admitted to analysts that, as a result of financial difficulties experienced by two OZK borrowers, OZK had granted a series of concessions to address the borrowers' financial problems.  As Gleason explained, OZK was "actively in a [dialogue] with the sponsors" to address their ongoing financial difficulties "under a series of short-term forbearance agreements . . . [and] looking at other opportunities and strategies to liquidate those [two loans] in the most cost-effective manner and the most beneficial manner possible."  In particular, Gleason said that for a "long, long time" OZK had swept surplus cash flow on one project because the borrower was unable to make payments.

55.     The series of forbearance agreements demonstrated that OZK knew the loans were "nonperforming" for a "long, long time," and thus should have been reflected in OZK's nonperforming asset ratio earlier in the Class Period. To determine when exactly these loans should have been classified as "nonperforming" required additional identifying details about the loans and analysis.

**Additional Post-Class Period Admissions Revealed the Information Needed to Identify the Loans and Their Respective Losses**

56.     On May 2, 2019, OZK provided investors an updated chart from the 3Q18 chart provided previously.  This chart indicated that the SC Loan's LTV had changed slightly, but the NC Loan's LTV was unchanged at a remaining balance of $12.3 million. This information, combined with the 3Q18 revelation of the remaining balances for both the SC and NC Loans ($20.6 million) and Gleason's January 18, 2019 comments – that the SC Loan's appraised value had not changed despite a slight reduction in the loan balance –

revealed that the 3Q18 ending balance was about $12.3 million for the NC Loan and about $8.3 million for the SC Loan (*i.e.*, $20.6 million less $12.3 million).

57.    Based on this data and analyses, Lead Plaintiff was able to estimate itemized "nonperforming" and loss amounts for each of the two loans.  For the SC Loan, the loss (or charge-off) is estimated to be about $20 million.  Even assuming no $20 million charge-off, the SC Loan's "nonperforming" level to be reported to investors would have been at least $30 million ($38.2 million less $6.9 million).  For the NC Loan, the nonperforming amount is estimated to be at least $30 million (*i.e.*, the beginning balance) and the loss (or charge-off) later recognized is estimated to be about $22 million.  To calculate these amounts for each loan, Lead Plaintiff added the charge off (or loan loss) to the 3Q18 ending loan balance:

| Analysis of $45.5 Million RESG Loan Amounts (in millions) | | | |
|---|---|---|---|
|  | Reported Amts. 3Q18 | South Carolina Loan | North Carolina Loan |
| Beg. balance, when fully funded | Not disclosed | $38.2 | No less than $34.3 |
| Est. principal payments and/or unfunded amount | Not disclosed | ($6.9) | Not estimated |
| Loan losses | ($45.1) | ($23.0) | ($22.0) |
| 3Q18 loan balance | $20.6 | $8.3 | $12.3 |
| Appraisal at 80% LTV | $25.75 | $10.375 | $15.375 |

58.    The following sections explain Lead Plaintiff's analysis, in detail, of when OZK knew the loans were "nonperforming" and thus should have reclassified them and/or recognized losses as such prior to charging off the loan losses.  The post-Class Period admissions, combined with the 3Q18 statements, provided the identifying information required for Lead Plaintiff to identify and analyze the nonperforming loans.

**RESG's 2007 South Carolina Loan Was "Nonperforming" at the Start of the Class Period**

59.     In 2007, RESG issued a $32.25 million CRE loan to JTL Rock Hill, LLC ("JTL") for the purchase of an enclosed retail shopping mall known as the Rock Hill Galleria (the "Galleria") in Rock Hill, South Carolina.  Gleason approved the SC Loan.

60.     Rock Hill is the fourth largest city in South Carolina.  The Galleria served York, Chester, and Lancaster counties.  Opened in 1991, the Galleria had space for five anchor tenants and about 70 specialty shops.  Between September 2009 and May 2011, OZK restructured the SC Loan five times, with each modification extending the SC Loan's maturity date.  In 2012 and 2013 online reviews, shoppers called the Galleria "empty" and a "dead mall."

61.     In August 2011, OZK amended the SC Loan as a 3-year, $38.184 million, CRE loan to JTL, an affiliate of Cypress Equities, LLC ("Cypress").  Cypress is a Dallas-based retail real estate investor that sponsored the SC Loan, providing OZK a guarantee of JTL's debt.  Cypress also acted as the leasing agent and/or property manager for the Galleria.

62.     By 2011, Cypress – and by extension JTL[2] – were extremely poor credits and Cypress was experiencing financial difficulties.  Since 2008, Cypress's revenues had plummeted, its employees were laid off, and its senior management salaries were reduced by up to 25%.

63.     As a result, Cypress was unable to obtain new construction financing on its own and was in "full crisis mode," according to Cypress owner and CEO, Chris Maguire.

---

[2]     Cypress and its affiliate JTL are referred to collectively herein as "JTL/Cypress."

For these reasons, repayment of the SC Loan was highly dependent upon full (or nearly full) tenancy and/or an outright sale to a new buyer by August 2014.

**JTL/Cypress Fails to Repay by the August 2014 Due Date**

64.     Under the 2011 amendment, Cypress guaranteed its affiliate JTL would pay OZK the entire $38 million principal balance in three years, by August 2, 2014.  By late July 2014, however, JTL/Cypress were unable to meet their financial obligations to OZK.  To address JTL/Cypress's financial difficulties, OZK granted JTL/Cypress a concession by restructuring the SC Loan, extending the loan's maturity date three months to October 2014.

65.     Effective August 2, 2014, the parties (OZK and JTL/Cypress) restructured the SC Loan by extending its maturity date to October 15, 2014 and further expressly agreed that after October 2014 there were was no right to further extensions:

> ***Borrower hereby agrees that on the October 2014 Maturity Date all the unpaid principal balance of the Note, together with all accrued but unpaid interest thereon, shall be due and payable.  Borrower hereby agrees it shall have no further right or option to extend the term of the Loan beyond the October 2014 Maturity Date.***

**The October 2014 Default**

66.     On October 15, 2014, JTL/Cypress defaulted on the SC Loan when the maturity date expired without final payment and without any further right of JTL to extend the loan's maturity date.  The October 2014 default and the previous August 2014 extension (to avoid an earlier default) each indicated that: (i) JTL/Cypress continued to have ongoing and material financial difficulties; and/or (ii) the rental income was insufficient to timely repay the SC Loan.  There was also no buyer for the Galleria.

- 23 -

67.     In late-December 2014, OZK granted JTL/Cypress a concession by modifying the SC Loan to extend the maturity date two more years, to October 15, 2016.  OZK was not bound to provide this concession because the loan agreement effective August 2, 2014 expressly provided that all amounts were due and that JTL "shall have no further right or option to extend the term of the Loan."

68.     According to OZK, RESG kept a watchful eye on each of its loans, including "remodeling each of those projects *on a monthly basis* throughout the life of the loan." Thus, by late 2015 and early 2016, as the October 2016 maturity date approached, it was evident to Defendants that JTL/Cypress continued to have financial difficulties that prevented JTL from repaying any significant balance of the SC Loan without further financial concessions.  Tenancy rates and cash flows had not improved to the point that JTL/Cypress could timely repay the SC Loan.   And there were also no prospects for JTL/Cypress to sell the Galleria or otherwise raise nearly $30 million to pay off the SC Loan by the mid-October 2016 maturity date.  In sum, the SC Loan was "nonperforming" and OZK should have performed impairment tests by the beginning of the Class Period to determine the amount of charge-offs for the SC Loan.

**Losses Were Probable on the Nonperforming South Carolina Loan No Later than the Beginning of the Class Period, Indicating Impairment, Loss Recognition and Non-Accrual Status**

69.     OZK's accounting policies state that a loan is considered "impaired" when based on current information and events, "it is probable that . . . the Bank will not be able to collect all amounts according to the contractual terms thereof."  OZK analyzes each impaired loan individually, mostly looking to only the collateral value as the means of repayment.

Further, OZK places loans on "nonaccrual" status when the loan is "deemed impaired" or "when doubt exists as to the ultimate collection of payments."

70. By the beginning of the Class Period, the SC Loan had been in default and was impaired with the likelihood of loss being probable because there was significant doubt that OZK would collect payments due under the loan agreement and the collateral value would be no more than what was appraised in 2018. *See* ¶57.

**The October 2016 Default**

71. On October 15, 2016, and as RESG would have expected in its monthly models, JTL/Cypress again defaulted on the SC Loan when the maturity date expired without final payment from JTL/Cypress and without any further right of JTL to extend the loan term. The October 2016 default, the October 2014 default, and the August 2014 extension (to avoid an earlier default) each indicated that JTL/Cypress were having extensive, ongoing and material financial difficulties and/or otherwise repaying in full the SC Loan. In sum, the SC Loan continued to be "nonperforming" suffering probable losses throughout 2016.

72. In mid-December 2016, in an apparent attempt to mask the default and nonperforming nature of the RESG credit – creating the false appearance that the SC Loan was performing at year-end 2016 – OZK again granted JTL/Cypress a concession (that it would not otherwise consider) by modifying the SC Loan (effective November 22, 2016) to extend the maturity date just a few weeks, to January 13, 2017.

73. At the time of this few-week extension that bridged the year-end reporting period, Defendants had no reasonable basis to conclude that JTL/Cypress would pay the entire loan balance by this new maturity date. The new maturity date was just weeks away

and there would be no extraordinary change in RESG's monthly models that could reasonably project a full repayment of the SC Loan by January 13, 2017.

**The January 2017 Default**

74.     On January 13, 2017 – as Defendants expected – JTL/Cypress defaulted on the SC Loan when the maturity date again expired without final payment by JTL/Cypress and without any further right of JTL to extend the term of the SC Loan, indicating that the loan was nonperforming with probable losses at year-end 2016.  The January 2017 default, and the previous three successive defaults, each indicated that JTL/Cypress were having extensive, ongoing and material financial difficulties, and/or that the Galleria could not generate sufficient cash flows, which prevented JTL/Cypress from timely repaying the SC Loan.

75.     On March 2, 2017, in an apparent attempt to mask the January 2017 default and nonperforming credit, OZK again modified the SC Loan (effective February 22, 2017) to extend the maturity date, this time to April 15, 2017.  By extending the maturity date just past the next reporting period, Defendants created the false appearance that the SC Loan was performing at quarter-end of the first quarter of 2017 ("1Q17").

**The April 2017 Default**

76.     On April 15, 2017, JTL/Cypress again defaulted on the SC Loan when the maturity date expired for the SC Loan without final payment and without any further right of the borrower to extend the term of the SC Loan.

77.     In mid-May 2017, in an apparent attempt to mask the April 2017 default and conceal the nonperforming credit, OZK again modified the SC Loan to extend the maturity

date a couple of months, this time to July 14, 2017.  By extending the maturity date just past the next reporting period, Defendants created the false appearance that the SC Loan was performing at quarter-end 2Q17.

