IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

STRATHCLYDE PENSION FUND,
Lead Plaintiff                                                              PLAINTIFF

v.                           No. 4:18-cv-793-DPM

BANK OZK; GEORGE GLEASON;
GREGORY MCKINNEY                                              DEFENDANTS

MEMORANDUM OPINION AND ORDER

From modest beginnings as Bank of the Ozarks in Jasper, Bank OZK has grown into a powerhouse. It is now a publicly traded company with all the usual reporting obligations to various federal regulatory agencies. The Bank's real estate specialties group has been one of the engines helping the Bank grow. In October 2018, the Bank revealed that two of the group's real estate loans had gone bad: an approximately $32 million loan for the Rock Hill Galleria Mall in South Carolina; and an approximately $34 million loan for a land, residential lot, and residential home project in North Carolina. Given recent re-appraisals of these properties, the Bank charged off approximately $45.5 million based on the reduced amounts it expected to be repaid. The short story is that the Galleria was losing tenants rather than gaining them. At the land development, the re-sale of existing homes, and lot owners building their homes, had undercut sales of new homes

built by the developer. The day after Bank OZK released its 2018 third quarter report, it's stock price fell more than 26%.

The world is now a small place, and the Strathclyde pension fund based in Glasgow, Scotland, is one of Bank OZK's stockholders. Strathclyde's investment took a hit. And Strathclyde has sued the Bank, George Gleason (the Bank's longtime Chairman and Chief Executive Officer), and Gregory McKinney (the Bank's Chief Financial Officer and Chief Administrative Officer) on behalf of itself and other stockholders. Strathclyde alleges that Bank OZK, Gleason, and McKinney indirectly misled investors about the health of these two loans, thus inflating the price of the Bank's stock. Their acts and omissions, Strathclyde claims, violated § 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), and implementing Rule 10(b)(5). Strathclyde also claims violations of the Act's § 20(a) — because Gleason and McKinney had control within the statute's meaning. 15 U.S.C. § 78t(a); *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010). The parties agree that this secondary claim stops or goes with the primary claim.

The parties also mostly agree on the governing law. To state a solid § 10(b) claim, Strathclyde must adequately allege six things with specificity. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42, 125 S.Ct. 1627, 1631 (2005); *In re K-tel International, Inc. Securities Litigation*, 300 F.3d 881, 888–89 (8th Cir. 2002). In seeking dismissal of the amended complaint, the Bank defendants concentrate their fire on

two points. They contend Strathclyde's allegations of material misrepresentation, plus its allegations of scienter—wrong mindedness, are insufficient. Strathclyde acknowledges the Private Securities Litigation Reform Act's heightened pleading standards, 15 U.S.C. § 78u-4(b)(1) & (2), and argues hard that it has met them. The Court accepts the amended complaint's particularized factual allegations as true; considers the whole pleading, as well as the filed materials embraced by it and matters of public record supplied by the parties; and, in evaluating state of mind, considers all inferences pro and con to decide whether a strong inference of scienter—a cogent and compelling one—exists. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324–25, 127 S.Ct. 2499, 2510 (2007).

Strathclyde says that by February 2016, both the North Carolina real estate development loan and the South Carolina mall loan were in trouble, and the Bank knew it, but didn't adequately alert its stockholders until more than two years later, during the third quarter of 2018. Instead, Strathclyde continues, the Bank's statements—in its financial disclosures and to investment analysts during quarterly calls—were all sweetness and light. Among much other information, the Bank's 10-K reports have a table about nonperforming assets. *E.g.* Doc. 37-1. The table accords with Generally Accepted Accounting Principles. Bad loans are not listed individually. They're in categories: nonaccrual—impaired loans, where collection is doubtful; accruing—

loans more than ninety days past due, but collection is expected; troubled debt restructuring—loans where the borrower is experiencing financial difficulty and the Bank has granted a concession; and foreclosed assets—loans where there's been repossession. The table's bottom lines are percentages of nonperforming loans to total loans and nonperforming assets to total assets. *Doc. 37-1 at 6–7.* Gleason and McKinney approved all the reports.

