**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| STRATHCLYDE PENSION FUND, Individually and on Behalf of All Others Similarly Situated, ) ) ) ) | |
| Plaintiff, ) | No. 4:18-cv-00793-DPM |
| ) | |
| v. ) | |
| ) | |
| BANK OZK and GEORGE GLEASON, ) ) | |
| Defendants. ) ) | |

**BRIEF IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

I.  BACKGROUND ............................................................................................... 2

  A.  Loan Classifications and Accounting ..................................................... 2

  B.  The Allowance For Loan And Lease Losses .......................................... 3

  C.  The Loan ................................................................................................. 4

    1.  Loan History – Pre-Class Period.................................................. 5

    2.  Loan History – Class Period ........................................................ 7

    3.  The Bank's Controls .................................................................... 9

II.  DISCUSSION ................................................................................................ 10

  A.  No Reasonable Trier Of Fact Could Conclude That The Bank's
      Disclosures Were False Or Misleading................................................. 11

    1.  TDR Classification..................................................................... 13

    2.  Impaired And Nonperforming .................................................... 17

  B.  No Reasonable Trier Of Fact Could Conclude That Defendants Acted
      With Scienter. ....................................................................................... 17

III.  CONCLUSION............................................................................................... 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re 2007 Novastar Fin., Inc., Sec. Litig.*,
    No. 07-CV-139, 2008 WL 2354367 (W.D. Mo. June 4, 2008) ..............................................20

*Abramson v. Newlink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020) ..............................................................................................13

*In re Atossa Genetics Inc. Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017) ............................................................................................13

*In re Ceridian Corp. Sec. Litig.*,
    542 F.3d 240 (8th Cir. 2008) ............................................................................................18

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ..............................................................................12, 13, 19

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ..........................................................................................................17

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011), *abrogated on other grounds by*
    *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ..........................................................................................................12

*Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*,
    395 F.3d 851 (8th Cir. 2005) ............................................................................................18

*In re GlenFed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994), *superseded by statute on other grounds by*
    Private Securities Litigation Reform Act of 1995,
    Pub. L. No. 104-67, 109 Stat. 737 ....................................................................................12

*In re K-tel Int'l, Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002) ......................................................................................17, 18

*Lustgraaf v. Behrens*,
    619 F.3d 867 (8th Cir. 2020) ............................................................................................11

*McAdams v. McCord*,
    584 F.3d 1111 (8th Cir. 2009) ..........................................................................................10

*In re Navarre Corp. Sec. Litig.*,
    299 F.3d 735 (8th Cir. 2002) ............................................................................................18

# TABLE OF AUTHORITIES

*(continued)*

<u>Page(s)</u>

*Nolte v. Cap. One Fin. Corp.*,
    390 F.3d 311 (4th Cir. 2004) ................................................................19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)..............................................................................1, 12, 13

*Scott v. Enter. Fin. Servs. Corp.*,
    947 F. Supp. 2d 1021 (E.D. Mo. 2013)...............................................18

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)..................................................................20

*Waterford Twp. Gen. Emps. Ret. Sys. v. SunTrust Banks, Inc.*,
    No. 09-CV-617, 2010 WL 3368922 (N.D. Ga. Aug. 19, 2010) ............19

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ..............................................................13

**Statutes**

15 U.S.C. § 78j(b) ...........................................................................................10

15 U.S.C. § 78t(a) ...........................................................................................10

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................10

Lead Plaintiff Strathclyde Pension Fund ("Plaintiff") claims securities fraud based on certain financial metrics Bank OZK disclosed regarding the performance of its entire loan portfolio overall. Plaintiff alleges these metrics were inaccurate due to the Bank's accounting for a single loan on a South Carolina shopping mall (the "Loan") that became nonperforming, and which the Bank disclosed as partially charged off, in October 2018. When the Bank announced this, along with other bad news, its stock price fell and this lawsuit followed.

All material facts regarding the Loan—its terms, modifications, payment history, classification, and accounting—are undisputed. Defendants' knowledge and bases for their classifications and accounting judgments also are undisputed, as are the repeated, independent, third-party reviews of those judgments. The only dispute is whether Plaintiff's disagreement with Defendants' accounting judgments establishes *securities fraud*. As a matter of law, it does not.

Reasonable accounting disagreements on the proper treatment of loans only show that loan accounting and risk classifications are judgment-laden opinions. Numerous courts confirm as much, holding that determining the likelihood of loan default is a quintessential opinion, not subject to after-the-fact criticisms of objective falsity. But a statement of opinion is not "false" or "misleading" within the meaning of the securities laws just because "external facts show the opinion to be incorrect." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188 (2015). Rather, a stated opinion is misleading—thus actionable—only if it is not sincerely held, is premised on untrue factual assertions, or misleads investors as to the basis for the opinion. There is no support for any of those findings here. That should end this case.

But that is not the only fatal defect in the claims: There also is no evidence that Defendants acted with *scienter*—i.e., culpable mentality amounting to deliberate deceit or reckless disregard for the truth. The Bank analyzed the Loan throughout the class period and documented its

determinations.  Its external auditors reviewed the Loan several times and each time confirmed the Bank's judgment in every relevant respect.  Criticize those judgments as Plaintiff may, it simply cannot prove that Defendants got anything wrong on purpose or acted with blatant disregard for whether they got it right.