78.     Sometime during 2Q17, OZK risk-rated the SC Loan as "substandard," indicating the loan had deteriorated, yet OZK continued to improperly categorize the loan as "performing" when in fact it had been continuously defaulting and "nonperforming" since at least 2015.

**The July 2017 Default**

79.     On July 14, 2017, JTL/Cypress defaulted again on the SC Loan when the maturity date expired for the SC Loan without final payment and without any further right of the borrower to extend the term of the SC Loan.

80.     Several days later, OZK again modified the SC Loan to extend the maturity date, this time to October 12, 2017, expressly noting: "BORROWER SHALL HAVE NO FURTHER RIGHT OR OPTION TO EXTEND THE TERM OF THE LOAN BEYOND THE FIFTH EXTENDED MATURITY DATE ABSENT OBTAINING THE CONSENT OF LENDER . . . . *LENDER DOES NOT INTEND TO EXTEND THE TERM OF THE LOAN BEYOND THE FIFTH EXTENDED MATURITY DATE*."  By extending the maturity date just past the next reporting period, Defendants created the false appearance that the SC Loan was performing at quarter-end, 3Q17.

81.     Just days after this amendment, on July 27, 2017, Thomas resigned abruptly as chief of RESG.  *See* ¶¶40-41.  Thomas's abrupt resignation, his recent exercise of OZK options, and OZK's stated intention that JTL/Cypress would receive no more extensions

- 27 -

after October 2017 are each indicative of Thomas being no longer willing to kick the can down the road, deferring reports of inevitable loan losses at RESG.

82.     On October 12, 2017, the SC Loan maturity date arrived, again without timely repayment of the SC Loan.  Although the previous extension indicated that OZK did not intend to grant any more extensions, those stated intentions were illusory because OZK would continue to grant extensions so long as the extensions masked the nonperforming nature of the SC Loan and OZK's expected loan losses.

83.     To conceal the SC Loan's nonperformance and expected loan losses, OZK again modified the SC Loan to extend the maturity date, this time just past the year-end reporting period, to January 10, 2018, expressly noting: "BORROWER SHALL HAVE NO FURTHER RIGHT OR OPTION TO EXTEND THE TERM OF THE LOAN BEYOND THE SIXTH EXTENDED MATURITY DATE ABSENT OBTAINING THE CONSENT OF LENDER . . . . *LENDER DOES NOT INTEND TO EXTEND THE TERM OF THE LOAN BEYOND THE SIXTH EXTENDED MATURITY DATE*."

**The January 2018 Default**

84.     On January 10, 2018, JTL/Cypress defaulted again on the SC Loan when the maturity date expired without final payment and without any further right of the borrower to extend the term of the SC Loan.

85.     On January 23, 2018, OZK again modified the SC Loan to extend the maturity date, this time to July 9, 2018, just past the 2Q18 reporting period, expressly noting: "BORROWER SHALL HAVE NO FURTHER RIGHT OR OPTION TO EXTEND THE TERM OF THE LOAN BEYOND THE SEVENTH EXTENDED MATURITY DATE

ABSENT OBTAINING THE CONSENT OF LENDER . . . . *LENDER DOES NOT INTEND TO EXTEND THE TERM OF THE LOAN BEYOND THE SEVENTH EXTENDED MATURITY DATE*."

**The July 2018 Default**

86.     On July 9, 2018, the maturity date again expired for the SC Loan without final payment and without any further right of the borrower to extend the loan term.  Several days later, OZK again modified the SC Loan to extend the maturity date, this time to October 15, 2018, expressly noting: "BORROWER SHALL HAVE NO FURTHER RIGHT OR OPTION TO EXTEND THE TERM OF THE LOAN BEYOND THE EIGHTH EXTENDED MATURITY DATE ABSENT OBTAINING THE CONSENT OF LENDER . . . . LENDER DOES NOT INTEND TO EXTEND THE TERM OF THE LOAN BEYOND THE EIGHTH EXTENDED MATURITY DATE."

**October 2018 Default and Ultimate Foreclosure**

87.     On October 15, 2018, JTL/Cypress defaulted again on the SC Loan when the maturity date expired for the SC Loan without final payment and without any further right of the borrower to extend the term of the SC Loan.  On or about April 17, 2019, OZK foreclosed on the SC Loan when JTL transferred by warranty deed title, to BOTO SC Properties, LLC (a subsidiary of OZK), a parcel at 2301 Dave Lyle Boulevard, Rock Hill, South Carolina, an enclosed retail mall known as the Rock Hill Galleria.

**RESG'S 2008 North Carolina Loan Was "Nonperforming" During the Class Period**

88.     In 2008, OZK issued a multi-million-dollar CRE loan (estimated to be at least $34.3 million fully funded) for the purchase of a multi-phased land, residential lot and

residential home project in the Charlotte-Concord region of North Carolina.   The development project that secured the NC Loan was a part of a 20-year-old subdivision. Gleason approved the NC Loan.

89.     Sometime during the fourth quarter of 2017 ("4Q17"), OZK risk-rated the NC Loan as "substandard," indicating that the loan had deteriorated, yet OZK continued to categorize the loan as "performing."

90.     In recent years, the NC Loan borrower modified its business plan to include significant vertical construction of residential homes for sale.  As part of this plan, custom homes were developed by individuals who had previously purchased lots in the development.  In its October 18, 2018 "management comments," OZK stated that "the newly built homes and the lots owned by our borrower have not sold well recently, with sales seeming to have been undercut by cheaper pricing on existing homes and lots which have come to market as the sentiment around the project has improved."

91.     But for some period of time Defendants knew the NC Loan borrower could not meet its financial obligations to OZK as they came due, so OZK granted the NC Loan borrower a series of concessions (*i.e.*, forbearances) to address the NC Loan borrower's financial difficulties.  *See* ¶¶54-55.

92.     In 2018, collateral for the NC Loan was appraised at about $15.375 million contemporaneous with the NC Loan borrower's inability to make payments on the loan.

**OZK was Required by GAAP and OZK's Accounting Policies to Report the RESG Problem Loans as "Nonperforming," to Stop Accruing Interest Income, and to Perform Impairment Testing**

93.     Under GAAP, a loan restructuring or modification constitutes a "troubled debt restructuring" ("TDR") "if the creditor for economic or legal reasons related to the debtor's financial difficulties grants a concession to the debtor that it would not otherwise consider." ASC 310-40-15-5.  Further, "[w]hatever the form of concession granted by the creditor to the debtor in a troubled debt restructuring, the creditor's objective is to make the best of a difficult situation."  ASC 310-40-15-7.  Similarly, under OZK's accounting policies, "Loans for which the terms have been modified and for which (i) the borrower is experiencing financial difficulties and (ii) we have granted a concession to the borrower are considered troubled debt restructurings ('TDRs') and are included in impaired loans and leases."  *See, e.g.*, OZK 2016 Form 10-K at 43.  OZK evaluates all impaired loans individually.  *Id.*

94.     In these circumstances, GAAP and OZK's accounting policies each required that OZK report the SC Loan and/or the NC Loan in OZK's financial reports as TDRs.  The SC Loan was a TDR throughout the Class Period because: (i) OZK, for economic or legal reasons related to JTL/Cypress's financial difficulties, granted concessions to JTL/Cypress; and (ii) OZK could have enforced its contractual rights for payments and/or foreclosure, and was not bound to consider extending the maturity date of the SC Loan, but did so to address JTL/Cypress's circumstances and make the best of a difficult situation.

95.     Under OZK's accounting policies, "all TDRs are considered impaired."  OZK 2017 Form 10-K at 42.  Also, by OZK's definition, TDRs are "nonperforming" assets.  *Id.* at 62 ("Nonperforming assets consist of (1) nonaccrual loans, (2) accruing loans 90 days or

more past due, (3) TDRs and (4) real estate or other assets that have been acquired in partial or full satisfaction of loan obligations or upon foreclosure."). TDRs are also a subset of "nonperforming loans." *Id.* at 63.

96.     Further, and regardless of whether or not the SC Loan and/or the NC Loan met the technical definition of a TDR, they were each substantively "nonperforming," and in any event should have been placed on nonaccrual status to stop the recognition of interest income on the SC Loan. *See, e.g.*, OZK 2016 Form 10-K at 65 ("The accrual of interest on non-purchased loans and leases and purchased loans without evidence of credit deterioration at the date of acquisition is discontinued when, in management's opinion, ***the borrower or lessee may be unable to meet payments as they become due***. We generally place a loan or lease, excluding purchased loans with evidence of credit deterioration at the date of acquisition, on nonaccrual status when such loan or lease is (i) ***deemed impaired*** or (ii) 90 days or more past due, ***or earlier when doubt exists as to the ultimate collection of payments***.").

97.     Thus, at the beginning of the Class Period, the SC Loan was "impaired" and/or "nonperforming" under OZK's accounting policies and GAAP because:

      (a)     under OZK accounting policies, the SC Loan was a TDR;[3]

      (b)     under GAAP, the SC Loan was a TDR; and/or

      (c)     the SC Loan was otherwise "deemed impaired" and dependent upon collateral for repayment.

---

[3]     *See id.* at 43: "Loans for which the terms have been modified and for which (i) the borrower is experiencing financial difficulties and (ii) we have granted a concession to the borrower are considered troubled debt restructurings ('TDRs') and are included in impaired loans and leases."

- 32 -

98.     During the Class Period, the NC Loan was "impaired" and/or "nonperforming" under OZK's accounting policies and GAAP because:

(a)     under OZK accounting policies, the NC Loan was a TDR;

(b)     under GAAP, the NC Loan was a TDR; and/or

(c)     the NC Loan was otherwise "deemed impaired" and dependent upon collateral for repayment.

99.     By definition, the SC Loan and/or the NC Loan were "impaired" during the Class Period because of their "TDR" or "nonaccrual" status.  Thus, the SC Loan and/or the NC Loan were required to undergo impairment tests at each reporting date to determine and disclose to investors the extent of the impairment.  Had OZK properly performed the required impairment tests under GAAP for the SC Loan, OZK would have recognized a loan charge-off of about $20 million no later than the beginning of the Class Period.

**Defendants Violated GAAP and OZK's Accounting Policies and Concealed RESG's Chronic Credit Problems, Which Were Not Discernable to OZK Investors**

100.    During the Class Period, Defendants caused OZK to issue materially false and/or misleading financial reports that expressly or impliedly represented that those reports complied with GAAP and OZK's accounting policies.  Those reports included OZK's 2015, 2016 and 2017 Forms 10-K; OZK's Reports on Form 10-Q for 1Q16, 2Q16, 3Q16, 1Q17, 2Q17, 3Q17, 1Q18 and 2Q18.  The following allegations identify and quantify the related false or misleading statements in those reports and related calls with investors and analysts.

101.    Although OZK evaluates each impaired loan individually, OZK did not and does not disclose identifying information about specific loans.  OZK provides a breakout of

- 33 -

loans by region and general type, but it does not provide sufficient information to investors to track down and evaluate specific loans.