Sometime in 2017, pursuant to its internal accounting policies, the Bank deemed both the North Carolina and South Carolina loans substandard but not impaired, partly because monthly payments were current. This kind of internal classification does not flow through to the 10-K. In the 3Q18 report, the Bank first provided public details about these two loans and the write downs. *Doc. 37-6.* Gleason's statements to analysts between April 2016 and July 2018 emphasized the real estate specialties group's successes and strengths. The group's book of business was, in Gleason's recurring word, "pristine." *Doc. 35 at 40.* Credit was extended carefully, albeit aggressively, and monitored constantly. The result was great profitability. In approximately fifteen years, only one loan hadn't included enough money to get the project built. And, across all those years, only approximately ten and a half million dollars out of hundreds and hundreds of millions lent had to be written off as uncollectable.

On the North Carolina loan, the § 10(b) claim is too short on particulars. There are simply not enough facts of record to satisfy the Reform Act's heightened pleading standards. *In re Stratasys Ltd. Shareholder Securities Litigation*, 864 F.3d 879, 882 (8th Cir. 2017). The handful of paragraphs in the amended complaint about this loan shake down to the fact that the development project failed. Doc. 35 at ¶¶88–92. Strathclyde alleges a "series" of forbearance agreements based on Gleason's remarks in a January 2019 call with analysts. Those would have merited public disclosure. But the call's transcript makes clear that Gleason said only that the Bank had "been operating *this last quarter* under a series of short-term forbearance agreements on each [troubled loan], and we've been working with the sponsors." Doc. 37-7 at 14 (emphasis added). The series thus spanned the months after the 3Q18 report, not years. Strathclyde offers no telling loan-related specifics about the failed North Carolina real estate development. It's claim about this loan is accounting in hindsight, which precedent does not allow. *In re K-tel*, 300 F.3d at 891.

On the South Carolina loan, though, there's more. This summary is mostly drawn from the amended complaint, Doc. 35 at ¶¶ 16, 20, 59–87, 109, 129. In 2008, Bank OZK lent a company more than thirty million dollars to buy the Galleria, a big mall with room for five anchor tenants and approximately seventy shops. The Galleria was approximately sixteen years old. Gleason approved the loan. During

the first few years, the loan was modified several times, with each modification extending the maturity date. This was not unusual: Bank OZK's real estate loans have an average term of three or four years, which contributes, the Bank says, to managing and regularly re-evaluating risk. In 2011, the loan's guarantor, a related entity, was in full crisis mode. Repayment was therefore dependent on mall tenancy or a sale. In online reviews, shoppers described the Galleria around this time as empty and dead. The borrower never missed a monthly payment, though. At some point, Bank OZK started sweeping rent to make sure monthly payments were made and to build a reserve against principal. After several extensions and various modifications, the borrower still owed approximately $30 million due by October 2016, about eight years in.

Strathclyde contends that, by this point, the loan was impaired under Bank OZK policy—it was probable the Bank could not be repaid in full. This conclusion would have put this loan in the nonaccrual category on the 10-K. The borrower did not repay the loan in full in October 2016. Strathclyde says this amounted to a default. Monthly payments continued. A couple of months later, in mid-December 2016, the Bank extended the maturity date into mid-January 2017. No repayment. In March, the maturity date was extended to mid-April. No repayment. In May, the date was extended to mid-July. No

repayment. At this point, the Galleria was about 50% occupied. In July, the maturity date was extended to October 2017.