In short, there are no factual disputes here, and the record provides no basis for a reasonable trier of fact to conclude that the Bank's statements of opinion were misleading, much less fraudulent.  Summary judgment should be entered in favor of Defendants.

## I.    <u>BACKGROUND</u>

Bank OZK is regulated by the Federal Deposit Insurance Corporation (the "FDIC").  ¶ 3.[1] The Bank's Real Estate Specialties Group ("RESG") focuses on commercial real estate loans.  ¶ 5. At the start of the class period in February 2016, RESG generated a significant portion of the Bank's loan portfolio and primarily focused on large construction loans.  ¶ 5.a.

### A.    **Loan Classifications And Accounting**

This case concerns how the Bank categorized a single loan and accounted for the risk that it might not be paid back.  The Bank used generally accepted accounting principles ("GAAP") to classify every loan, including this Loan.  ¶¶ 22–22.a.  Three classifications are relevant.

*First*, a modification to a loan is classified as a "troubled debt restructuring" ("TDR") if (1) the borrower is experiencing financial difficulties, (2) the modification is a concession to the borrower, and (3) the lender would not have granted the concession but for the borrower's financial difficulties.  ¶ 14.a.  To evaluate whether a borrower is experiencing financial difficulties, a lender should consider (among other things) whether the borrower is currently in payment default, in bankruptcy, unlikely to be able to service its debt in the future, and able to refinance the debt on

---

[1]  All "¶ __" citations refer to the Statement of Undisputed Material Facts, filed contemporaneously herewith.

competitive terms. ¶ 14.c. A modification generally constitutes a concession when the lender modifies a loan in such a way that it no longer expects to collect all amounts due. ¶ 14.d. Reducing an interest rate due to a decrease in market rates, however, is not a concession. ¶ 14.e. Even if a loan is classified as a TDR, it can be removed from TDR status if it is modified again when the borrower is no longer experiencing financial difficulties or receiving a concession. ¶ 14.f.

*Second*, a loan is "impaired" when the lender concludes, based on current information, that it is *probable* it will not be able to collect all amounts due based on the contractual terms of the loan agreement. ¶ 19.

*Third*, a loan is "nonperforming"—a regulatory, not accounting, term—when it is past due by more than 90 days. ¶¶ 17–17.a. The Bank's policy was to classify loans in TDR status as nonperforming. ¶ 18.

B.    **The Allowance For Loan Losses**

In addition to classifying loans as discussed above, banks must account for the risk that some loans will not be fully repaid. ¶ 11.e. To do so, they book expenses to reflect their best estimate of losses inherent in their loan portfolios. This calculated estimate is the "allowance for loan losses" or "ALL" (sometimes, "ALLL"). ¶ 11.b. The ALL is basically a loan reserve against future charge-offs, based on an estimate of how much of a bank's loan portfolio will go unpaid. ¶ 11.b. The Bank evaluates its ALL each quarter, and when it increases its ALL to account for additional risk, it incurs an expense for the ALL at that time. ¶¶ 11.c–11.d.

If the Bank concludes a *particular loan* is not likely to be repaid in full, it "charges off" the amount it does not expect to recover, reducing its loan assets on the balance sheet and decreasing its ALL by the amount of the charge-off. ¶ 11.f. So long as the Bank does not need to increase its ALL, it will already have recognized the expense of the charge-off. ¶ 11.h.

Consistent with regulatory guidance, the Bank calculated its ALL based on various characteristics of each loan, including the risk rating assigned to it. ¶¶ 29–29.a. In October 2018, the Bank had eighteen risk categories for RESG loans, ¶ 28, each with a different percentage of loan exposure, to calculate its ALL, ¶ 28. Prior to October 2017, the Bank's policies provided a "special" reserve amount for inclusion in the ALL for certain loans. In particular, the Bank calculated a special reserve for loans rated "Watch" where:

> (i) the customer is continuing to make regular payments as agreed and (ii) it is highly probable that the customer will continue to make regular payments as agreed, but (iii) the bank's collateral is likely to be insufficient to protect the bank from loss in the unlikely event a default occurs.

¶¶ 23.f.i–23.f.ii.[2] Regulatory guidance in 2014 permitted banks to calculate ALL by reserving for individual loans even where a loss on the loan was *not* probable. ¶ 63.d. The Bank disclosed its policies related to calculating a "special" reserve for loans rated "Watch"—as well as other policies relating to the calculation of the ALL—in its annual reports on form 10-K. ¶¶ 11, 23.f.iii.

### C.    The Loan

The Bank originated the Loan in September 2007 to finance the purchase and development of the Rock Hill Galleria shopping mall in South Carolina (the "Mall"). ¶ 37. Belk, Sears, and JCPenney were tenants of the Mall through the beginning of the class period. ¶ 37.j. An attached Wal-Mart—though not a tenant—also generated foot traffic. ¶ 37.k.