102.    OZK did not disclose identifying information about either the SC Loan or the NC Loan prior to the October 18, 2018 disclosure.  Without minimal identifying information, an investor would need to visit dozens of county recorders offices, sifting through their files, to identify every loan issued by OZK.  An investor would also need to assess the borrower's financial condition.  From there, expert analysis would be required to assess the loan history of each and every loan to potentially identify OZK's pattern of granting a series of modifications.

103.    Only on October 18, 2018, did Defendants begin to provide the minimal information required to potentially identify the specific problem loans.  Defendants stated that the SC Loan "originated in 2007" was "secured by a regional mall" that included "anchor tenants Sears and JC Penney."  Defendants stated that the NC Loan "originated in 2008" and was "secured by a multi-phase land, residential lot and residential home project in North Carolina."  After the Class Period, Defendants later provided additional detail about the problem loans.  *See* ¶¶54-58.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### OZK's Fiscal Year 2015 Financial Results

104.    On February 19, 2016, Defendants caused OZK to issue and file with the SEC OZK's 2015 Annual Report on Form 10-K, falsely and materially understating OZK's "nonperforming loans" and "nonperforming assets" (excluding purchased loans) (2015 Form

- 34 -

10-K at 64) by at least $30 million, and falsely and materially understating related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 12-31-2015 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $13,194 | $43,194 |
| Nonperforming assets (NPAs) (in millions) | $36,064 | $66,064 |
| NPLs/Total Loans | 0.20% | 0.66% |
| NPAs/Total Assets | 0.37% | 0.67% |

## OZK's 1Q16 Financial Results

105.    By April 2016 Defendants knew, or were reckless in not knowing, that the SC Loan had been, and was expected to be, in continuing default and that OZK had granted the debtor concessions to address the debtor's financial difficulties.

106.    On April 12, 2016, OZK conducted a conference call with investment analysts. On that call, Gleason stated:

> At March 31, 2016, excluding purchase loans, our non-performing loans and leases as a percent of total loans and leases *were 15/100 of 1%*. Our non-performing assets, as a percent of total assets, *were 29/100 of 1%*. And our loans and leases past due 30 days or more, including past-due non-accrual loans and leases to total loans and leases, were 23/100 of 1%. *These ratios of non-performing loans and leases and past due loans and leases are our best ever as a public company*.

> While *these ratios reflect the pristine nature of our asset quality*, the raw numbers may be even more illuminating. For example, excluding purchase loans, our non-accrual loans and leases have declined from $21.1 million at year-end 2014 to $13.2 million at year-end 2015, and most recently to $11.4 million at March 31, 2016.

The statements were false and/or misleading when made because the stated levels of nonperforming assets, related risk ratios and non-accrual loans were materially understated since they did not include the nonperforming SC Loan.

107.     Analysts responded immediately and positively to Gleason's claims of pristine and improving asset quality, with SunTrust Robinson Humphrey ("SunTrust") saying OZK "*Asset quality remains pristine*" and Merion Capital Group echoing "*Pristine Asset Quality*."

108.     On May 6, 2016, OZK issued and filed with the SEC its 1Q16 Quarterly Report on Form 10-Q ("1Q16 Form 10-Q"), falsely and materially understating OZK's "[n]onperforming loans" and "nonperforming assets" (excluding purchased loans) by at least $30 million (1Q16 Form 10-Q at 49), and falsely and materially understating related risk ratios because the reported amounts did not include the nonperforming SC Loan:

| Reported Metric At 3-31-2016 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $11,374 | $41,374 |
| Nonperforming assets (NPAs) (in millions) | $33,622 | $63,622 |
| NPLs/Total Loans | 0.15% | 0.55% |
| NPAs/Total Assets | 0.29% | 0.56% |

## OZK's 2Q16 Financial Results

109.     By the end of 2016, Defendants knew, or were reckless in not knowing, that JTL/Cypress had already defaulted on the SC Loan and was unable to repay the SC Loan by the October 2016 maturity date.  Under OZK's accounting policies and GAAP, the SC Loan was nonperforming.

- 36 -

110.    On July 11, 2016, OZK conducted a conference call with investment analysts.

On that call, Gleason stated:

> At June 30, 2016, excluding purchased loans, our non-performing loans and leases as a percent of total loans and leases *were just 0.09%*.  Our non-performing assets as a percent of total assets *were just 0.25%*.  And our loans and leases past due 30 days or more, including past due non-accrual loans and leases, to total loans and leases were just 0.22%.

> These ratios of non-performing loans and leases, and past due loans and leases, are our best ever as a public company, setting new records for the second consecutive quarter.  *These ratios clearly reflect our pristine asset quality*.

> These recent ratios are a continuation of a multi-decade long commitment to excellent asset quality, which has resulted in our having asset quality consistently better than the industry as a whole.  In our 19 years as a public company, our net charge-off ratio has averaged 37% of the industry's net charge-off ratio, and we have beaten the industry's net charge-off ratio in every single year.

111.    Analysts responded immediately and positively to Gleason's claims of pristine and industry-beating asset quality, with SunTrust saying "RESG . . . maintaining pristine asset quality" and Wells Fargo echoing that OZK "*asset quality remained pristine*."  On July 26, 2016, Sandler O'Neill added that "*Ozarks credit quality remains pristine* . . . ."

112.    On August 8, 2016, OZK filed with the SEC its 2Q16 Quarterly Report on Form 10-Q ("2Q16 Form 10-Q"), falsely and materially understating OZK's "[n]onperforming loans" and "nonperforming assets" (excluding purchased loans) by at least $30 million (2Q16 Form 10-Q at 52) because they did not include the nonperforming SC Loan:

| Reported Metric At 6-30-2016 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $7,700 | $37,700 |
| Nonperforming assets (NPAs) (in millions) | $31,028 | $61,028 |
| NPLs/Total Loans | 0.09% | 0.46% |
| NPAs/Total Assets | 0.25% | 0.50% |

## OZK's 3Q16 Financial Results

113.   By October 2016, Defendants knew, or were reckless in not knowing, that JTL/Cypress had already defaulted and would not or could not repay the SC Loan by the October 2016 maturity date.

114.   On October 11, 2016, OZK conducted a conference call with investment analysts.  On that call, Gleason stated:

*[O]ur pristine asset quality were all clearly on display*.

During our conference call in July, *I was bragging about* our record net income in both the first and second quarters of this year, and our second-quarter records for net interest income, service charge income, and mortgage income, as well as *our excellent net interest margin efficiency ratio and asset quality*.  We commented in July that we had, quote, continued to hit on all cylinders with our very conservative and disciplined business strategy, end quote.

*That analogy is still applicable* . . . .

115.   Analysts responded immediately and positively to Gleason's claims of consistent pristine asset quality, with SunTrust saying "*Asset Quality Consistently Pristine*" and Stephens Inc. echoing that "*OZRK's credit quality remains in pristine condition*." Piper Jaffray added, "We believe the current valuation of 13.0x 2017E EPS and 2.4x TBV is attractive given OZRK's 2016E-18E EPS growth of ~18%, ROTCE of 16%, and *strong*

- 38 -

*asset quality*," and Sandler O'Neill concluded that "We have remained very bullish on the shares of OZRK in spite of the YTD weakness given our ardent belief in the bank's strong growth profile, exemplary profitability, ***and pristine asset quality***, and 3Q results did nothing to deter these views. . . . ***Credit Metrics Remain Pristine***."

116.   In reality, OZK credit was not pristine, as Defendants had, since the beginning of 2016, concealed "nonperforming" RESG loans and the extent of their impairment, understating risk ratios and hiding from investors expected RESG loan losses.

117.   On November 8, 2016, OZK issued and filed with the SEC its 3Q16 Quarterly Report on Form 10-Q ("3Q16 Form 10-Q"), falsely and materially understating OZK's "[n]onperforming loans" and "nonperforming assets" (excluding purchased loans) by at least $30 million (3Q16 on Form 10-Q at 57) and related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 9-30-2016 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $7,428 | $37,428 |
| Nonperforming assets (NPAs) (in millions) | $51,678 | $81,678 |
| NPLs/Total Loans | 0.08% | 0.43% |
| NPAs/Total Assets | 0.28% | 0.44% |

**OZK's Fiscal Year 2016 Financial Results**

118.   By January 13, 2017, Defendants knew, or were reckless in not knowing, that JTL/Cypress had thrice defaulted on the SC Loan, and Defendants had no reasonable basis to believe that JTL/Cypress would be able to suddenly repay the $30-plus million balance by July 2017.  In sum, the SC Loan was deeply distressed, impaired and nonperforming.  Armed

- 39 -

with this knowledge, on January 17, 2017, OZK conducted a conference call with analysts. On that conference call, Gleason stated:

(a)     "Asset quality was among the numerous highlights of our 2016 results. Most of our asset quality ratios were at or near record levels throughout the year.  For example, our net charge-off ratio for total loans and leases for 2016 was a record 0.07%, after having varied only slightly from 5 to 9 basis points annualized in each quarter of 2016. This was our lowest annual net charge-off ratio in our 19 years as a public company."

(b)     "The extremely low leverage of [the RESG] portfolio exemplifies our very conservative credit culture and is one of the many reasons we have such confidence in the quality and durability of our loan and lease portfolio."

(c)     "[RESG's] priorities have always been first, on asset quality; second, on profitability; and third, on growth.  *As a result of the emphasis on quality, RESG has had only two loans result in losses in 14 years*.  RESG's total credit losses since inception are $10.4 million, which is just a 7 basis point average annualized loss ratio over its entire history."

(d)     "*In recent years, RESG has tended to be even more conservative*. Given the exceptional track record of this division and the low leverage and the significant diversification of its portfolio by both geography and product type, *you can see why we are so confident in how well our asset quality will hold up under a broad array of economic and real estate market scenarios*."

119.     Analysts responded in glowing terms.  For example, a Merion Capital Group analyst noted, "*Asset quality remains very strong*," and a Stephens Inc. analyst reported,

"Excellent Credit Continues. *OZRK's credit quality remains in pristine condition*. . . . Notably, 2016 net charge-offs of 13 bps have been at the midpoint of 2016 guidance in the range of 5-20 bps and better than 2014 (16 bps) and 2015 (17 bps). *OZRK remains conservative in its credit underwriting* of construction loans as its current loan to cost is 48%, which compares to our estimate of industry average range of 70%-90%."

120.    On March 1, 2017, OZK issued and filed with the SEC its 2016 Annual Report on Form 10-K, falsely and materially understating OZK's "[n]onperforming loans" and "nonperforming assets" (excluding purchased loans) by at least $30 million (2016 Form 10-K at 66) and falsely and materially understating related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 12-31-2016 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $14,371 | $44,371 |
| Nonperforming assets (NPAs) (in millions) | $58,073 | $88,073 |
| NPLs/Total Loans | 0.15% | 0.46% |
| NPAs/Total Assets | 0.31% | 0.47% |

**March 2017 – the Raymond James Conference**

121.    The SC Loan and/or the NC Loan continued to be nonperforming and impaired on March 7, 2017.  On March 7, 2017, OZK executives Tyler Vance ("Vance") and Hicks, speaking on behalf of OZK at the Raymond James Institutional Investors Conference, made the following statements:

(a)     Vance:

***The second discipline we excel in is asset quality, a real hallmark of our company***.  Since going public in 1997, our annual net charge-off ratio has been below the industry average every year.  And over those 20 years, our net charge-off ratio has been only 35% of the industry average.