Two weeks or so later, in late July, the longtime head of the real estate specialties group, Dan Thomas, exercised stock options and resigned. No reason was given; Strathclyde alleges that Thomas ran out of rope on the South Carolina and North Carolina loans. Bank OZK's stock dropped by approximately 12%. At a September 2017 conference, in the wake of Thomas's departure, Gleason said he didn't need to take a "fresh look" at the real estate specialties group's portfolio because he had "approved every single loan originated in 14 years" and "been intimately involved in the details of [the group] from its inception 14 years ago." *Doc. 35 at 51.*

The October 2017 due date for the South Carolina loan came and went. It was extended to early January 2018. In late January, the same thing happened with another extension to early July 2018. In June, the mall was reappraised. Bank OZK then downgraded the loan, reporting the likely loss on its 3Q18 report. After more extensions the Bank foreclosed. A Bank-related-entity bought the Galleria in 2019. Until the 3Q18 report, Bank OZK's message in calls with analysts and at conferences had remained upbeat: the quality of its real estate loans was pristine; the Bank had incurred only ten and a half million dollars in losses throughout the real estate specialty group's history; the group monitored all this debt monthly; and the "metrics" — all the data

reflected in the Bank's quarterly and annual reports — demonstrated the strength of these assets. *Doc. 35 at 52.* It is undisputed that Bank OZK did not classify the South Carolina loan as a nonperforming asset on any report during the class period. It is undisputed that, had it done so, the metrics would have changed: the Bank's percentage of nonperforming loans to total loans would have suffered, as would its percentage of nonperforming assets to total assets. And it is undisputed that Bank OZK's outside auditors, even with the benefit of hindsight, have not restated any Bank financial reports.

Has Strathclyde adequately pleaded supposed misstatements of material fact? Yes. Materiality turns on whether "there is a substantial liklihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 131 S.Ct. 1309, 1318 (2011) (quotations omitted). The Bank defendants are partly correct here. Many of Gleason's statements about the quality of the real estate group's credit are puffery, the kind of unverifiable opinion that is good salesmanship's hallmark. *Stratasys*, 864 F.3d at 882. Some, however, were different in kind. They were rooted in the numbers, and therefore verifiable. *Ibid.* These are what Gleason called the metrics, the data about iffy loans and the percentage of those loans in terms of Bank OZK's total loans and total assets. Gleason was of course drawing on

the 10-K reports. Those reports contain all the appropriate cautionary language. As the Bank defendants argue, predictions about future performance are sheltered by the statutory safe harbor. 15 U.S.C. § 78u-5(c). False statements about the past are not. And Strathclyde has pleaded with particularity, and plausibility, why the Bank's failure to acknowledge problems with the South Carolina loan sooner in its statements about nonperforming assets was supposedly misleading. 15 U.S.C. § 78u-4(b)(1); *In re Stratasys*, 864 F.3d at 882. One need only read the transcript of the calls with analysts to see how closely they scrutinize, question, and rely upon the 10-K reports and the Bank officers' explanations of them. *Doc. 37-4 & 37-7*. Even discounting for expertise, a reasonable investor would have perceived a significant change in the mix of available information. *Matrixx Initiatives*, 563 U.S. at 38, 131 S.Ct. at 1318.

The main dispute here is about falsity. Everyone agrees that the many extensions happened. Arguing from Generally Accepted Accounting Principles and Bank OZK's policies, Strathclyde says the South Carolina loan was impaired by October 2016, in default with repayment improbable. Strathclyde sees a pattern of Bank OZK deliberating between forbearance and foreclosure, with the many extensions representing concessions to the borrower, the Bank having repeatedly chosen forbearance. The Bank defendants respond that loan extensions are like lunch, unremarkable and routine. That's true but

not dispositive on the record presented. What the Court lacks are the loan agreements. Whether any default actually occurred depends on the facts, measured against what Bank OZK and the borrower agreed. Without the loan documents, and accepting Strathclyde's particularized allegations as true, which the Court must do at this early point in the case, Strathclyde has adequately pleaded that these extensions were not routine: They were concessions to buy time for an impaired loan the Bank knew the borrower probably could not repay when due. It follows, then, that Strathclyde has adequately pleaded misstatements of material fact in the 10-K's and Gleason's echoing words about the metrics. See the amended complaint, *Doc. 35*, at ¶¶ 106, 110, 118 & 133(b).