The borrower—JTL Rock Hill, LLC ("JTL")—was a single-asset entity owned by Cypress/Rock Hill II, LP ("Cypress") for the purpose of buying and developing the Mall. ¶ 37.a. Under the Loan, JTL could borrow up to $32.3 million in principal, but only about $25 million was advanced at first. ¶ 37.b. The interest rate at origination was LIBOR + 1.70%—meaning

---

[2]  The Bank also calculated a special reserve for loans rated "Substandard," meaning that default still was not probable, but there was an elevated risk of loss. ¶¶ 23.h–23.h.i.

interest was the monthly LIBOR rate plus 1.70%. ¶ 37.h.  In August 2008, the interest rate was increased to LIBOR + 2.85%.  ¶ 38.b.  The original loan agreement provided for maturity on September 17, 2008, but the amortization period—the length of time to pay off the Loan through monthly principal and interest—was 360 months.  ¶ 37.d.  The Bank did not expect the Mall's income in a single year to pay off the principal of the Loan, which amortized over 30 years. ¶ 37.e.

### 1.    Loan History – Pre-Class Period

Before the class period started on February 19, 2016, JTL was more than 30 days late on a payment only once.  ¶ 59. The parties agreed at various times to extend Loan maturity, ¶¶ 41, 43, 45–48, 60, 79, 87, 92, 95, 99, 105, 109, as is common in commercial real estate lending, ¶ 39. Extensions to healthy borrowers are normally done to accommodate client needs, allow new information to come in, or account for events that have delayed development.  ¶ 39.d.

The 2008 recession affected shopping malls nationwide, ¶ 42.c, and the Mall's occupancy rate dropped, ¶ 42.d.  Since origination, the "debt service coverage ratio" ("DSCR") on the Loan was below 1.0.  ¶ 42.a.  DSCR is the ratio between an entity's net income and its monthly debt service, and a DSCR below 1.0 indicates that a borrower's monthly net income is insufficient on its own to service the borrower's monthly debt obligations.  ¶ 42.b.  JTL's below-1.0 DSCR indicated that it could not service the Loan using only net income from the Mall, but the parties had set aside reserves in the Loan budget to cover such temporary shortfalls.  ¶ 37.c.  Between 2008 and 2011, the Bank and JTL agreed to several extensions of the maturity date, while JTL continued to make timely monthly payments.  ¶¶ 41, 43, 45–48.

In August 2011, the Bank and JTL agreed to restate and amend the Loan.  ¶ 52.  The Bank lent up to $38,184,456 for redevelopment and extended maturity to August 2, 2014.  ¶¶ 52.a–52.b. The interest rate increased to the greater of (a) LIBOR + 3.5% or (b) an escalating floor starting at 4.5% and increasing to 5.5% over three years.  ¶ 52.c.

Prospects at the Mall thereafter improved.  Net operating income grew 74% between June 2013 and December 2014.  ¶ 55.b.  JTL negotiated a nearly 30% rent increase from a prospective tenant that had delayed its original opening plans.  ¶ 58.a.  Annual tenant sales at the Mall grew from $44.3 million at the end of 2013 to $50.2 million in February 2016.  ¶ 74.  Occupancy improved from 81% in December 2012 to 95% by September 2013.  ¶ 55.d.

While conditions at the Mall improved, LIBOR dropped to nearly zero by 2013.  ¶ 56.c. LIBOR is a proxy for interest on a risk-free loan, and the "spread" above LIBOR essentially is the lender's profit on a loan.  ¶ 37.h.iv.  Due to the historic drop in LIBOR, ¶ 56.c, the escalating interest rate floors under the August 2011 Loan restatement (5.0% in April 2013, going to 5.50% in August) were well above the "spread" of the loan at origination (LIBOR + 1.70%) and first modification in August 2008 (LIBOR + 2.85%), ¶ 56.c.  The Bank therefore decided to reduce interest to a flat rate of 3.75%.  ¶¶ 56, 56.c.  The Bank noted that "(i) the Property's operating performance ha[d] improved . . . , (ii) market rates ha[d] decreased significantly since the time of the 2011 Loan Extension, and (iii) the proposed Interest Rate represents a healthy spread over LIBOR relative to current market terms."  ¶ 56.a.  Eighteen months later, the parties agreed to a floating interest rate at LIBOR + 3.50 with a floor of 3.75%.  ¶ 66.a.  After April 2013, including during the class period, interest always exceeded LIBOR + 3.50%, twice the spread at origination.

In the third quarter of 2014, the Bank began calculating a special reserve for the Loan to include in its overall ALL.  Because the Loan was then in the "Watch – Special Reserve" risk category, the Bank determined the special reserve for the Loan—as it did for all similarly situated commercial real estate loans—by calculating the difference between the estimated maximum commitment under the Loan and the appraised value of the collateral (the Mall realty and leases). *E.g.*, ¶ 63.a.  The first special reserve was $3,530,000.  ¶ 63.

In December 2014, the parties extended the Loan for two years from October 2014 and returned to a floating interest rate of LIBOR + 3.50% with a 3.75% floor. ¶ 66.a. JTL also executed a "Cash Management Agreement" whereby all gross revenues from the Mall were deposited into an account maintained and controlled by the Bank. ¶ 67.