(b)     Vance:

So as you can see, when you combine a superb net interest margin, again, greater than 5% in Q4, ***industry-leading asset quality ratios***, which I just showed you, and this top decile efficiency ratio, exceptional results can be achieved. . . .

***We have also achieved these exceptional results by adhering to our conservative credit principles, long-standing principles that we hold as a company*** . . . .

(c)     Hicks:

***Over our 14-year history, only 2 loans have gone bad for a total net charge-off of $10.4 million***, which is an annualized loss ratio of 7 basis points.

We're extremely conservative in our leverage and even more so today than we were just 10 years ago.

*          *          *

***And we believe we may be the most conservative CRE portfolio in the country***.

The RESG business model emphasizes industry-leading excellence throughout the life of the loan.

**OZK's 1Q17 Financial Results**

122.   By April 2017, Defendants knew, or were reckless in not knowing, that JTL/Cypress had already defaulted, and Defendants expected JTL/Cypress to again default on the SC Loan, as the SC Loan was nonperforming, deeply distressed and impaired.  On April 11, 2017, OZK conducted a conference call with investment analysts.  On that conference call, Gleason stated:

- 42 -

(a)     "Asset quality continued to be a highlight in the quarter just ended. *Most of our asset quality ratios were at or near record levels*."

(b)     "These ratios reflect our long-standing commitment to conservative underwriting standards and excellent asset quality, which has resulted in our having asset quality consistently better than the industry as a whole."

(c)     "Likewise, our extremely low loan to cost and loan to value ratios are probably more conservative than just about every other CRE lender in the country. Accordingly, we believe our CRE portfolio may be the lowest risk CRE portfolio in the industry."

(d)     "*Our track record, including our record through the Great Recession, speaks for itself*. Our significant expertise and the conservatism we employ in our CRE lending are significant factors in our asset quality."

123.    Analysts responded to these statements positively.  For example, Merion Capital Group stated, "[w]e believe that OZRK's strong loan growth, *pristine asset quality*, outstanding efficiency and high margin warrant a premium valuation."  And SunTrust reported, "*Asset Quality Still Very Strong*. . . .  Originated NPAs as a percentage of loans were 0.25%, down from 0.31% from last quarter. . . .  Given these trends, we are now more optimistic about OZRK's credit outlook."

124.    On May 5, 2017, OZK filed its 1Q17 Quarterly Report on Form 10-Q ("1Q17 Form 10-Q") with the SEC, falsely and materially understating OZK's "nonperforming loans" and "nonperforming assets" (excluding purchased loans) by at least $30 million

(1Q17 Form 10-Q at 48), and falsely and materially understating related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 3-31-2017 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $11,069 | $41,069 |
| Nonperforming assets (NPAs) (in millions) | $47,968 | $77,968 |
| NPLs/Total Loans | 0.11% | 0.40% |
| NPAs/Total Assets | 0.25% | 0.41% |

125.    The reported "nonperforming" amounts above (and related ratios) were materially understated because the "nonperforming" amounts did not include the SC Loan and/or the NC Loan, which were "nonperforming" on the report date.

**OZK's 2Q17 Financial Results**

126.    By mid-May 2017, the Galleria (that secured the SC Loan) was or would soon be nearly 50% vacant, severely and further impacting the ability of JTL/Cypress to repay any portion of the SC Loan.   Thus, by July 2017, Defendants knew, or were reckless in not knowing, that JTL/Cypress had already defaulted, and Defendants expected JTL/Cypress to again default.

127.    On July 14, 2017, JTL/Cypress defaulted on the SC Loan for the fifth time, again indicating the SC Loan was nonperforming, distressed and impaired to the point that Defendants expected OZK to realize loan losses on the SC Loan.

128.    On July 12, 2017, OZK conducted a conference call with investment analysts. On that conference call, Hicks and McKinney stated:

- 44 -

(a)   Hicks:

At quarter end, our average loan to cost for the RESG portfolio was a very conservative 49.1%, and our average loan to appraised value was even lower at just 42.0%.  The extremely low leverage of this portfolio exemplifies our very conservative credit culture and is one of the many reasons we have such confidence in the quality of our loan and lease portfolio.

(b)   McKinney:

Our asset quality metrics through the second quarter are some of our best as a public company.  For example, our annualized net charge-off ratios during the quarter just ended were 3 basis points for non-purchased loans and leases and 5 basis points for total loans and leases.  At quarter end, excluding purchase loans, our nonperforming loans and leases as a percent of total loans and leases were just 11 basis points.  Our nonperforming asset as a percent of total assets were just 23 basis points, and our loans and leases past due 30 days or more, including past due nonaccrual loans and leases, to total loans and leases were a record-low 0.15%.  This was our sixth consecutive quarter of reporting a record-low past due ratio.  These ratios reflect our long-standing commitment to conservative underwriting standards and excellent asset quality, which have resulted in our having asset quality consistently better than the industry as a whole.

129.   On July 27, 2017, Thomas abruptly and unexpectedly resigned as chief of RESG.

130.   On or about August 8, 2017, OZK issued and filed with the FDIC its 2Q17 Quarterly Report on Form 10-Q ("2Q17 Form 10-Q"), falsely and materially understating OZK's "nonperforming loans" and "nonperforming assets" (excluding purchased loans) by at least $30 million (2Q17 Form 10-Q at 50), falsely and materially understating related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 6-30-2017 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $11,628 | $41,628 |
| Nonperforming assets (NPAs) (in millions) | $45,628 | $75,628 |
| NPLs/Total Loans | 0.11% | 0.38% |
| NPAs/Total Assets | 0.23% | 0.38% |

**September 2017 – the Raymond James and Barclays Conferences**

131.   On September 6, 2017, Gleason spoke on behalf of OZK at the Raymond James Institutional Investors Conference, making the following statement:

> So we expect RESG will grow, and I've said many times that it is our best unit in every aspect of what we do.  It's our best underwritten loans, our best documented loans, our most precisely closed loans, our lowest leveraged, best sponsors, best projects, best serviced loans to Brannon Hamblen's Asset Management team. ***So they're our best credits in every respect***.

132.   On September 11, 2017, Gleason spoke on behalf of OZK at the Barclays Global Financial Services Conference, making the following statements:

> Well, it's not so much a fresh look for me because in 14 years we've had Real Estate Specialties Group, ***I have approved every single loan originated in 14 years***.  So I'm looking at things sometimes a few days or a week or 2 earlier than I might have looked at before, but ***I've been intimately involved in the details of RESG from its inception 14 years ago***.
>
> *                *                *
>
> ***And in the 14-year history of RESG, we've had 2 losses, 2 credits result in losses that were about $10.5 million***, I think a little less than $10.5 million in total losses in 14 years, which equates to about a 6 basis point average annualized net charge-off ratio for RESG.  And it is a much bigger percentage of the portfolio today than it was then.  So it's hard for me to understand what else we have to do to make a compelling case that our asset quality is pristine.  Our past-due ratios, I think, for the last 4 or 5 quarters have been the lowest quarterly past-due ratios in the 20-year history of our company as public company.  Our nonperforming asset ratios, our nonperforming loan ratios are

near record lows in the history of the company.  Again, I'd point to that 4 basis point charge-off ratio.  And even if it quadruples, you're still at a 16 basis point net charge-off ratio that would be the exceptional compared to the industry.  So we feel extremely good about our asset quality.

## OZK's 3Q17 Financial Results

133.   By October 2017, Defendants knew the SC Loan was nonperforming, impaired and expected JTL/Cypress to default again on October 12, 2017.  On October 11, 2017, OZK conducted a conference call with investment analysts.  On that conference call, Hicks and Gleason stated:

(a)   Hicks:

At September 30, 2017, the RESG portfolio accounted for 66% of the funded balance and 94% of the unfunded balance of our total non-purchased loans and leases.  At quarter end, our average loan-to-cost for the RESG portfolio was a conservative 48.9%, and our average loan to appraised value was even lower at just 41.5%.  *The very low leverage of this portfolio exemplifies our conservative credit culture and is one of the many reasons we have such confidence in the quality of our loan and lease portfolio*.

(b)   Gleason:

*Our asset quality metrics during the quarter were excellent*.  These ratios reflect our long-standing commitment to conservative underwriting standards and excellent asset quality, *which has resulted in our having asset quality consistently better than the industry as a whole*.

*Our annualized net charge-off ratios during the quarter just ended were 8 basis points for non-purchased loans and leases and 9 basis points for total loans and leases.  In our 20 years as a public company, our net charge-off ratio has averaged about 34% of the industry's net charge-off ratio, and we have beaten the industry's net charge-off ratio in every year*.

Our outperformance has been even better recently as evidenced by the fact that our net charge-off ratio was just 13% of the industry's net charge-off ratio last year and just 12% of the industry's net charge-off ratio for the first 6 months of this year.

(c)     Gleason:

At quarter end, excluding purchased loans, our nonperforming loans and leases as a percent of total loans and leases were just 11 basis points.  Our nonperforming assets as a percent of total assets were just 20 basis points and our loans and leases past due 30 days or more, including past-due nonaccrual loans and leases to total loans and leases, were a record low 12 basis points. This was our seventh consecutive quarter of reporting a record low past due ratio, reflecting the outstanding work of our loan and lease teams.

134.    Analysts continued to respond favorably to these statements.  On October 11, 2017, a Stephens Inc. analyst reported, "OZRK's credit metrics remain excellent as nonperforming loans (ex purchased) represent just 11 bps of loans and NCOs represent 9 bps of loans (annualized)."  And, "Excellent Credit Continues.  OZRK's credit quality remains in pristine condition."   And Wells Fargo stated, "[a]sset quality trends remain strong, with nonperforming loans comprising 11bps of total loans (unchanged Q/Q), while net charge-offs increased to 9bps of avg. loans in Q3, up 5 bps Q/Q."