Next, considering the allegations collectively, and weighing the competing inferences against each other, does a strong inference of contemporaneous intent to mislead, or severe recklessness, exist? *Tellabs*, 551 U.S. at 319 n.3, 127 S.Ct. at 2507 n.3. No, as to McKinney. Yes, as to Gleason and Bank OZK.

Strathclyde pleads specifics about McKinney—eight quarterly financial reports, one annual report, and one statement to analysts. But, the inference of scienter rests mostly on McKinney's job as Chief Financial Officer. Given his role, he should have known enough about the South Carolina loan, Strathclyde reasons, to know that it was in trouble when he signed the reports that disclosed no problem.

Precedent forecloses this argument. *K-tel*, 300 F.3d at 891. The law requires more: a clear and cogent inference, either that McKinney knew at the time that the reports and his statement were misleading, or that he was severely reckless in his actions and words. *K-tel*, 300 F.3d at 893. There is no allegation that McKinney was deep in the real estate specialty group's business. Even assuming that he should have taken a harder look, that's insufficient to support a § 10(b) claim. *In re Ceridian Corp. Securities Litigation*, 542 F.3d 240, 248 (8th Cir. 2008).

Gleason's situation is different. He was deeply involved with the real estate specialties group from the start. The South Carolina loan had been on the Bank's books for almost a decade. It was substantial. He had approved making this loan. After Thomas resigned in the summer of 2017, Gleason was even more involved with the group. The pattern of short-term extensions across the quarterly reporting deadlines in 2017 and 2018 is striking to even a non-banker. Consider, too, the calls with analysts: Gleason seems to carry around most of the Bank's business in his head. The law doesn't require him, or any CEO, to be clairvoyant. *K-tel*, 300 F.3d at 891. But, if everything Strathclyde alleges is true (and of course that's a big if at this point), then based on what Gleason called his intimate involvement in the real estate group's loans, *Doc. 35 at 51*, he would have discerned trouble here; in late 2017 and early 2018 the loan on the Galleria was probably uncollectable in full when Bank OZK was indirectly reporting otherwise and when

Gleason was confirming the Bank's metrics in the calls. A strong inference arises that Bank OZK and Gleason were at least severely reckless in not disclosing the loan's troubles. *Horizon Asset Management Inc. v. H&R Block, Inc.*, 580 F.3d 755, 766–67 (8th Cir. 2009).

Three loose ends. First, the Bank defendants argue that Strathclyde hasn't adequately alleged loss causation about the approximately 12% stock drop after Thomas's resignation. The Court agrees. This element does the work of proximate cause in a claim at common law. *Rand-Heart of New York, Inc. v. Dolan*, 812 F.3d 1172, 1179–80 (8th Cir. 2016). As the bank defendants argue, Strathclyde's pleading shows that analysts read the departure as a flag that the group might not continue growing, while maintaining pristine loan quality, without Thomas's experienced leadership. *Doc. 35 at 62–63*. There was no specific concern about the quality of the real estate group's portfolio, or the two bad loans, or any notion that his departure signaled such a problem. Strathclyde's speculation about why Thomas left is insufficient to link it all together. *Ibid.* Second, Bank OZK remains in the case because Gleason remains in. Third, the dependent § 20(a) claim also goes forward.

* * *

The motion to dismiss, *Doc. 37*, is partly granted and mostly denied. Strathclyde's claims against Gregory McKinney are dismissed without prejudice for failure to state a claim. Bank OZK and Gleason must answer by 1 May 2020. An Initial Scheduling Order will issue.

So Ordered.

*/s/ D.P. Marshall Jr.*
D.P. Marshall Jr.
United States District Judge

3 April 2020