### 2.    Loan History – Class Period

In February 2016, the Loan had a positive DSCR, ¶ 75, net income of approximately $2.34 million, ¶ 73, and occupancy of 93%, ¶ 76. During the class period, JTL did not miss a single monthly payment of principal and interest. ¶ 111. Beginning in October 2016, the parties executed several short-term maturity extensions. *E.g.*, ¶¶ 79, 87, 92, 95, 99, 105, 109. Setting short-term maturity dates on the Loan (e.g., 60 or 90 days) gave the Bank leverage to pressure JTL when the Bank wanted to alter the terms of the Loan or exercise greater control over the property. ¶ 39.e. In reviewing the Loan in 2016 and 2017, PwC noted these extensions were "conventional" and "consistent with the type of loan." ¶ 39.a.

In January 2017, the parties agreed to restart the 360-month amortization period, meaning monthly principal payments would be divided over the next 360 months rather than the time left under the original 30-year amortization. ¶ 87. This lowered JTL's monthly loan payments in the short term, ¶ 87.a, but increased the total amount of interest the Bank would collect over the long term. ¶ 87.a. The Bank noted at the time this was appropriate in light of (i) the alteration of one tenant's lease providing for a lower base rent but a higher upside based on sales, (ii) the "increasing probability" that JTL would "capture significant economic upside" from certain developments at the Mall, and (iii), "the fact that the Bank [would] continue to realize substantial principal reduction payments . . . and sweep all net cash flow." ¶ 87.b.

Although cash flow at the Mall remained strong, its appraised value dropped during the class period, from $29,500,000 on March 31, 2016, to $25,190,000 (as adjusted by the Bank) in

7

November 2016.  ¶¶ 64, 82, 85.  This resulted in part from market conditions—market indices for real estate investment trusts dropped for both retail and mall properties.  ¶ 103.  Yet the Mall remained relatively stable—occupancy rates, net operating income, and DSCR saw no significant decreases.  ¶ 104.  The Bank also revised its policies for calculating reserves in 2017.  ¶ 26.  Based on the revised policy and the declining appraised value, the Bank increased the ALL calculation for this Loan in late 2017 and early 2018, reaching $13,921,453 in the second quarter of 2018.  ¶ 108.

In September 2018, the Bank received a new appraisal for the Mall, valuing the property at $13,100,000—a drop of about 48% from the 2016 appraisal.  ¶¶ 112–112.a.  The drop was again largely attributable to market conditions:  The appraiser determined that a dramatically higher "direct capitalization rate"—an estimate of the expected yield of a property's net operating income based on sales of comparable properties and other market factors—was appropriate based on sales of other retail malls and industry surveys, resulting in a substantially lower appraisal.  ¶¶ 112.b–112.b.iii.  In light of the appraisal, as well as reduced sales by certain tenants, departure of several tenants, and abandoned expansion plans in the first half of 2018, the Bank concluded that it was unlikely to receive all amounts owed under the Loan and categorized the Loan as impaired and nonperforming.  The Bank charged off a portion of the Loan, equal to the outstanding balance minus the appraised value of the collateral.  ¶ 113.

On October 18, 2018, the Bank announced it had charged off $45.5 million on two RESG loans in the third quarter of 2018, including $20.3 million for the Loan.  ¶ 114.  Because it previously reserved $13,869,780 for the Loan, that quarter the Bank incurred only an additional $6.47 million in expenses (called a "provision") to cover the unreserved amount of the charge-off (costing it only $4.8 million after adjusting for tax consequences).  ¶ 113.a.  It also increased its

overall ALL, $2.8 million of which was attributable to the Loan due to its effect on the amount of historical charge-offs.  ¶ 113.c.  Both internally and publicly, the Bank noted that the decision to categorize the Loan as impaired and charge-off the unsecured balance was a result of the September 2018 appraisal and the "significantly more conservative assumptions" used therein. ¶¶ 115–115.c.

### 3.    The Bank's Controls

Throughout the class period, the Bank employed controls to ensure the accuracy of its financial disclosures and the reliability of its accounting procedures.  *First*, the Bank maintained internal controls.  Beginning in August 2011, the Bank evaluated the modifications of the Loan to determine whether they should be classified as TDRs.  *E.g.*, ¶¶ 54, 57, 61, 69, 80, 88, 93–93.a, 96–96.b, 106, 110.  Each time the Bank concluded—based on the modification documentation and JTL's consistent payment history—that JTL was not experiencing financial difficulties, and thus the Loan was not in TDR status.  ¶¶ 54, 57, 61, 69, 80, 88, 93–93.a, 96–96.b, 106, 110.  These determinations were documented in the loan file and made available to the Bank's auditors.  *See infra*.  In addition, the Bank's loan officers, corporate finance group, and internal audit team regularly reviewed the Bank's financial disclosures, including loan reserves and loan reports, for material accuracy.  ¶ 30.