135.    On or about November 7, 2017, OZK issued and filed with the FDIC its 3Q17 Quarterly Report on Form 10-Q ("3Q17 Form 10-Q"), falsely and materially understating OZK's "nonperforming loans" and "nonperforming assets" (excluding purchased loans) by at least $30 million (3Q17 Form 10-Q at 52), falsely and materially understating related risk ratios because they did not include the nonperforming SC Loan:

| Reported Metric At 9-30-2017 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" |
|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $13,269 | $43,269 |
| Nonperforming assets (NPAs) (in millions) | $41,285 | $71,285 |
| NPLs/Total Loans | 0.11% | 0.36% |
| NPAs/Total Assets | 0.20% | 0.34% |

- 48 -

136.    The reported "nonperforming" amounts, risk ratios and loan losses reported in OZK's Fiscal Year 2015 through 3Q17 financial statements and discussed during conference calls with analysts (as discussed in ¶¶104-135) were materially false or misleading when made because Defendants did not recognize a loss for that portion of the SC Loan in which the likelihood of loss was probable and estimatable and/or because the SC Loan was nonperforming, but not included in the reported amounts.  Defendants knew, or were reckless in not knowing, that RESG's monthly modeling of the Galleria project would show that the property continued to have financial issues and likewise JTL/Cypress continued to have financial difficulties that prevented JTL from repaying the SC Loan without further financial concessions.  RESG's models would also show that it was probable JTL/Cypress would not and could not raise nearly $30 million to pay off the SC Loan by the "new" maturity dates and Defendants could estimate the amount of probable loss.  Thus, Defendants knew or should have known that the SC Loan had suffered loan losses and was categorically and/or substantively in a loss position and/or "nonperforming," yet they continued to categorize the SC Loan as performing, concealing from investors lingering RESG credit issues.

**OZK's Fiscal Year 2017 Financial Results**

137.    By January 2018, Defendants were expecting large loan losses on the SC Loan and/or the NC Loan.  On January 16, 2018, OZK conducted a conference call with investment analysts.  On that conference call, Gleason stated:

> Our asset quality metrics throughout 2017 were excellent.  These ratios reflect our longstanding commitment to conservative underwriting standards and excellent asset quality, which has resulted in our having asset quality consistently better than the industry as a whole.

- 49 -

In our 20 years as a public company, our net charge-off ratio has averaged about 34% of the industry's net charge-off ratio and we have beaten the industry's net charge-off ratio in every year. Recently, our outperformance has been even better, as evidenced by the fact that our net charge-off ratio was just 13% of the industry's net charge-off ratio in both 2016 and the first 9 months of 2017. Our net charge-off ratios for 2017 were identical to such ratios for 2016, being just 6 basis points for non-purchased loans, 9 basis points for purchased loans and 7 basis points for total loans. As we've noted, we've long enjoyed excellent asset quality as compared to the industry, but our net charge-off ratios for the past 2 years have been exceptional. At year-end, excluding purchased loans, our nonperforming loans as a percent of total loans were just 10 basis points; our nonperforming assets as a percent of total assets were just 18 basis points; and our loans past due 30 days or more, including past-due nonaccrual loans, to total loans were 15 basis points.

. . . Some people have referred to us as aggressive lenders, which they apparently conclude based on our growth rate and the fact that we are among the most active lenders nationally in commercial real estate finance. We've been doing this business for a long time. ***Our excellent loan loss ratios both in recent years and for decades before, along with our consistently excellent asset quality ratios, some of which I just mentioned, support our view that we are very conservative in our lending***.

\*     \*     \*

What I can tell you is we feel obviously pretty good about asset quality, given the nonperforming loan, nonperforming asset and past due ratios we've been consistently posting over the last several years.

138.    Analysts responded positively. A Stephens Inc. analyst reported, "OZRK's credit metrics remain excellent as nonperforming loans (ex purchased) represent just 10 bps of loans and NCOs represent 5 bps of loans (annualized)." The analyst also commented:

Excellent Credit Continues. OZRK's credit quality remains in pristine condition. Excluding purchased loans, NPLs to EOP Loans remained stable at 0.10% (peers ~ 60 bps). As a percentage of originated loans, the reserve for loan losses increased 2 bps to 0.74%. 4Q17 net charge-offs were just 5 bps, a modest decrease from 9 bps in 3Q17. OZRK remains conservative in its credit underwriting of construction loans as its average loan to cost is now 49%.

And a Sandler O'Neill analyst reported, "[a]sset quality remains pristine with only 5 bps of NCOs on only 24 bps of NPAs."

- 50 -

139.    On or about February 27, 2018, OZK issued and filed with the FDIC its 2017

Annual Report on Form 10-K, falsely and materially understating OZK's "nonperforming

loans" and "nonperforming assets" (excluding purchased loans) by at least $30 million to

$60 million ( 2017 Form 10-K at 63), falsely and materially understating related risk ratios

because they did not include the nonperforming SC Loan:

| Reported Metric At 12-31-2017 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" | Adding $60M Carolina Loans to "nonperforming" |
|---|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $12,899 | $42,899 | $72,899 |
| Nonperforming assets (NPAs) (in millions) | $38,256 | $68,256 | $98,256 |
| NPLs/Total Loans | 0.10% | 0.36% | 0.57% |
| NPAs/Total Assets | 0.18% | 0.33% | 0.46% |

**March 2018 – the Raymond James Conference**

140.    By March 2018, both the SC Loan and the NC Loan were nonperforming

because OZK had granted concessions to the respective borrowers to address their ongoing

financial difficulties.  In sum, OZK expected loan losses on each of these loans.

141.    On March 6, 2018, OZK executives Hicks and Vance spoke on behalf of OZK

at the Raymond James Institutional Investors Conference, making the following statements:

(a)    Hicks:

Asset quality, excellent track record over our 21 years as a public
company.  I can't emphasize our discipline and approach here enough.  Our –
we've never had a year since 1997 where our charge-off ratio hasn't beaten the
industry, and we've averaged 34% of the industry's net charge-off ratio.  That
doesn't come by happenstance.  That comes with a discipline and approach at
every level, a culture at every level within our lending organization.  That
asset quality is paramount and extreme importance to our lending.

- 51 -

(b)   Hicks:

And because of this focus right here, we've really experienced very little losses over the 15-year history at RESG, an average of 5 basis points of losses, and *just a couple of loans that incurred those losses over its history*. *So excellent track record*.

> *One part of RESG that, again, is not emphasized enough is our asset management team. We have over 40% of our staff in our asset management and servicing team. These are individuals that monitor these projects on a monthly basis. And so they identify any issues, if there are any issues, very early on in a project*. And that's a huge differentiator for us. And I don't know that it gets emphasized enough.

(c)   Vance:

You can see the fourth quarter highlights, here, record quarterly net income of $146.2 million, a very low ratio of nonperforming loans at 10 basis points, a very low ratio of past due loans at 15 basis points and a very low ratio of net charge-offs, as Tim mentioned earlier, at just 8 basis points.

## OZK's 1Q18 Financial Results

142.   On April 12, 2018, OZK conducted a conference call with investment analysts.

On that conference call, Gleason stated:

> But clearly, it's a very competitive environment. What we had to do and have always done in a very competitive environment is keep our focus on our priorities. *And priority number one is asset quality*. So giving on credit terms or getting competitive on credit terms is really a nonnegotiable thing for us. *We protect credit quality as our paramount mission*. Secondly is to maintain profitability. And we will make adjustments to our pricing as we think were appropriate based on return on equity and so forth and you have a little room to move, but you don't have a ton of room to move and still meet our profitability standards. And then growth is the tertiary consideration. So, if we're faced with a situation where we have to give on credit quality to achieve growth, we're not going to do it. If we're faced on a situation where we're going to have to get on pricing to achieve growth, we're only going to do it if we can still achieve our target minimum return on equity numbers. So you just got to be disciplined and continue to execute well. I think the one thing that really helps us is that our ability to execute for our customers and the confidence that our customers have in us being able to deliver what we say we're delivering to execute with excellence and the transactions gets us paid more than our competition in many, many transactions. So, we're relying on

- 52 -

the reputation of relationship, our execution and expertise, our discipline to continue to maintain our credit quality and our profit margins in whatever sort of competitive environment we're in.

143.   Once again, analysts reacted positively to OZK's earnings release.   For example, SunTrust reported, "**Asset Quality Still Pristine**," and Wells Fargo stated, "**[a]sset quality trends remain strong, with nonperforming loans comprising 8bps of total loans (flat Q/Q), while net charge-offs were a modest $1.6MM, or just 4bps of avg. loans**."

144.   On or about May 8, 2018, OZK issued and filed with the FDIC its 1Q18 Quarterly Report on Form 10-Q ("1Q18 Form 10-Q"), falsely and materially understating OZK's "nonperforming loans" and "nonperforming assets" (excluding purchased loans) by at least $30 million to $60 million, (1Q18 Form 10-Q at 48), falsely and materially understating related risk ratios because they did not include the nonperforming SC Loan and/or NC Loan:

| Reported Metric At 3-31-2018 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" | Adding $60M Carolina Loans to "nonperforming" |
|---|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $12,471 | $42,471 | $72,471 |
| Nonperforming assets (NPAs) (in millions) | $34,402 | $64,402 | $94,402 |
| NPLs/Total Loans | 0.09% | 0.35% | 0.53% |
| NPAs/Total Assets | 0.16% | 0.31% | 0.43% |

145.   The reported "nonperforming" amounts (and related ratios) above, were materially understated because the "nonperforming" amounts did not include the SC Loan and/or the NC Loan.

**OZK's 2Q18 Financial Results**

146.    On July 12, 2018, OZK conducted a conference call with investment analysts.

On that conference call, Gleason stated:

> We have always said, and no one should be surprised at our actions in this regard, we've always said that asset quality is the most important in the asset quality pricing growth equation for us, and that growth is a tertiary consideration.  So the way we have approached it and will continue to approach it is we're going to hold very firmly to our longstanding asset quality standards.  Those are not negotiable.
>
> . . . So, we're quite content to have less growth unless we can get that growth on credit quality and pricing standards that makes sense to us.
>
> And I would hope that any thoughtful holder of our company's stock would applaud that approach, ***that credit quality is just not something that you want to play with or take chances on***.  And return on equity is not something you want to get below a minimum target level, and if growth suffers because you're being disciplined, then so be it.

147.    Analysts accepted OZK's representations that growth is a "tertiary consideration."  For example, a Stephens Inc. analyst commented, "***[i]n the long term, we believe the Company's softer loan growth outlook demonstrates sound discipline in order to maintain credit standard***."  The analyst further reported, "***OZRK's credit quality remains in pristine condition***."  Additionally, Barclays reported, "[w]ith more competitors entering the CRE space with looser standards/structures, ***[OZK] is willing to sacrifice near-term growth to drive better through-the-cycle risk-adjusted returns***."

148.    On or about August 7, 2018, OZK issued and filed with the FDIC its 2Q18 Quarterly Report on Form 10-Q ("2Q18 Form 10-Q"), falsely and materially understating OZK's "nonperforming loans" and "nonperforming assets" (excluding purchased loans) by at least $30 million to $60 million, (2Q18 Form 10-Q at 49), falsely and materially

understating related risk ratios because they did not include the nonperforming SC Loan
and/or NC Loan:

| Reported Metric At 6-30-2018 | Falsely Reported Amount | Adding $30M SC Loan to "nonperforming" | Adding $60M Carolina Loans to "nonperforming" |
|---|---|---|---|
| Nonperforming loans and leases (NPLs) (in millions) | $13,543 | $43,543 | $73,543 |
| Nonperforming assets (NPAs) (in millions) | $34,205 | $64,205 | $94,205 |
| NPLs/Total Loans | 0.10% | 0.36% | 0.52% |
| NPAs/Total Assets | 0.15% | 0.31% | 0.42% |

149.    The reported "nonperforming" amounts (and related ratios) above, were
materially understated because the "nonperforming" amounts did not include the SC Loan
and/or the NC Loan.