*Second*, the Bank's external auditors, Crowe and PwC, reviewed and audited its financial statements.  ¶¶ 10-10.a.  In each year from the Loan's origination in 2007 through 2018, the auditors issued unqualified audit opinions that the Bank's annual financial statements were prepared in compliance with GAAP and free of any material misstatement.  ¶¶ 32–32.b, 35.a.  Both Crowe and PwC reviewed loans in the Bank's portfolio, including this Loan.  In February 2015, Crowe examined the August 2014 modification and concluded that "it appear[ed] reasonable that this modification was not considered a TDR," noting in particular the consistent history of

payment.  ¶ 34.f.i.  Crowe came to the same conclusion when reviewing the December 2014 modification.  ¶ 34.f.ii.  PwC, for its part, twice reviewed the Loan and agreed with the Bank's judgments that JTL was not experiencing financial difficulties and the modifications should not be classified as TDRs.  ¶¶ 35.f.i, 35.f.iii.  PwC also reviewed the Bank's processes for evaluating loan modifications for TDRs and concluded that they were "designed appropriately."  ¶ 35.c.  Neither Crowe nor PwC has ever requested that the Bank restate its financials for any of the years at issue. ¶ 120.

*Third*, at all relevant times the Bank was subject to regulatory oversight by the FDIC and the Arkansas State Bank Department ("ASBD"), ¶¶ 3–4, which included regular examinations of the Bank as a part of a "continuous examination process," ¶ 36.c.  In April 2017, the FDIC, including a TDR expert, examined the Loan in particular.  ¶¶ 89–89.b, 90.a.  The Bank did not reclassify the Loan as impaired, nonperforming, or in TDR status following that examination.

## II.   <u>DISCUSSION</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Plaintiff's claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78t(a)) both require proof of fraud.  Under Section 10(b) (and SEC Rule 10b-5, promulgated thereunder), Plaintiff must prove "(1) a material misrepresentation or omission, (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation."  *McAdams v. McCord*, 584 F.3d 1111, 1113 (8th Cir. 2009).  Under Section 20(a), Plaintiff must prove (1) a primary violation of the federal securities law, (2) that the defendant exercised control over the operations of the

primary violator, and (3) the defendant possessed the power to determine the acts upon which the underlying violation is predicated. *See Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010).

There is no evidence that would permit a reasonable trier of fact to conclude that the Bank violated Section 10(b) or, thus, that Mr. Gleason is liable under Section 20(a).

### A.    No Reasonable Trier Of Fact Could Conclude That The Bank's Disclosures Were False Or Misleading.

Plaintiff does not challenge any of Defendants' statements about the likelihood of default on the Loan *because they made no such statements*. Instead, Plaintiff challenges the Bank's disclosure of certain aggregate ratios (e.g., the ratio of nonperforming loans to total loans) that, it claims, were made false by the Bank's erroneous classifications of the Loan. *E.g.*, Dkt. 72 ¶¶ 146, 150, 154, 159. Thus, as a starting matter, Plaintiff's challenge to the accounting for the Loan is removed from the disclosures at issue. And many of its experts' analyses focus on individual tenants at the Mall—details that are *far* removed from any disclosures made to shareholders. Moreover, Plaintiff has abandoned any claim that Bank OZK's reports of its income, revenue, and expenses were materially false. Ex. 15, at 17:8–18:2, 154:6–24. And there is no claim that Defendants misstated any objectively verifiable financial results.

The only disagreement is over the performance and risk categories the Bank used for the Loan. Those classifications derive from subjective judgments about the likelihood of loss on the Loan and are quintessential statements of opinion. Predicting the likelihood of default on a loan "is typically one of the most subjective and difficult judgments to make." ¶ 15.b. GAAP therefore provides that "[c]reditors shall have latitude to develop measurement methods that are practical in their circumstances," ¶ 15.d, and the FDIC has stated that evaluating a borrower's financial condition "requires the use of judgment," ¶ 15.a. "Judgments could differ between knowledgeable, experienced, and objective persons," and "[s]uch differences between reasonable judgments do

11

not, in themselves, suggest that one judgment is wrong and the other is correct." ¶ 15.c. The parties' respective experts agreed on this fundamental point. ¶ 15.

Because "loan loss reserves reflect management's *opinion or judgment* about what, if any portion of amounts due on the loans ultimately might not be collectible," *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (emphasis added), *abrogated on other grounds by Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015), statements regarding such reserves—or, as here, the corresponding determinations regarding the likelihood of default that inform those reserves—are statements of opinion, *see id.* at 112–13; *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613–14 (9th Cir. 2017). The probability of a loss and corresponding recognition of a loss reserve are "flexible accounting concepts, which, when applied, do not always (or perhaps ever) yield a single correct figure." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994), *superseded by statute on other grounds by* Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737; *see also Fait*, 655 F.3d at 113 ("[D]etermining the adequacy of loan loss reserves is not a matter of objective fact."). "Such a determination is inherently subjective, and . . . will vary depending on a variety of predictable and unpredictable circumstances." *Fait*, 655 F.3d at 113.

The Supreme Court has rejected the view that "a statement of opinion that is ultimately found incorrect—even if believed at the time made—may count as an 'untrue statement of a material fact.'" *Omnicare*, 575 U.S. at 182. Instead, a statement of opinion is "false" or "misleading" only if (1) the speaker did not "actually hold[] the stated belief," (2) the statement contains "embedded statements of fact" that are untrue, or (3) the defendant "omits material facts about the [defendant']s inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 184–

85, 189; *see also City of Dearborn Heights*, 856 F.3d at 615–16.  It is settled that an affirmative "statement of opinion . . . is not misleading just because external facts show the opinion to be incorrect." *Omnicare*, 575 U.S. at 188.  And circuit courts have made clear that omissions liability for opinions—i.e., the third category of liability from *Omnicare*—arises only when the speaker does not disclose that it failed to make a meaningful inquiry into the opinion asserted, *see Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189 (9th Cir. 2021); *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020), or received an opposing opinion from an authoritative source (such as a federal regulator), *see In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017).