150.    During the quarter ended September 30, 2018, OZK commenced classification
of the SC Loan as "non-accrual" and previously accrued interest was reversed.

**September 2018 – the Barclays Conference**

151.    On September 13, 2018, OZK executive Gleason spoke on behalf of OZK at
the Barclays Global Financial Services Conference, making the following statements:

> And we said, and I'm very proud of the fact we said this, because we'd lived
> this format 39 years as Chairman and CEO, that asset quality, our standards
> and principles, they are non-negotiable.  We won't deviate from those.
>
> *        *        *
>
> And the reality is, if you run a very disciplined credit book, which we do, we –
> every year since we went public, we've beaten the industry's charge-off ratio
> every single year.  And we've averaged about 32% at the industry's charge-off
> ratio.  If you put credit first and profitability second and growth is a tertiary
> consideration, that growth number is going to swing around from quarter-to-

- 55 -

quarter. And if you're time profile for a company is 1 quarter or 2 or 3 quarters, that may be disconcerting to you. But if your time profile for the company is longer term, then you're going to look at it and say, "Well, I want to be invested in a company that's going to maintain their discipline and not try to achieve a constant growth rate, but try to achieve constant credit quality." And as economic conditions ebb and flow, your growth rate's going to ebb and flow with that. And so we're going to make every good-quality, good-yielding loan that we can make that's consistent with all of our credit standards. And if that's a $1 billion of new originations in a quarter, that's great. And if that's $3 billion or $4 billion of new originations in a quarter, that's great. But we're not going to change our credit standards just because other people do.

*       *       *

And as a result of that in the 15-year history of Real Estate Specialties Group, we have not had a ***single loan, not one loan***, wherein we've gotten at the end of the project and we've not had the project completed with the funds that remained in the loan. So that requires a very effective completion guarantee structure, where your sponsor's going to cover cost overruns and do it immediately. It requires a very effective asset management servicing structure, ***where you identify issues that will create budget problems early on in the process***, where you still got the leverage to require the sponsor to fix that. And it requires sponsors of high quality and projects of high quality. So we've been very successful in totally avoiding that risk.

152.   The reported "nonperforming" amounts, risk ratios and loan losses reported in OZK's Fiscal Year 2017 through 2Q18 financial statements and discussed during conference calls as discussed in ¶¶137-151 were materially false or misleading when made because Defendants had not charged off the SC Loan (*see* ¶136) and because Defendants did not include the nonperforming SC Loan and/or NC Loan amounts in reported levels of nonperforming loans and assets. Defendants knew, or were reckless in not knowing, that RESG monthly modeling of the projects underlying these loans would show that the properties continued to have financial issues. For example, RESG models would have revealed that the Galleria was 46% vacant in mid-2017, and given the historical defaults of

the SC Loan, it was probable that OZK would suffer a loan loss on the SC Loan and the amount of that loss was estimable.  In the case of the NC Loan, OZK had granted the borrower forbearances (*i.e.*, loan modifications) for the purpose of addressing the borrower's financial difficulties.  Thus, although Defendants knew or should have known that the SC Loan and the NC Loan were substantively "nonperforming" and that it was probable that at least the SC Loan would suffer material loan losses, Defendants continued to categorize both loans as performing.

**LOSS CAUSATION/ECONOMIC LOSS**

153.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of OZK common stock and operated as a fraud or deceit on Class Period purchasers of OZK common stock.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market via their disclosure of the previously concealed truth, the price of OZK common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of OZK common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

**RESG Executive Thomas's Abrupt Resignation Partially Revealed RESG's Poor Credit Quality**

154.    On July 27, 2017, news of Thomas's surprise resignation from RESG reached the market, indicating that RESG may be having credit issues.  On news of Thomas's resignation, shares of OZK dropped $5.65 per share, or 12%, to close at $40.50 per share on volume of 9.1 million shares.  News of Thomas's resignation caused Stephens Inc. analyst,

- 57 -

Matt Olney, to downgrade OZK to equal-weight rating from "overweight" and cutting his price target to $48 per share from $58 per share (*i.e.*, 17%).

155.    According to Morgan Stanley, "[t]he OZRK shares sold off more than 12% that day given concerns that Mr. Thomas' departure may signal slower loan growth for Ozarks, *or an inability of RESG to maintain its excellent credit quality without Mr. Thomas' leadership*."   Morgan Stanley also stated that "[o]ne potential concern with Mr. Thomas leaving the bank is that RESG credit quality could deteriorate, or *may not maintain its pristine standards going forward*."   An analyst at Piper Jaffray noted, "Dependence on key management is always an investment risk, especially at high performing banks."  Wells Fargo reported, "[w]hile we are comfortable that the existing RESG team and infrastructure are strong enough to sustain momentum, *this resignation adds to the list of uncertainty surrounding the name*."

156.    During investor meetings that took place shortly after Thomas's resignation and during a conference call in September 2017, however, Gleason tried to blunt any further pressure on the OZK share price by reassuring analysts that he was now fully in charge of RESG, where it was "business as usual" and that credit quality remained priority number one.  Similarly, investors and analysts believed Gleason and Defendants' prior statements that RESG's asset quality was "pristine" and that risk ratios were at record low levels.

**Defendants Finally Reveal the Entirety of the Previously Concealed Truth that RESG Credit Quality was Poor, with Additional Nonperforming Loans and Related Losses**

157.    On October 18, 2018, Defendants stunned the market with disclosures that RESG would suffer $45.5 million in loan losses from two long-dated loans, indicating to

investors that RESG risk management had known of and/or recklessly disregarded evident

"nonperforming" loans in RESG's portfolio.  Defendants prepared and issued the following

management comments to investors:

> [D]uring the quarter just ended, we incurred charge-offs on two credits in our Real Estate Specialties Group ("RESG") portfolio.  These two unrelated projects are in South Carolina and North Carolina and have been in our portfolio since 2007 and 2008, respectively.  Both credits were previously classified as substandard, but continued to be performing credits until the third quarter 2018.

> \*       \*       \*

> [T]hese two credits have previously been classified as substandard with combined allowance allocations totaling $19.1 million as of June 30, 2018. . . . The combined charge-offs on these two credits in the quarter just ended were $45.5 million, which required related provision expense of $26.4 million in the quarter just ended, in addition to the previous allowance allocations of $19.1 million.  Both credits were placed on non-accrual status in the quarter just ended, which resulted in the reversal of the outstanding accrued interest.  The combined remaining balance on these two credits, after the charge-offs, is $20.6 million.

158.    On October 19, 2018, OZK management conducted a conference call with

analysts.  On that call, Gleason explained:

> The South Carolina credit went substandard in the second quarter of 2017. The North Carolina credit went substandard in the fourth quarter of 2017. And of course, our substandard and watch assets and in other writings in our assets are reported in the notes in our Qs and Ks.  So those were disclosed in those numbers, not specifically referenced, but disclosed in those numbers. The reserves for them, the $19 million, were accumulated over that period of time.  Each of those credit was a watch-rated credit before it became substandard. . . .

> \*       \*       \*

> So when it was a watch-rated credit, they added 2.5% allowance allocation for them.   And then as they became watch-rated credit, those allowance allocations were increased based on the appraisals on the properties at the time.  The 2 properties have both been appraised in the last 2 years, one, I think, about 2 years ago and one about a year ago.  And then, of course, as the

- 59 -

performance of those deteriorated this year, we obtained new appraisals on both properties in the quarter just ended. Obviously, the property performance had deteriorated significantly on both. That poor recent performance was factored into the assumptions in the appraisal that led to a significant divergence in the most recent appraisals from the 2 appraisals done just 1 or 2 years ago on those properties. And hence, that's why the additional provision was needed over and above the $19.1 million that was previously reserved for these.

159. Analysts were shocked by Defendants' October 18, 2018 disclosure and warned that the price of OZK shares would be punished by disclosure of OZK's credit issues, with credit issues likewise affecting loan growth and margins:

(a)     Barclays noted that OZK's announcement of "***credit issues***" and related earnings impacts would "***meaningfully pressure . . . shares tomorrow***."

(b)     Stephens Inc. said "OZK's 3Q18 results were disappointing due to ***elevated credit concerns***, slowing loan growth and NIM compression."

(c)     SunTrust said the primary reason (over 50%) for OZK's 3Q18 earnings miss (actual $0.58 per share versus consensus of $0.91 per share) "***was higher provisioning related to 2 RESG credits that were partially charged off during 3Q18. As a result, the stock will likely significantly underperform on Friday***."

160. Analysts further attributed OZK's disappointing financial results and stock price decline to RESG credit issues, and in particular, the adverse investor sentiment around this news:

(a)     Brean Capital called the earnings miss (operating EPS of $0.65 versus consensus of $0.91) "***definitely a surprise***" attributing $0.20 of the 3Q18 EPS miss related to RESG credit issues.

(b)     Morgan Stanley called it:

*Highly disappointing 3Q18 results*.   Bank OZK reported 3Q18 earnings that came in far worse than expected.  Operating EPS, adjusted for its one-time rebranding initiative, was $0.64, well below both our estimate of $0.92 and consensus of $0.90.  Our *downgrade to Equal-weight* is based on more than just a single weak quarter – we believe many of its headwinds will persist, including weak loan growth and lack of NIM expansion, and we are cutting our 2020e EPS by 18% as a result.

Morgan Stanley noted that "*[t]he bigger impact of these credit losses, however, is on sentiment and how the market is likely to perceive the company's credit quality going forward*."  In downgrading the stock, with a price target of $32, Morgan Stanley added that "we believe the OZK shares will continue to trade at a substantial discount to peers for the foreseeable future."

(c)     Stephens Inc. concurred with Morgan Stanley, saying that "this news is a stark reminder that higher IR can result in incremental stress on CRE loan covenants. . . . *[I]nvestor sentiment on select banks could further deteriorate following this news*."

161.    In response to the bad news about RESG credits, on October 19, 2018, the price of OZK shares fell over 26% to close at $25.52 per share, about 50% off of Class Period highs.

**Defendants' False and/or Misleading Statements Harmed Lead Plaintiff and the Class**

162.    As a result of their purchases of OZK common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e*., damages, under the federal securities laws.  Defendants' false and misleading statements and omissions had the intended effect and caused OZK common stock to trade at artificially inflated levels throughout the Class Period.

- 61 -

163.   By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of OZK's business and prospects.   When the truth about the Company was partially revealed to the market after the close of trading on July 27, 2017, the price of OZK common stock fell precipitously.   The price of OZK common stock fell tremendously after the full truth was revealed to the market after the close of trading on October 18, 2018.