There is no evidence the Bank did not believe the opinions it disclosed, and there are no "embedded statement of facts" at issue in them.  Moreover, it is undisputed that the Bank conducted an inquiry into its accounting opinions and never received opposing opinions—indeed, third parties concurred in its assessment of the Loan.  Because the undisputed facts do not support liability under *Omnicare*, it does not matter whether the opinions reflected in the Bank's classification were ultimately correct.  As discussed below, however, the Bank's classifications—with respect to TDR, impairment, and nonperformance—*were* correct, and at the very least reasonable, as independent auditors repeatedly confirmed.

### 1.    TDR Classification

As noted above, a loan modification is a TDR if (1) the borrower is experiencing financial difficulties, (2) the modification is a concession to the borrower, and (3) the lender would not have granted the concession but for the borrower's financial difficulties.  ¶ 14.a.  Plaintiff's principal theory is that the modifications of the Loan going back to 2014 satisfied each of those elements and therefore should have been classified as TDRs.  As set forth above, Plaintiff's disagreement with the Bank's judgment is not sufficient to render a statement of opinion false.  But in any event,

the Bank's determinations that the Loan's modifications did not satisfy each element of a TDR were reasonable and certainly do not rise to the level of false or misleading statements of opinion.

***Financial Difficulties***.   The TDR determination of whether a borrower is experiencing financial difficulties is a subjective judgment open to reasonable disagreement.  ¶¶ 15–15.f.

While the Mall had setbacks from the 2008 financial crisis, its performance before the class period was on a consistent upward trend:  Net operating income, cash flow (and DSCR), monthly sales, and occupancy all improved during this period.  ¶¶ 55–55.d.  Before the class period, JTL was 30 days' late on a monthly payment only once.  ¶ 59.  JTL also negotiated a substantial rent increase from a new junior anchor tenant.  ¶ 58.a.  Even though the Mall had challenges, the Loan's consistent payment history and positive trends provided a reasonable basis for the Bank to conclude JTL was not facing financial difficulties.

During the class period (the only relevant time), the Loan started strong.  No payments were more than 30 days late, ¶ 59; all rents went to the Bank; DSCR was positive, ¶ 75; and occupancy was 93%, ¶ 76.  At every modification, the Bank examined whether the modification was a TDR, and each time the Bank concluded that JTL was not experiencing financial difficulties.  ¶¶ 54, 57, 61, 69, 80, 88, 93–93.a, 96–96.b, 106, 110.  PwC *twice* affirmed that determination during the class period.  ¶¶ 35.f.i, 35.f.iii.  The Bank recognized the decline in value of the collateral as but one factor considered alongside the consistent payment and positive cash flow in making its determination—as GAAP instructs.  ¶ 96.  It was not until September 2018, when the appraised value of the Mall dropped from $25,190,000 to ***$13,100,000***, that the Bank reasonably determined that repayment of the Loan was unlikely.  ¶¶ 112, 113.

Plaintiff's experts assert that because JTL could not have paid off the full balance of the Loan at the maturity dates, it necessarily was in financial distress.  The undisputed facts show this

14

Loan was a "transitional loan," set for a short-term maturity with the understanding that extensions may be appropriate, ¶ 37.f, as evidenced by the mismatch between the original maturity date (one year) and the amortization period (*thirty* years), ¶ 37.d.  The Bank thus considered JTL's ability to repay over the full amortization period when assessing whether JTL was experiencing financial difficulties, ¶ 15.f.  As with similar loans, setting shorter maturity dates gave the Bank leverage to force the borrower to give additional information or consent to new terms.  ¶ 39.e.  At best, Plaintiff promotes an alternative accounting treatment, but that does not establish the Bank's assessments of JTL's financial condition were unreasonable, and certainly does not establish that the Bank's financial disclosures contained false or misleading statements of opinion.

*Concessions Not Available But For Financial Difficulties*.  Plaintiff claims three types of modifications were concessions:  (1) maturity extensions, (2) interest rate modifications, and (3) one reset of the amortization period.  None support Plaintiff's claims.

*First*, maturity extensions are afforded to commercial real estate borrowers of all kinds. Plaintiff's expert acknowledges "[i]t is common in CRE lending, and in fact with all types of commercial lending, to extend loan maturities with extensions," and "[e]xtensions to healthy borrowers are normally done to accommodate the borrower's needs or to wait for financial or other information to come in."  ¶¶ 39, 39.d.  In light of that admission, Plaintiff cannot prove that the Bank would not have "granted the [modification] *but for* the borrower's financial difficulties," ¶ 14.a (emphasis added), because a maturity extension can be appropriate in many circumstances. The Bank's extension of maturity dates for the Loan does not, without more, constitute a concession for TDR purposes.