164.   These declines removed the inflation from the price of OZK common stock, causing real economic loss to investors who had purchased OZK common stock during the Class Period.   The declines in the price of OZK common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.   The timing and magnitude of the price declines in OZK common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.   The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of OZK common stock and the subsequent significant decline in the value of OZK common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## ADDITIONAL INDICIA OF SCIENTER

165.   In addition to the facts alleged herein and throughout, the following facts provide additional indicia of scienter: (1) Defendants' hands-on management of the RESG

- 62 -

loan book infers scienter; (2) Gleason's admissions of borrower concessions during the Class Period infers scienter; (3) the timing of loan modifications to mask nonperformance at reporting periods infers scienter; (4) the statements concerned OZK's most important metric; (5) the magnitude of the miss and analysts' surprise infers scienter; (6) OZK used inflated shares as merger consideration; and (7) the timing of Thomas's abrupt resignation infers scienter.

**Defendants' Hands-On Management of the RESG Loan Book Infers Scienter**

166.   As noted above, the RESG group was central to OZK's growth story, taking OZK from a small community bank in Arkansas to a national lender funding commercial real estate projects in virtually every major metropolitan city in the country.  OZK positioned itself as superior to its competitors by frequently touting its attention to the most minute details of each loan.

167.   For example, Gleason reportedly personally manages the Company's 30 days past-due loan list, reviewing each problem carefully with its lender once a month.  He discovers the root of the problem, what efforts have been taken to resolve it and how the lender plans to proceed.  Indeed, when OZK finally disclosed the history about the SC Loan and the NC Loan problems, Gleason admitted that OZK had been, for a "long, long time," performing cash sweeps, working with loan sponsors through a series of forbearance agreements and providing serial concessions to the debtors to address their financial difficulties.

168.   Defendant's oft-repeated refrain during many investor calls stresses OZK's "robust" policies, procedures and policies in place to assure the asset quality of OZK's CRE portfolio.  For example, during OZK's 4Q16 earnings call Gleason stated:

> *[W]e have robust policies, procedures and processes in place to assure the quality of our CRE portfolio and to effectively measure, monitor and manage our CRE concentrations*.
>
> Of course, our specialized expertise in CRE and the conservatism we employ in our CRE lending are among our most critical safeguards.  Our track record, including our track record through the great recession, speaks for itself.

169.   One such procedure in place is that RESG is not responsible for approving its own loans. Rather, virtually all RESG loans must be approved by the Directors' Loan Committee, which consists of Gleason, the Chief Credit Officer, and three to five rotating board members.

170.   When an analyst asked during the Raymond James Institutional Investors Conference on March 7, 2017 about the "secret sauce" behind RESG, Hicks, OZK's current CAO and Executive Director of Investor Relations, replied:

> But our asset managers are managing it from the day we close to the day it's paid off.  So even though we have funded the dollar, our asset managers are remodeling each of those projects on a monthly basis throughout the life of the loan.  *And that discipline and culture that we have with those asset managers provide us conservative – really conservative metrics and allow us to have pristine asset quality*.

171.   At the same conference the following year, Hicks reiterated the importance of asset quality:

> Asset quality, excellent track record over our 21 years as a public company.  I can't emphasize our discipline and approach here enough.  Our – we've never had a year since 1997 where our charge-off ratio hasn't beaten the industry, and we've averaged 34% of the industry's net charge-off ratio.  That doesn't come by happenstance.  That comes with a discipline and approach at

every level, a culture at every level within our lending organization.  ***That asset quality is paramount and extreme importance to our lending***.

172.    Hicks attributed RESG's success to the RESG group's attention to detail:

> One part of RESG that, again, is not emphasized enough is our asset management team.  We have over 40% of our staff in our asset management and servicing team.  ***These are individuals that monitor these projects on a monthly basis.  And so they identify any issues, if there are any issues, very early on in a project***.  And that's a huge differentiator for us.  And I don't know that it gets emphasized enough.

173.    During the 2Q18 conference call, Gleason reiterated that OZK prioritizes asset

quality over growth:

> We have always said, and no one should be surprised at our actions in this regard, we've always said that asset quality is the most important in the asset quality pricing growth equation for us, and that growth is a tertiary consideration.  So the way we have approached it and will continue to approach it is we're going to hold very firmly to our longstanding asset quality standards.  Those are not negotiable.

174.    During the Raymond James Institutional Investors Conference on March 7,

2017, Hicks touted OZK's hands-on RESG business model:

> The RESG business model emphasizes industry-leading excellence throughout the life of the loan.  We have thorough underwriting, ***including detailed modeling and testing for economic stress, interest rate stress, exit – refinancing stress and cap rate stress***.  ***We have rigorous economic analysis***, including supply-and-demand metrics for the relevant markets, submarket and micromarket, as appropriate.  We have comprehensive and constant – consistent documentation under the supervision of our in-house legal team in coordination with outside counsel.  We have an emphasis on precision at closing, and ***we have thorough life-of-loan asset management by teams of skilled asset managers***.
>
> \*       \*       \*
>
> But our asset managers are managing it from the day we close to the day it's paid off.  So even though we have funded the dollar, our asset managers are remodeling each of those projects on a monthly basis throughout the life of the loan. . . .

\*       \*       \*

We understand that we're concentrated in CRE.  We understand that, that means that we need to have additional safeguards to measure, monitor and manage our risk.  ***We report our concentration risk in vast detail to our board on a quarterly basis, and they're extremely involved from that perspective***.

175.   At investor meetings in August 2017 and at the September 2017 Raymond James Institutional Investors Conference, Gleason announced his "***conscious decision to devote a lot more of my time to RESG for the next 2.5 years***."  Gleason added that he had "already told several of my executive officers and several of our key directors that ***I was going to do what I've done probably a half dozen other times in the history of the company, and that's do a mass handoff of direct reports and shift my focus elsewhere to RESG***."

176.   A few days later at the Barclays Global Financial Services Conference, Gleason corrected an analyst who had suggested that Gleason's increased focus on RESG would provide him with a "fresh look," stating that was "intimately involved" in every RESG loan:  "Well, it's not so much a fresh look for me because in 14 years we've had Real Estate Specialties Group, ***I have approved every single loan originated in 14 years***.  So I'm looking at things sometimes a few days or a week or 2 earlier than I might have looked at before, ***but I've been intimately involved in the details of RESG from its inception 14 years ago***."

177.   During the September 2018 Barclays Global Financial Services Conference, Gleason stated that OZK's discipline allowed the Company to beat the industry's charge-off ratio year after year:

And the reality is, if you run a very disciplined credit book, which we do, we – every year since we went public, we've beaten the industry's charge-off ratio every single year.  And we've averaged about 32% at the industry's charge-off ratio. . . .

* * *

And as a result of that in the 15-year history of Real Estate Specialties Group, we have not had a single loan, not one loan, wherein we've gotten at the end of the project and we've not had the project completed with the funds that remained in the loan.  So that requires a very effective completion guarantee structure, where your sponsor's going to cover cost overruns and do it immediately.  It requires a very effective asset management servicing structure, where you identify issues that will create budget problems early on in the process, where you still got the leverage to require the sponsor to fix that.  And it requires sponsors of high quality and projects of high quality.  So we've been very successful in totally avoiding that risk.

178.    Given the admitted importance of asset quality and OZK's low charge-off ratios as a great differentiator, the Individual Defendants – OZK's most senior executives – can be presumed to have knowledge of the problems with the SC Loan and the NC Loan.  In addition, Defendants' repeated statements to the investing public regarding their focus and time spent on the minute details of each loan further demonstrates their knowledge.

**Gleason's Admissions of RESG Borrower Concessions During the Class Period Infers Scienter**

179.    In January 2019, Gleason admitted "[w]e're actively in a [dialogue] with the sponsors" of both the SC and the NC Loans.  Gleason admitted that they engaged in a "series of short-term forbearance agreements" for each of the loans.  Gleason implied that they had been actively anticipating the SC Loan's failure by "swe[eping] surplus cash flow on that project for a ***long, long time***."  The active participation with the sponsors of both the loans and the "series of short-term forbearance agreements" lend themselves to an inference that the Defendants knew that these loans would fail long before OZK charged them off.

- 67 -

**The Timing of Defendants' "Modifications" to Mask Chronic Loan Problems at Reporting Periods Infers Scienter**

180.    Defendants repeatedly extended the maturity date for the SC Loan following loan defaults.  When extending those dates, Defendants chose new maturity dates that were slightly past the current reporting period.  By extending maturity dates in this manner, Defendants masked the fact that the SC Loan was in substantive default, nonperforming and impaired.

**The Alleged False/Misleading Statements Misinformed Investors About OZK's Most Important Performance Metric**

181.    Defendants' false and/or misleading statements alleged herein concerned OZK's asset quality.  As a commercial bank, or "spread bank," OZK generated its main source of profits through its interest rate "spread" – the positive difference between paying its depositors a lower rate than that interest rate it extends to borrowers.  OZK thus focused on Net Interest Income ("NII") – that measured the spread – as "the ultimate revenue metric for a 'spread bank.'"

182.    OZK told investors that "the [k]ey in [d]riving [l]ong-[t]erm [i]ncreases in [n]et [i]nterest [i]ncome" (aka, "the ultimate revenue metric") was disciplined credit quality. OZK's oft-repeated message was that OZK was head and shoulders better than other commercial lenders because OZK's credit quality was priority number one, ensuring NII, thereby making OZK a superior investment.  OZK's credit quality was material to its investors.

183.    Defendants therefore knew, or were reckless in not knowing, of the problems with the SC Loan and/or the NC Loan, having granted serial concessions during the Class

Period.   Including the SC Loan and NC Loan as nonperforming loans in OZK's nonperforming assets would have caused OZK's nonperforming asset ratio to far exceed both its reported amounts as well as the peer-reported amount.  An inference that Defendants would be aware of (or be reckless in not knowing) the fact that this "key in driving NII" failed to include the nonperforming SC Loan and/or NC Loan amounts follows as a matter of course.

**The Magnitude of the Miss and Analysts' Surprise Infers Scienter**

184.   Because Defendants distinguished OZK from its peers by representing the Company as a very conservative lender with industry-leading low levels of "non-performing loans," "non-performing assets" and "charge-offs," it came as a shock to investors that, in fact, OZK had been concealing loans that should have been reported as nonperforming.  As a result of the charge-offs, OZK's 3Q18 EPS came in far lower than analysts' expectations at $0.64, compared with consensus estimates of $0.90.  The stock price reacted accordingly, dropping $9.33 per share, or 26%, on trading volume more than 20 times the average.

185.   In reaction to OZK's disclosure, analysts expressed their surprise, wondering why loans that had been in OZK's portfolio for a decade had not been restructured, and noting the outsized impact that even smaller loans in OZK's portfolio can have.

186.   For example, UBS wrote in an October 18, 2018 report entitled "Massive Write-offs Makes Funding Pressure a Footnote for Q3":

> These were 2 cash flowing loans in the portfolio for a decade, why were they not restructured in a manner that produced a lower loss content?

*        *        *

We expect a very sharply negative reaction as emergence of credit if not already a widespread performance issue, something that becomes more widely discussed.