*Second*, the interest rate for the Loan was lowered only once, in 2013—well before the start of the class period and as part of the Bank's effort to bring the rate closer to the market standard.

Until 2011, interest on the Loan was a spread above LIBOR, starting with a 1.70% spread and increasing to a 2.85% spread.  ¶¶ 37.h, 38.b.  The spread increased again in 2011 to 3.50% above LIBOR, with a floor starting at 4.50% and climbing steadily.  ¶ 52.c.  By 2013, LIBOR had declined to nearly zero, ¶ 56.c, and the 5% floor rate therefore was far above the 3.50% spread that the Bank negotiated, ¶ 56.c.  The Bank thus reasonably determined that adjusting the rate was appropriate to reflect market conditions and maintain a "healthy spread," as the Bank documented that determination in the loan modification memo.  ¶ 56.a.  Guidance confirms that reducing interest is not a concession if done to align with market conditions.  ¶ 14.e.  That is precisely what the Bank did, and there is no evidence in the record indicating that the Bank had any other reason for doing so.

Plaintiff's accounting expert asserts this interest modification was not on market terms, because the rate for the Loan in 2013 was lower than the average interest rate across all RESG loans the Bank originated or renewed in 2013 and 2014.  Ex. 14 ¶ 110.  This contention is factually unsupported and creates no material issue of fact.  Whether one loan's interest rate is below the enterprise-wide average is of no moment—virtually all loans in a portfolio will be either above or below the calculated average rate, yet clearly *some* of those loans were executed at market terms.  Moreover, Plaintiff's expert did not examine the characteristics of those loans, including whether, for example, some were for construction (they were), in different geographical regions (they were), or involved different types of properties (they did).  *See* Ex. 143.  In fact, Plaintiff's expert did not even opine on what he believed the market rate *was*.

*Third*, resetting the amortization period actually *increased* the prospective return for the Bank.  ¶ 87.a.  Moreover, the Bank's internal documents—uncontradicted by any testimony—point to numerous *positive* factors regarding developments at the Mall signaling higher upside and

weighing in favor of this modification.  ¶ 87.b.  And under the Cash Management Agreement executed in 2014, the Bank—not JTL—would reap the upside.  ¶¶ 67–67.b.

Accordingly, not only is there no factual dispute that Plaintiff cannot satisfy the rigorous standard for proving a false or misleading statement of opinion, there also is no factual dispute that Plaintiff cannot prove that the Bank's TDR treatment of the Loan was objectively unreasonable. Disagreement among reasonable professionals does not suffice in this context, and that is all Plaintiff can show.  For that reason, the claims fail.

## 2.    Impaired And Nonperforming

Plaintiff also claims the Bank should have classified the Loan as impaired or nonperforming by at least 2014.  These claims, however, are entirely derivative of its arguments regarding TDR classification, and thus fail for the same reasons.[3]

## B.    No Reasonable Trier Of Fact Could Conclude That Defendants Acted With Scienter.

To establish scienter, Plaintiff must prove (a) Defendants had "a mental state embracing intent to deceive, manipulate, or defraud," (b) Defendants' conduct "r[ose] to the level of severe recklessness, . . . presenting a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it," or (c) opportunity to commit fraud and an "unusual or heightened" motive to do so.  *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 893–94 (8th Cir. 2002) (alteration and quotation marks omitted).  The first and third are not at issue:  There is no evidence of a willful intent to deceive or manipulate stockholders or

---

[3]  Plaintiff has argued, at times, that the Bank was required to classify the Loan as "Substandard" before the second quarter of 2017.  But this cannot be the basis for the claims:  This theory appears nowhere in the Second Amended Complaint.  Moreover, it is settled that securities fraud claims must be premised on false or misleading statements that actually cause a loss when they are corrected.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345–46 (2005).  The Bank's stock price did not change when it classified the Loan as substandard and amended its disclosures accordingly in 2017.

an "unusual or heightened" motive to commit fraud—Plaintiff's expert pointed out that some Bank executives' compensation depends partially on the "net charge-off" ratio for the Bank, Ex. 14 ¶ 154, but conceded he does not know any effect the timing of this charge-off had on compensation or whether overall compensation would have been *higher* had the Loan been charged off sooner, Ex. 15, at 151:13–152:22.

That leaves only "severe recklessness," a standard Plaintiff cannot satisfy. Recklessness requires evidence "that the misstatements were so obvious that Defendants must have been aware of, or recklessly disregarded them." *Scott v. Enter. Fin. Servs. Corp.*, 947 F. Supp. 2d 1021, 1029 (E.D. Mo. 2013); *see also Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 395 F.3d 851, 856 (8th Cir. 2005) (holding alleged "poor audit" as insufficient without allegations of "the intent to deceive, manipulate, or defraud required for securities fraud"). This Court has already recognized that an error in judgment on proper accounting for a loan does not give rise to an inference of scienter, because "precedent does not allow" claims for securities fraud based on "accounting in hindsight." Dkt. 50 at 5 (citing *In re K-tel*, 300 F.3d at 891). "Section 10(b) and Rule 10b-5 prohibit fraud, not accounting malpractice." *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 246 (8th Cir. 2008). A company's non-compliance with GAAP is "insufficient, standing alone, to raise an inference of scienter." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 745 (8th Cir. 2002).