187.    In a report dated October 18, 2018 entitled "OZK: First Look-Tough Q3 As Credit, Growth, And Margin Drive Large Miss," Wells Fargo stated:

This was a challenging quarter for OZK as a combination of large charge-offs, weaker loan growth, and lower net interest margin (NIM) netted $0.64 of operating EPS, well below our/Street estimates of $0.90.  The $42MM Q3 provision was the largest surprise, as two older-vintage real estate specialties group (RESG) loans were placed on nonaccrual status and $45.5MM was charged-off. . . .

Lastly, we would note that these two loans are likely some of the smaller loans within the RESG portfolio, further illustrating the potential volatility when a credit event does materialize.

188.    Brean Capital reported on October 19, 2018:  "While our optimism going into the quarter was not overly high given the trends in CRE lending and commentary around elevated pay downs, this quarter's result was definitely a surprise."

189.    Other analysts noted that OZK's stock price would likely remain depressed until OZK won back investor confidence.  According to a Morgan Stanley report on October 19, 2018, entitled "The Story Has Changed; Plummeting EPS Estimates Drive Downgrade":

Highly disappointing 3Q18 results.  Bank OZK reported 3Q18 earnings that came in far worse than expected. . . .

\*      \*      \*

The bigger impact of these credit losses, however, is on sentiment and how the market is likely to perceive the company's credit quality going forward. . . .

\*      \*      \*

We believe the OZK shares will continue to trade at a substantial discount to peers for the foreseeable future, given the company seems to have lost investor confidence after posting a significant drop in net interest income and margin in

- 70 -

3Q18, reduced its loan growth guidance, and posted a surprise credit loss on two of its RESG loans originated over 10 years ago.

190.    Sandler O'Neill reported on October 19, 2018:

> Two Large RESG NCOs Drive the Lion's Share of the 3Q18 Miss – OZK took a $26.4M incremental provision on $45.5M in NCOs related to two substandard RESG loans. . . .  These current losses will further sour the well around the shares and we think that we may need to work through a credit cycle before OZK will be able to earn back confidence in its current business model.

191.    Finally, Stephens Inc. reported on October 22, 2018 in a report entitled, "OZK Takes a Body Blow; Decreasing PT to $28, Maintain EW Rating":

> OZK's 3Q18 results were disappointing due to elevated credit concerns, slowing loan growth and NIM compression.  The stock was clobbered on Friday (down -27%) as investors digested news and tried to understand the fallout.  We expect the negative investor sentiment to remain until OZK can prove the 3Q18 credit results were an anomaly rather than the beginning of a trend.

**OZK's Use of Price-inflated Shares as Merger Currency Infers Scienter**

192.    During the Class Period, OZK used its inflated stock as currency to purchase other banks, fueling its growth:

| Date | Target | OZK Shares Used as Merger Currency |
|---|---|---|
| July 2016 | Community & Southern Holdings, Inc. | 20.98 million shares Valued at $800.3 million |
| July 2016 | C1 Financial, Inc. | 9.37 million shares Valued at $376.1 million |
| **Total OZK shares used as Merger Currency** | | **30.35 million shares Valued at $1.18 billion** |

193.    Defendants executed each of these landmark transactions for OZK having made contemporaneously false and/or misleading statements that artificially inflated the

- 71 -

price of OZK shares.  Defendants knew that these OZK shares were being used as currency for these larger transactions, where as little as 10% inflation would provide OZK over $100 million of merger currency it would not need to spend from existing capital or cash.

**The Timing of Thomas's Abrupt Resignation Infers Scienter**

194.    Thomas's resignation occurred during a period when pressure was mounting within OZK to report loan losses on the SC Loan.

195.    On April 15, 2017, JTL/Cypress defaulted on the SC Loan for a fourth time.  In mid-May 2017, in an apparent attempt to mask the April 2017 default and conceal the nonperforming credit, OZK modified the terms of the SC Loan to extend the maturity date to July 14, 2017.  On July 14, JTL/Cypress again defaulted on the loan.  On July 27, 2017, Thomas resigned abruptly, only two weeks after the fifth default of the SC Loan.  OZK shares plummeted over 12% on news of Thomas's resignation.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE

196.    Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

197.    Lead Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and the fraud-on-the-market doctrine because the market for OZK stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)     OZK stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient market;

(b)     OZK stock traded in large weekly volumes of millions of shares;

(c)     As a regulated issuer, OZK filed periodic public reports with the SEC and the FDIC;

(d)     OZK regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)     OZK was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

198.   As a result of the foregoing, the market for OZK stock promptly incorporated current information regarding OZK from publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all those who transacted in OZK stock during the Class Period suffered similar injury through their transactions in OZK stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

199.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-

existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of OZK who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

200.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of itself and all persons or entities who purchased OZK's common stock during the Class Period, and who were damaged thereby.  Excluded from the Class are Defendants and their immediate families, the officers and directors of OZK at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

201.    The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  OZK stock was actively traded on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by OZK

or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  While the exact number of Class members is unknown to Lead Plaintiff, NASDAQ reports more than 128 million shares outstanding, with over 300 institutional investors alone.  Accordingly, Lead Plaintiff reasonably believes that, including individual investors, there are at least one thousand members in the proposed Class.

202.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

203.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

204.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether Defendants' acts as alleged herein violated the federal securities laws;

(b)   whether Defendants' statements made to the investing public misrepresented or omitted material facts about OZK's business, operations and financial conditions;

(c)   whether the price of OZK was artificially inflated during the Class Period; and

(d)     to what extent the Class members have sustained damages and the proper measure of damages.

205.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of Section 10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

206.    Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

207.    Defendants are liable for making false statements and failing to disclose adverse facts known to them about OZK.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on those who transacted in OZK's stock during the Class Period was a success, as it: (i) deceived the investing public regarding OZK's business and financial condition; (ii) artificially inflated the price of OZK's stock; and (iii) caused Lead Plaintiff and other Class members to transact in OZK stock at inflated prices.

208.    During the Class Period, Defendants participated in the preparation of and/or caused to be disseminated the false or misleading statements specified above, which they knew or recklessly disregarded were materially false or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make

- 76 -

the statements made, in light of the circumstances under which they were made, not misleading.

209.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff or others similarly situated in connection with their transactions in OZK stock during the Class Period.

210.   Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about OZK's business, operations and financial condition as specified herein.

211.   The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information.  Defendants made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made about the Company and its business operations and financial status, in the light of the circumstances under which they were made, not misleading.  These practices and course of business operated as a fraud and deceit upon those who transacted in OZK stock during the Class Period.

212. The Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing OZK's operating condition and financial status from the investing public and supporting the artificially inflated price of its stock.

213. As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of OZK stock was artificially inflated during the Class Period. In ignorance of the fact that the market prices of the Company's stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants but not disclosed in Defendants' public statements during the Class Period, Lead Plaintiff and the other Class members acquired OZK stock during the Class Period at artificially high prices and were ultimately damaged thereby.

214. At the time of said misrepresentations and omissions, Lead Plaintiff and other Class members were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and other Class members and the marketplace known the truth regarding the problems that OZK was experiencing, which Defendants did not disclose, Lead Plaintiff and other Class members would not have transacted in OZK's stock, or, if they had transacted in its stock during the Class Period, would not have done so at the artificially inflated prices which they paid.

215.   By reason of the foregoing, Defendants have violated §10(b) of the 1934 Act and Rule 10b-5.

216.   As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in OZK's stock.

**COUNT II**

**For Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants**

217.   Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

218.   The Individual Defendants acted as controlling persons of OZK within the meaning of §20(a) of the 1934 Act:

(a)   By reason of their positions as executive officers and/or directors, their participation in and awareness of OZK's operations and intimate knowledge of the false statements and omissions made by OZK and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of OZK, including the content and dissemination of the various statements Lead Plaintiff contends are false and misleading;

(b)   The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

- 79 -

(c)     Because of their positions as CEO, CFO and CAO, the Individual Defendants directly participated in OZK's management and were directly involved in OZK's day-to-day operations.  The Individual Defendants also controlled the contents of OZK's quarterly reports and other public filings, press releases, conference calls and presentations to securities analysts and the investing public.  The Individual Defendants prepared, reviewed and/or were provided with copies of OZK's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

219.    By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for relief and judgment, as follows:

A.      Declaring that Defendants are liable pursuant to the 1934 Act;

B.      Determining and certifying that this action is a proper class action and certifying Lead Plaintiff as a Class representative and Lead Plaintiff's counsel as Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

C.      Awarding compensatory damages in favor of Lead Plaintiff and the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

D.      Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

E.      Awarding such other relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff hereby demands a trial by jury.

DATED:  June 21, 2019               ROBBINS GELLER RUDMAN
                                                                & DOWD LLP
                                                    JONAH H. GOLDSTEIN
                                                    CARISSA J. DOLAN
                                                    HEATHER G. SCHLESIER


                                                 s/ JONAH H. GOLDSTEIN
                                        JONAH H. GOLDSTEIN (193777)

                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)
                                        jonahg@rgrdlaw.com
                                        cdolan@rgrdlaw.com
                                        hschlesier@rgrdlaw.com

                                        Lead Counsel for Lead Plaintiff

                                        CARNEY BATES & PULLIAM, PLLC
                                        ALLEN CARNEY (ABN 94122)
                                        519 West 7th Street
                                        Little Rock, AR  72201
                                        Telephone:  501-312-8500
                                        501/312-8505 (fax)
                                        acarney@cbplaw.com

                                        Local Counsel

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 21, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ JONAH H. GOLDSTEIN
JONAH H. GOLDSTEIN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: JonahG@rgrdlaw.com

# Mailing Information for a Case 4:18-cv-00793-JM Strathclyde Pension Fund v. Bank OZK et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com

- **Jess L. Askew , III**
  jess.askew@kutakrock.com,freda.hoover@kutakrock.com,Suzette.McCasland@kutakrock.com

- **Steve W. Berman**
  steve@hbsslaw.com,heatherw@hbsslaw.com

- **John Paul Byrd**
  paul@paulbyrdlawfirm.com,joseph@paulbyrdlawfirm.com,jane@paulbyrdlawfirm.com,sara@paulbyrdlawfirm.com,paulbyrd@aristotle.net

- **James Allen Carney , Jr**
  acarney@cbplaw.com,jcox@cbplaw.com

- **Carissa J. Dolan**
  CDolan@rgrdlaw.com

- **Joseph D. Gates**
  joseph@paulbyrdlawfirm.com,jodeangates@gmail.com

- **Jonah H. Goldstein**
  JonahG@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Andrew King**
  andrew.king@kutakrock.com,Suzette.McCasland@KutakRock.com,freda.hoover@kutakrock.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com

- **Jason J. Mendro**
  jmendro@gibsondunn.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,kwoods@rgrdlaw.com

- **Steven A. Owings**
  sowings@owingslawfirm.com,josh@owingslawfirm.com

- **Lesley F. Portnoy**
  lportnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com

- **Heather G. Schlesier**
  HSchlesier@rgrdlaw.com

- **F. Joseph Warin**
  fwarin@gibsondunn.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)