There is no evidence of scienter here. Witnesses for the Bank explained its accounting treatment of the Loan—consistent payment history, positive trends, flexibility for the Bank, and many other factors. *See, e.g.*, ¶¶ 39.b, 39.e, 56.d, 67.c–67.d. There is no question that Defendants sincerely believed that the Bank had properly accounted for the Loan, and Plaintiff's accounting expert disclaimed that he was offering any opinion on scienter—even though he has done so in other cases. Ex. 15, at 22:1–23:2. The mere fact that the Bank had knowledge of the facts on

which Plaintiff's experts rely for their competing, hindsight opinions is irrelevant:  "[A] corporation's mere knowledge of negative factors that potentially" affect an accounting determination "does not of itself support an inference that a corporation acted with scienter in exercising its judgment."  *City of Dearborn*, 856 F.3d at 621.  Disagreement on accounting judgment does not prove scienter.

Significantly, the independent third parties who examined the Loan never concluded it was in TDR status, impaired, or nonperforming before October 2018.  ¶¶ 91.a, 118.  Crowe and PwC expressly *agreed* several times with the Bank's accounting judgments, ¶¶ 34.f–34.f.ii, 35.f–35.f.iii, and PwC confirmed the adequacy of the Bank's TDR process, ¶ 35.c.  Following the FDIC's examination of the Loan in 2017, the Bank did not reclassify the Loan as in TDR status, impaired, or nonperforming.  ¶ 90.a.  For every year at issue, the Bank's auditors issued unqualified audit opinions that the Bank's financial statements were accurately stated in all material respects, ¶¶ 32–32.b, 35.a, and never requested that the Bank restate its financials.  ¶ 120.

This transparency contradicts any claim of recklessness or fraud.  Had the Bank's external auditors or the FDIC disagreed with the Bank's accounting treatment of the Loan, they could have said so.  *See Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 316 (4th Cir. 2004).  And they *did* say so when warranted—in 2017, PwC disagreed with the Bank's risk rating for the Loan, concluding that it should be classified as "Substandard" (but not impaired) instead of "Watch."  ¶ 91.  Yet PwC did not at that time—or any other time—indicate that the Loan should be classified as in TDR status, impaired, or nonperforming, ¶ 91.a, dispelling any contention that Defendants acted with *fraudulent intent*, *see Waterford Twp. Gen. Emps. Ret. Sys. v. SunTrust Banks, Inc.*, No. 09-CV-617, 2010 WL 3368922, at *2 (N.D. Ga. Aug. 19, 2010) ("The Plaintiff does not allege that anyone—other than the Plaintiff—has said that [the bank] should restate its financial

reports."); *In re 2007 Novastar Fin., Inc., Sec. Litig.*, No. 07-CV-139, 2008 WL 2354367, at *3 (W.D. Mo. June 4, 2008) ("[I]t is noteworthy that nobody—the SEC, [the defendant's] auditors, or anyone else—has suggested that [the defendant] should or must restate its financial reports.").

Plaintiff's experts point to the Bank's "special" reserve for the Loan starting in 2014 to argue that Defendants must have subjectively believed losses were probable on the Loan, saying such a reserve is appropriate under GAAP only when losses are both probable and estimable.  Ex. 14 ¶¶ 22, 24.  This argument is nonsensical.  The Bank's 10-Ks, before and during the class period, disclosed that the special reserve assessment was for loans where there was "a reasonable basis to believe the customer may continue to make regular payments," i.e., even where losses were *not* probable and even where the loan was *not* deemed impaired.  ¶ 23.f.iii; *see also* ¶¶ 23.f.i, 25.c. Consistent with this approach, internal memoranda set forth the Bank's judgment that JTL was "as likely as not to continue to make its contractual loan payments."  ¶ 94.  Regulatory guidance expressly permitted this practice.  ¶ 63.d; *see also Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) ("There appears to be no single method of evaluating and setting loan loss reserves . . . .").  There is no evidence that Defendants actually believed that losses on the Loan were probable before October 2018.

## III.    CONCLUSION

Plaintiff must prove *fraud*.  Nuanced disagreements on the fringes of subjecting accounting judgments—themselves statements of opinion—do not support a case for securities fraud.  Yet after extensive discovery, that is all Plaintiff can muster on a materially undisputed factual record. Defendants respectfully request that the Court grant summary judgment for Defendants.

DATED:  February 4, 2022

Jess Askew III, Ark. Bar No. 86005
Andrew King, Ark. Bar No. 2007176
Frederick H. Davis, Ark. Bar No. 2012271
KUTAK ROCK LLP
124 W. Capitol Ave., Suite 2000
Little Rock, AR 72201
jess.askew@kutakrock.com
andrew.king@kutakrock.com
Tel.: (501) 975-3000

F. Joseph Warin (*pro hac vice*)
Jason J. Mendro (*pro hac vice*)
Lissa M. Percopo (*pro hac vice*)
Joshua M. Wesneski (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
fwarin@gibsondunn.com
jmendro@gibsondunn.com
Tel.: (202) 955-8500

*Counsel for Defendants Bank OZK and
George Gleason*