# EXHIBIT 72

Reviewed by:

Jeanne A. Pearson
Johnston, Allison & Hord, PA

When recorded, return to:

Tracey S. Bailey, Esq.
Winstead PC
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201

## THIRD MODIFICATION AGREEMENT AND EXTENSION AGREEMENT

This THIRD MODIFICATION AGREEMENT AND EXTENSION AGREEMENT ("Agreement") is executed to be effective as of October 15, 2014, by and among **BANK OF THE OZARKS** ("Lender"), **JTL ROCK HILL, LLC**, a South Carolina limited liability company ("Borrower"), **CYPRESS EQUITIES I, LP**, a Texas limited partnership ("Cypress"), and **CHRIS MAGUIRE**, an individual ("Maguire", and individually and collectively, as the context may require, with Cypress, "Guarantor")

## WITNESSETH:

WHEREAS, Lender made a loan ("Loan") to Borrower on August 5, 2011, in the maximum principal amount of **THIRTY-EIGHT MILLION ONE HUNDRED EIGHTY FOUR THOUSAND FOUR HUNDRED FIFTY SIX AND NO/100 DOLLARS ($38,184,456.00)**; and

WHEREAS, Lender and Borrower executed that certain Amended and Restated Loan Agreement (as same may have been heretofore amended, the "Loan Agreement") dated August 5, 2011, pertaining to the Loan; and

WHEREAS, Borrower executed and delivered to Lender that certain Amended and Restated Promissory Note (as same may have been heretofore amended, the "Note") dated August 5, 2011, payable to the order of Lender in the amount of and evidencing the Loan; and

WHEREAS, Borrower executed and delivered that certain Amended and Restated Mortgage (as same may have been heretofore amended, the "Mortgage") dated of even date with the Note to Lender, recorded as Document No. 201100141727 in Volume 12102, Page 227, of the Mortgage Records of York County, South Carolina, covering the real property described in Exhibit A attached hereto and incorporated herein for all purposes, together with all improvements, appurtenances, other properties (whether real or personal), rights and interests described in and encumbered by the Mortgage (collectively, the "Property"), to secure the payment of the Note and performance by Borrower of the other obligations set forth in the Loan Documents (as herein defined); and

Exhibit 0100

WHEREAS, Borrower caused to be issued by Commonwealth Land Title Insurance Company ("Title Company") that certain Loan Policy of Title Insurance ("Policy") No. SC0410-81-011-062-2011.81228-84092126 dated August 9, 2011, in the amount of the Note, insuring the dignity and priority of the lien created and evidenced by the Mortgage; and

WHEREAS, Borrower caused Cypress to execute and deliver to Lender that certain Amended and Restated Guaranty (as same may have been heretofore amended, the "Cypress Guaranty") dated of even date with the Note; and

WHEREAS, contemporaneously herewith, Borrower shall cause Maguire to execute and deliver to Lender that certain Guaranty (Carveout) (the "Carveout Guaranty", and together with the Cypress Guaranty, the "Guaranty") dated as of December 24, 2014; and

WHEREAS, contemporaneously herewith, Borrower and Cypress Equities Managed Services, L.P., a Texas limited partnership ("Manager"), shall execute and deliver to Lender that certain Cash Management Agreement (the "CMA") dated as of date hereof; and

WHEREAS, Borrower, Cypress and Lender executed that certain First Modification Agreement (the "First Modification") dated April 15, 2013, pursuant to which certain modifications were made to the terms of the Loan; and

WHEREAS, Borrower, Cypress and Lender executed that certain Second Modification Agreement and Extension Agreement (the "Second Modification") dated August 2, 2014 and recorded on August 19, 2014 in Volume 14317 at Page 183 of the Mortgage Records of York County, South Carolina, pursuant to which certain modifications were made to the terms of the Loan; and

WHEREAS, Lender, Borrower and Guarantor now propose to modify certain of the terms and provisions of the Loan Agreement, the Note, the Mortgage, the Guaranty, the First Modification, the Second Modification and the other related documents executed by Borrower, Guarantor or third parties pertaining to, evidencing or securing the Loan (collectively, the "Loan Documents"); and

WHEREAS, all capitalized terms not otherwise defined herein shall have the meaning ascribed to such term in the Loan Agreement.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower hereby agree as follows:

1. Modification. Notwithstanding the modification of the Note pursuant to the terms of this Agreement, all of the Loan Documents (including, without limitation, the Note) are deemed to be continuing in full force and effect (and are not extinguished). All monies due and payable under the Note shall continue to be due and payable in accordance with the terms of the Note, as modified hereby. Nothing herein contained shall affect or impair the validity or priority of the Mortgage or any of the other Loan Documents, which are hereby renewed and extended in accordance with the terms of this Agreement.

2. <u>Extension of Maturity Date</u>. Borrower hereby acknowledges that as set forth in the Note and the Loan Agreement (as each has been modified by the Second Modification), the Maturity Date is October 15, 2014 (the "<u>Original Maturity Date</u>"). Borrower and Lender hereby agree to extend, and do hereby extend (the "<u>Extension</u>"), the Original Maturity Date from **October 15, 2014** to **October 15, 2016** (such new Maturity Date, the "<u>New Maturity Date</u>", and the period from **October 15, 2014** to the New Maturity Date, the "<u>New Loan Term</u>"). Borrower hereby agrees that on the New Maturity Date all of the unpaid principal balance of the Note, together with all accrued but unpaid interest thereon, shall be due and payable. Borrower hereby agrees it shall have no further right or option to extend the term of the Loan beyond the New Maturity Date unless agreed to in writing by Lender. Borrower hereby renews, but does not extinguish, the Note and the liens, security interests and assignments created and evidenced by the Mortgage and other Loan Documents, and in this regard all of the Loan Documents are hereby renewed and modified by extending the maturity date thereof as set forth above. Borrower covenants to observe, comply with and perform each of the terms and provisions of the Loan Documents, as modified hereby. Borrower hereby agrees and acknowledges that any further Advances (as defined in the Loan Agreement) by Lender to Borrower of any unadvanced proceeds of the Loan shall be at the sole and absolute discretion of Lender. Borrower covenants to observe, comply with and perform each of the terms and provisions of the Loan Documents, as modified hereby.

3. <u>Amendment to Loan Documents to Reflect Modifications</u>. From and after the execution of this Agreement and satisfaction of the requirements hereof, for all purposes under the Loan Documents, the term "<u>Maturity Date</u>" shall be deemed to mean the New Maturity Date as defined herein.

4. <u>Interest Rate</u>. Borrower, Lender and Guarantor hereby agree that commencing as of **October 15, 2014** the interest rate borne on the Note shall be the <u>lesser</u> of (a) the Maximum Lawful Rate, <u>or</u> (b) the <u>greater</u> of (i) the Minimum Rate (as defined in Section 5(b) below), or (ii) the rate of interest adjusted daily equal to the LIBOR Rate plus **three and one-half percent (3.50%) (i.e., plus 350 basis points)**. Borrower and Lender further acknowledge and agree that any references in the Loan Documents to the "<u>Note Rate</u>" shall have the meaning given such term in Section 5(a)(1) of this Agreement.

5. <u>Modifications to Note</u>. In consideration of the agreements set forth herein and effective as of the execution of this Agreement, Borrower, Guarantor and Lender hereby agree to the amendment and modification of the Note (as modified by the First Modification and Second Modification) as follows:

(a) <u>Revision of Definitions from Section 2.3</u>. To be effective as of the date hereof and until the New Maturity Date, the following terms are hereby deleted from Section 2.3 of the Note (as modified by the First Modification and Second Modification) and the below are inserted in lieu thereof:

(1) "<u>Note Rate</u>" shall mean the <u>lesser</u> of (a) the Maximum Lawful Rate, <u>or</u> (b) the <u>greater</u> of (i) the Minimum Rate, or (ii) the rate of interest adjusted daily equal to the LIBOR Rate plus **three and one-half percent (3.50%) (i.e., plus 350 basis points)**.

(2) "<u>Payment Date</u>" shall mean the first (1st) day of each calendar month.

(3) "<u>Reamortization Date</u>" shall mean the first (1st) day of each successive calendar month until the Maturity Date. If any Reamortization Date shall occur on any day which is not a Business Day, such Reamortization Date shall be the immediately preceding Business Day."

(b)     <u>Addition of Definitions to Section 2.3</u>. To be effective as of the date hereof and until the New Maturity Date, the following terms are hereby added, in alphabetical order, to <u>Section 2.3</u> of the Note (as modified by the First Modification and Second Modification):

(1) "<u>LIBOR Rate</u>" shall mean the interest rate per annum equal to the "London interbank offered rate" for a one-month period (rounded upwards, if necessary, to the nearest 1/10,000 of 1%) as published in the "Money Rates" section of <u>The Wall Street Journal</u>. Any change in the rate will take effect on the effective date as indicated in <u>The Wall Street Journal</u>. Interest will accrue on any non-Business Day at the rate in effect on the immediately preceding Business Day. In the event <u>The Wall Street Journal</u> ceases to be available to Lender for any reason or ceases to provide such rate listing, then the LIBOR Rate shall mean the London Interbank Offered Rate for the applicable period and amount as quoted by another comparable reference source selected by Lender.

(2) "<u>Minimum Rate</u>" shall mean an interest rate of **three and three-quarters percent (3.75%)** per annum.

6.     <u>Modifications to the Loan Agreement</u>. In consideration of the agreements set forth herein, Borrower, Guarantor and Lender hereby agree to amend and modify the Loan Agreement, and the Loan Agreement is hereby amended and modified as set forth below:

(a)     <u>Revision of Section 5.24(b)</u>. To be effective as of the date hereof and until the New Maturity Date, <u>Section 5.24(b)</u> of the Loan Agreement is hereby deleted in its entirety and the following is inserted in lieu thereof:

"(b)     <u>Debt Service Requirements</u>. The term "<u>Debt Service Requirements</u>" shall mean all principal and interest payments which would be owing during such Calendar Period based upon a hypothetical payment schedule calculated using (i) the Outstanding Principal Balance plus the amount equal to the loan proceeds which have not yet been advanced to Borrower by Lender, (ii) an interest rate equal to the actual interest rate borne on the Indebtedness during the Calendar Period, and (iii) a declining payment amortization schedule of three hundred sixty (360) months.

(b) As of the date hereof, Borrower hereby acknowledges and agrees that, with respect to the payment amortization schedule, there are two hundred and eighty-four (284) periods remaining.

(c) <u>Revision of Definitions from Section 1.1</u>. To be effective as of the date hereof and until the New Maturity Date, the following terms are hereby deleted from <u>Section 1.1</u> of the Loan Agreement:

"<u>Replacement Reserve</u>: As defined in <u>Section 6.6</u> hereof.

<u>Replacement Reserve Deposit</u>: As defined in <u>Section 6.6</u> hereof.

<u>TILC Reserve</u>: As defined in <u>Section 6.7</u> hereof.

<u>TILC Reserve Deposit</u>: As defined in <u>Section 6.7</u> hereof."

(d) <u>Revision to Section 6.6</u>. To be effective as of the date hereof and until the New Maturity Date, <u>Section 6.6</u> of the Loan Agreement is hereby deleted in its entirety and the below is inserted in lieu thereof:

"6.6 [<u>Intentionally Deleted</u>.]"

(e) <u>Revision to Section 6.7</u>. To be effective as of the date hereof and until the New Maturity Date, <u>Section 6.7</u> of the Loan Agreement is hereby deleted in its entirety and the below is inserted in lieu thereof:

"6.7 [<u>Intentionally Deleted</u>.]"

(f) <u>Revision to Section 6.8(a)</u>. To be effective as of the date hereof and until the New Maturity Date, <u>Section 6.8(a)</u> of the Loan Agreement is hereby deleted in its entirety and the below is inserted in lieu thereof:

"(a) <u>Deposits Required</u>. In accordance with the provisions of the First Modification Agreement, Borrower has established and currently maintains a Reserve (the "<u>Operating Deficit Reserve</u>") with Lender. Borrower hereby agrees that it shall continue to deposit on each Payment Date all Net Cash Flow remaining from the immediately preceding calendar month into the Operating Deficit Reserve."

7. <u>Cash Management Account</u>. Contemporaneously with the execution of this Agreement, Borrower shall close and transfer that certain "Lock Box Account" (and all sums therein) currently held at KeyBank into which all tenants at the Mortgaged Property deposit their rental payments into the Cash Management Account (as defined in the CMA). From and after the date hereof and during the New Loan Term and until the New Maturity Date, all Rents and other revenue from the Mortgaged Property shall be deposited into the Cash Management Account in accordance with the CMA. The Cash Management Account shall be maintained with Lender until the Loan is paid in full.

As additional security for the payment and performance by Borrower of all duties, responsibilities and obligations under the Note and the other Loan Documents (as modified herein), Borrower hereby unconditionally and irrevocably assigns, conveys, pledges, mortgages, transfers, delivers, deposits, sets over and confirms unto Lender, and hereby grants to Lender a security interest in the Cash Management Account, including (i) all insurance on said account; (ii) all contract rights and general intangibles or other rights and interests pertaining thereto; (iii) all sums now or hereafter therein or represented thereby; (iv) all replacements, substitutions or proceeds thereof; (v) all instruments and documents now or hereafter evidencing the Cash Management Account; (vi) all powers, options, rights, privileges and immunities pertaining to the Cash Management Account (including the right to make withdrawals therefrom); and (vii) all proceeds of the foregoing. Borrower hereby authorizes and consents to the Cash Management Account being held in Lender's name or the name of any entity servicing the Note for Lender and hereby acknowledges and agrees that Lender, or at Lender's election, such servicing entity, shall have exclusive control over said account. **BORROWER HEREBY INDEMNIFIES AND HOLDS LENDER HARMLESS WITH RESPECT TO ALL RISK OF LOSS REGARDING AMOUNTS ON DEPOSIT IN THE CASH MANAGEMENT ACCOUNT, EXCEPT TO THE EXTENT THAT ANY SUCH LOSS IS CAUSED BY THE GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT OF LENDER.**

8. Draw Account. Contemporaneously herewith and effective as of the date hereof, Borrower shall establish an account (the "Draw Account") with Lender which Draw Account shall be Borrower's sole account with respect to the Mortgaged Property for Tenant Improvements with respect to any Approved Lease and, during the pendency of construction through and until completion of such improvements (the "Construction Period"), all vendor, construction or other payments of obligations of Borrower with respect to such tenant improvements (collectively, "Construction Expenses") shall be paid by Borrower directly from the Draw Account. The obligation of Lender to make an Advance shall be subject to the simultaneous occurrence or satisfaction of the terms and conditions set forth in Section 3.3 (Tenant Improvements and Leasing Commissions Advances) of the Loan Agreement, and Lender shall cause all such Advances to be funded into the Draw Account. Borrower hereby acknowledges that the Draw Account is the "Special Account" referred in the Loan Agreement and all Advances shall be funded into the Draw Account.

9. Extension Fee. Contemporaneously herewith and as a condition to the effectiveness of this Agreement, Borrower shall pay to Lender, as additional consideration for the Extension as set forth hereinabove, an extension fee in an amount equal to **$90,040.09**, which extension fee payment shall be paid to Lender as a fee and shall not constitute a payment against the principal or interest balance of the Loan.

10. Deposits into Reserves. During the New Loan Term and until the New Maturity Date, Borrower agrees and covenants that (i) it shall continue to make deposits into the Impositions Reserve in accordance with Section 6.5 of the Loan Agreement, and (ii) it shall continue to make deposits into the Operating Deficit Reserve in accordance with Section 6.8 of the Loan Agreement. Notwithstanding anything to contrary stated in the Loan Agreement or herein, Lender, in its reasonable discretion, may at any time elect to apply any funds in the Operating Deficit Reserve to the Outstanding Principal Balance.

11. <u>Payments</u>.   Borrower shall continue to make, on each Payment Date during the New Loan Term and until the New Maturity Date, the interest payment and Principal Reduction Payments (as defined in the Note) due under the Note as amended by the First Modification, the Second Modification and this Agreement.  Interest on the outstanding principal balance shall continue to accrue at the Note Rate as set forth in the Note as amended herein.

12. <u>Carveout Guaranty</u>.   Contemporaneously herewith and as a condition to the effectiveness of this Agreement, Lender shall have received from Maguire the Carveout Guaranty, in form and substance satisfactory to Lender, duly executed by Maguire.

13. <u>Cash Management Agreement</u>.   Contemporaneously herewith and as a condition to the effectiveness of this Agreement, Lender shall have received from Borrower the CMA, in form and substance satisfactory to Lender, duly executed by Borrower and Manager.

14. <u>Notice and Consent of Waiver of Appraisal Rights</u>.   For the avoidance of doubt, Borrower and Guarantor hereby acknowledge and agree that, in connection with the Mortgage and the Guaranty and pursuant to § 29-3-680, South Carolina Code of Laws, 1976, as amended, Borrower and Guarantor received written notice that Lender required the waiver of appraisal rights in connection with the Mortgage and the Guaranty and, by their execution thereof, consented to such waiver of their appraisal rights.

15. <u>Title Insurance</u>.   If required by Lender, Borrower shall cause the Title Company to issue with respect to the Policy, an endorsement or endorsements acceptable to Lender, confirming that the Policy has not been reduced or terminated by virtue of the terms and provisions hereof.

16. <u>Acknowledgment by Borrower</u>.   Except as otherwise specified herein, the terms and provisions hereof shall in no manner impair, limit, restrict or otherwise affect the obligations of Borrower or any third party to Lender, as evidenced by the Loan Documents.  Borrower hereby acknowledges, agrees and represents that (i) Borrower is indebted to Lender pursuant to the terms of the Note as modified hereby; (ii) the liens, security interests and assignments created and evidenced by the Loan Documents are, respectively, valid and subsisting liens, security interests and assignments of the respective dignity and priority recited in the Loan Documents; (iii) there are no claims or offsets against, or defenses or counterclaims to, the terms or provisions of the Loan Documents, and the other obligations created or evidenced by the Loan Documents; (iv) Borrower has no claims, offsets, defenses or counterclaims arising from any of Lender's acts or omissions with respect to the Property, the Loan Documents or Lender's performance under the Loan Documents or with respect to the Property; (v) the representations and warranties made by Borrower in the Loan Documents were true and correct representations and warranties of Borrower, as of the date thereof; and (vi) Lender is not in default and no event has occurred which, with the passage of time, giving of notice, or both, would constitute a default by Lender of Lender's obligations under the terms and provisions of the Loan Documents.  To the extent Borrower now has any claims, offsets, defenses or counterclaims against Lender or the repayment of all or a portion of the Loan, whether known or unknown, fixed or contingent, same are hereby forever irrevocably waived and released in their entirety.

17. <u>No Waiver of Remedies</u>. Except as may be expressly set forth herein, nothing contained in this Agreement shall prejudice, act as, or be deemed to be a waiver of any right or remedy available to Lender by reason of the occurrence or existence of any fact, circumstance or event constituting a default under the Note or the other Loan Documents.

18. <u>Joinder of Guarantor</u>. By its execution hereof, each Guarantor hereby (i) acknowledges and consents to the terms and provisions hereof, (ii) ratifies and confirms the Guaranty made by it, as modified hereby, including all interest and costs of collection, to and for the benefit of Lender, (iii) agrees that its Guaranty is and shall remain in full force and effect, and the terms of its Guaranty cover and pertain to the Loan, Note, Mortgage and other Loan Documents, as modified hereby, (iv) acknowledges that there are no claims or offsets against, or defenses or counterclaims to, the terms and provisions of and the obligations created and evidenced by its Guaranty, (v) certifies that the representations and warranties made by it in its Guaranty were true and correct representations and warranties of such Guarantor as of the date thereof, and (vi) acknowledges that Lender has satisfied and performed its covenants and obligations under its Guaranty and the Loan Documents (if any), and that no prior action or failure to act by or on behalf of Lender has or will give rise to any cause of action or other claim against Lender for breach of the Guaranty, the Loan Documents or otherwise.

19. <u>Release</u>. Borrower and Guarantor waive, discharge, and forever release Lender, Lender's employees, officers, directors, attorneys, stockholders, and their successors and assigns, from and of any and all claims, causes of action, allegations or assertions that Borrower or Guarantor have or may have had at any time up through and including the date of this Agreement, against any or all of the foregoing, regardless of whether any such claims, causes of action, allegations or assertions are known to Borrower or Guarantor or whether any such claims, causes of action, allegations or assertions arose as result of Lender's actions or omissions in connection with the Loan Documents, or any amendments, extensions or modifications thereof, or Lender's administration of the debt evidenced by the Loan Documents or otherwise, INCLUDING ANY CLAIMS, CAUSES OF ACTION, ALLEGATIONS OR ASSERTIONS RESULTING FROM LENDER'S OWN NEGLIGENCE, except and to the extent (but only to the extent) caused by Lender's gross negligence or willful misconduct.

20. <u>Interest Limitation</u>. The Loan Documents shall be governed by and construed according to the laws of the State of Texas from time to time in effect except to the extent preempted by United States federal law or to the extent that, under the terms of the Loan Documents, the provisions thereof are to be governed by the law of the state where the Property is located. The interest limitation provisions contained in <u>Section 5.4</u> of the Note are incorporated herein for all purposes.

21. <u>Costs and Expenses</u>. Contemporaneously with the execution and delivery hereof, Borrower shall pay, or cause to be paid, all costs and expenses incident to the preparation, execution and recordation hereof and the consummation of the transaction contemplated hereby, including, but not limited to, recording fees, title insurance policy or endorsement premiums or other charges of the Title Company, and reasonable fees and expenses of legal counsel to Lender.

22. <u>Additional Documentation</u>. From time to time, Borrower shall execute or procure and deliver to Lender such other and further documents and instruments evidencing, securing or pertaining to the Loan or the Loan Documents as shall be reasonably requested by Lender so as to evidence or effect the terms and provisions hereof, all in such form as may be reasonably satisfactory to Borrower.

23. <u>Effectiveness of the Loan Documents</u>. Except as expressly modified by the terms and provisions hereof, each of the terms and provisions of the Loan Documents are hereby ratified and shall remain in full force and effect; provided, however, that any reference in any of the Loan Documents to the Loan, the amount constituting the Loan, any defined terms, or to any of the other Loan Documents shall be deemed, from and after the date hereof, to refer to the Loan, the amount constituting the Loan, defined terms and to such other Loan Documents, as modified hereby.

24. **<u>Governing Law</u>. THE TERMS AND PROVISIONS HEREOF SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN.**

25. <u>Time</u>. Time is of the essence in the performance of the covenants contained herein and in the Loan Documents.

26. <u>Binding Agreement</u>. This Agreement shall be binding upon the heirs, executors, administrators, personal representatives, successors and assigns of the parties hereto; provided, however, the foregoing shall not be deemed or construed to (i) permit, sanction, authorize or condone the assignment of all or any part of the Property or any of Borrower's rights, titles or interests in and to the Property or any rights, titles or interests in and to Borrower, except as expressly authorized in the Loan Documents, or (ii) confer any right, title, benefit, cause of action or remedy upon any person or entity not a party hereto, which such party would not or did not otherwise possess.

27. <u>Headings</u>. The section headings hereof are inserted for convenience of reference only and shall in no way alter, amend, define or be used in the construction or interpretation of the text of such section.

28. <u>Construction</u>. Whenever the context hereof so requires, reference to the singular shall include the plural and likewise, the plural shall include the singular; words denoting gender shall be construed to mean the masculine, feminine or neuter, as appropriate; and specific enumeration shall not exclude the general, but shall be construed as cumulative of the general recitation.

29. <u>Severability</u>. If any clause or provision of this Agreement is or should ever be held to be illegal, invalid or unenforceable under any present or future law applicable to the terms hereof, then and in that event, it is the intention of the parties hereto that the remainder of this Agreement shall not be affected thereby, and that in lieu of each such clause or provision of this Agreement that is illegal, invalid or unenforceable, such clause or provision shall be judicially construed and interpreted to be as similar in substance and content to such illegal,

OZX00000500

invalid or unenforceable clause or provision, as the context thereof would reasonably suggest, so as to thereafter be legal, valid and enforceable.

30. <u>Counterparts</u>. To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature and acknowledgment of, or on behalf of, each party, or that the signature and acknowledgment of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures and acknowledgment of, or on behalf of, each of the parties hereto. Any signature and acknowledgment page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures and acknowledgments thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature and acknowledgment pages.

31. <u>ENTIRE AGREEMENT. THIS AGREEMENT AND THE OTHER DOCUMENTS, IF ANY, HEREIN REQUIRED TO BE EXECUTED REPRESENT THE FINAL AGREEMENT OR AGREEMENTS BETWEEN THE PARTIES AS TO THE SUBJECT MATTER HEREOF AND THEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. THIS INSTRUMENT MAY BE AMENDED ONLY BY AN INSTRUMENT IN WRITING EXECUTED BY THE PARTIES HERETO.</u>

[Remainder of page intentionally left blank.]

EXECUTED under seal to be effective as of the date first above written.

**SIGNED, SEALED AND
DELIVERED IN THE PRESENCE
OF:**

Name: John C. Fox

Name: Andrea Robinson

**LENDER:**

**BANK OF THE OZARKS**

By: _____ [SEAL]
Name: Brannon Hamblen
Title: Director of Asset Management, Real Estate Specialties Group

STATE OF TEXAS    §
                  §
COUNTY OF DALLAS  §

This instrument was ACKNOWLEDGED before me on **December 22**, 2014, by **BRANNON HAMBLEN**, as Director of Asset Management, Real Estate Specialties Group of **BANK OF THE OZARKS**, on behalf of said bank.

[S E A L]

My Commission Expires:

6/17/2018

Tiffany Whittington
Notary Public, State of Texas

Tiffany Whittington
Printed Name of Notary Public



THIRD MODIFICATION AGREEMENT AND EXTENSION AGREEMENT – Signature Page
49265-21/Rock Hill - NC

<u>SIGNED, SEALED AND
DELIVERED IN THE PRESENCE
OF:</u>

/s/ Sheree Crespin
Name: SHEREE CRESPIN

/s/ Renetta Gill
Name: RENETTA GILL

**BORROWER:**

**JTL ROCK HILL, LLC**,
a South Carolina limited liability company

By: Cypress/Rock Hill II, LP,
    a Delaware limited partnership
Its: Manager

    By: Cypress/Rock Hill II, GP, LLC,
        a Delaware limited liability company
    Its: General Partner

        By: Cypress Retail Fund GP, LLC,
            a Delaware limited liability company
        Its: Manager

        By: /s/ Brian Parro [SEAL]
        Name: Brian Parro
        Title: Vice President/CFO

STATE OF TEXAS    §
                                §
COUNTY OF DALLAS  §

This instrument was ACKNOWLEDGED before me, on the 18th day of December, 2014, by **BRIAN PARRO**, the Vice President/CFO of **CYPRESS RETAIL FUND GP, LLC**, a Delaware limited liability company, the Manager of **CYPRESS/ROCK HILL II, GP, LLC**, a Delaware limited liability company, the General Partner of **CYPRESS/ROCK HILL II, LP**, a Delaware limited partnership, Manager of **JTL ROCK HILL, LLC**, a South Carolina limited liability company on behalf of said entities.

[SEAL: STACIA DUGGAN, Notary Public, State of Texas, My Commission Expires March 07, 2018]

My Commission Expires:

3-7-18

/s/ Stacia Duggan
Notary Public, State of Texas

Stacia Duggan
Printed Name of Notary Public

THIRD MODIFICATION AGREEMENT AND EXTENSION AGREEMENT – Signature Page
49265-21/Rock Hill - NC

| | |
|---|---|
| **SIGNED, SEALED AND DELIVERED IN THE PRESENCE OF:** | **CYPRESS/GUARANTOR:** |
| | **CYPRESS EQUITIES I, LP**, a Texas limited partnership |
| Name: SHEREE CRESPIN | By: Cypress Equities I GP, LLC, a Texas limited liability company |
| | Its: General Partner |
| Name: RENETTA GILL | By: _____ [SEAL]<br>Name: Brian Parro<br>Title: Vice President/CFO |

STATE OF TEXAS §
§
COUNTY OF DALLAS §

This instrument was ACKNOWLEDGED before me, on the 18th day of December, 2014, by **BRIAN PARRO**, the Vice President/CFO of **CYPRESS EQUITIES I GP, LLC**, a Texas limited liability company, the General Partner of **CYPRESS EQUITIES I, LP**, a Texas limited partnership, on behalf of such limited liability company and limited partnership.

[STACIA DUGGAN
Notary Public, State of Texas
My Commission Expires
March 07, 2018]

Notary Public, State of Texas

My Commission Expires:

3-7-18

Stacia Duggan
Printed Name of Notary Public

THIRD MODIFICATION AGREEMENT AND EXTENSION AGREEMENT – Signature Page
49265-21/Rock Hill - NC

| SIGNED, SEALED AND DELIVERED IN THE PRESENCE OF: | MAGUIRE/GUARANTOR: |
|---|---|
| Name: SHEREE CRESPIN | _____ [SEAL]<br>CHRIS MAGUIRE, an individual |
| Name: RENETTA GILL | |

STATE OF TEXAS       §
                     §
COUNTY OF DALLAS     §

This instrument was ACKNOWLEDGED before me, on the 18th day of December, 2014, by **CHRIS MAGUIRE**, an individual.

[SEAL: STACIA DUGGAN, Notary Public, State of Texas, My Commission Expires March 07, 2018]

My Commission Expires:

3-7-18

_____
Notary Public, State of Texas

Stacia Duggan
Printed Name of Notary Public

# EXHIBIT A

## Legal Description

[A copy of the Legal Description of the Real Property follows this cover page.]

6424077v.8 49265-21

EXHIBIT A/Legal Description – Cover Page
49265-21/Rock Hill - NC

OZX00000506

Exhibit "A"

A parcel of land being located in the City of Rock Hill, Ebenezer Township, York County, South Carolina, and being more particularly described as follows:

Starting at a point of commencement in the centerline intersection of the 200' right-of-way of Dave Lyle Boulevard and Meeting Boulevard, then going S. 57-02-20 E., 156.21 feet, being the point of beginning.

Thence from the point of beginning along the northern right-of-way of Dave Lyle Boulevard, S. 72-45-59 W., 240.00 feet to a point; thence along the common property lines of Ryan's Family Steakhouse, Inc., two courses and distances (1) N. 17-13-55 W., 200.22 feet; (2) S. 72-45-59 W., 440.00 feet; thence along the common property lines of Galleria Entranceway Properties, Inc., three courses and distances (1) S. 72-45-59 W., 190.00 feet; (2) S. 27-45-59 W., 42.43 feet; (3) S. 17-14-01 E., 50.00 feet; thence with the northern right-of-way of Dave Lyle Boulevard, S. 72-45-59 W., 150.00 feet; thence with the common property lines of 493 South Herlong, LLC, three courses and distances; (1) N. 17-14-01 W., 50.00 feet; (2) N. 62-14-01 W., 42.43 feet; (3) S. 72-45-56 W., 408.00 feet; thence with common property line of Chick-Fil-A, S. 72-45-56 W., 226.21 feet; thence with Apple South, Inc., six courses and distances: (1) S. 72-45-56 W., 125.79 feet; (2) with a curve to the right, a chord bearing of N. 75-31-29 W., chord of 210.24 feet, arc length of 221.37 feet, radius of 200.00; (3) S. 72-45-56 W., 40.51 feet; (4) with a curve to the right, chord bearing of S. 03-53-51 E., chord length of 148.73 feet, radius of 868.51 feet and length of 148.91 feet; (5) S. 01-00-52 W., 24.41 feet; (6) S. 44-57-55 E., 69.49 feet; thence with a curve to the right, chord bearing N. 88-52-20 W., chord of 36.19 feet, length of 36.20 feet; radius of 2,191.83; thence N. 18-39-35 W., 49.54 feet; thence N. 16-16-11 W., 297.12 feet; thence N. 17-14-01 W., 1,062.27 feet; thence N. 72-45-59 E., 2,200.00 feet; thence N. 76-04-22 E., 306.46 feet; thence S. 17-16-00 E., 637.98 feet; thence S. 44-27-44 E., 50.66 feet; thence S. 17-15-53 E., 149.14 feet; thence S. 72-44-00 W., 76.25 feet; thence S. 17-16-00 E., 114.16 feet; thence with a curve to the right, chord bearing of N. 02-52-18 E., chord of 67.65 feet, radius of 98.25 feet, length of 69.06 feet; thence S. 23-00-35 W., 310.63 feet; thence with a curve to the right, chord bearing S. 33-50-34 W., 37.68 feet, radius of 100.25 feet, length of 37.91 feet; thence S. 17-18-42 E., 211.59 feet; thence S. 72-35-04 W., 100.31 feet to the point of beginning.

Containing 75.041 acres.

LESS AND EXCEPT:

Parcel 1:

All that certain piece, parcel or tract of land lying, being and situated in the City of Rock Hill, York County, South Carolina, lying and generally situated in northeast quadrant of the intersection of I-77 and Dave Lyle Boulevard, S.C. 122, and being more particularly described as follows:

Commencing at a pk nail at the intersection of centerline of Dave Lyle Boulevard and Meeting Boulevard. Thence N. 57-47-25 W., 479.08 feet to a Point of Beginning; thence S. 72-45-59 W., 322.50 feet to a point; thence N. 17-14-01 W., 464.15 feet to a point; thence N. 27-45-59 W.,

63.64 feet to a point; thence N. 17-14-01 W., 572.19 feet to a point; thence S. 89-12-58 W., 269.88 feet to a point; thence with a curve to the left, chord bearing of N. 79-51-18 E., chord of 24.94 feet, radius of 100.67 feet, length of 25.00 feet to a point; thence N. 72-44-26 E., 58.02 feet to a point; thence with a curve to the right, chord bearing of N. 79-12-39 E., chord of 33.47 feet, radius of 148.50 feet, length of 33.54 feet to a point; thence N. 85-36-02 E., 35.81 feet to a point; thence N. 85-40-25 E., 116.88 feet to a point; thence with a curve to the left, chord bearing of N. 79-12-13 E., chord of 67.95 feet, radius of 301.50 feet, length of 68.09 feet to a point; thence N. 72-44-00 E.; 139.60 feet to a point; thence with the curve to the right, a chord bearing of S. 62-16-00 E., chord of 91.92 feet, radius of 65.00 feet and length of 102.10 feet to a point; thence S. 17-16-00 E., 355.00 feet to a point; thence S. 17-01-52 E., 68.75 feet to a point; thence S. 17-16-00 E., 154.13 feet to a point; thence with a curve to the right, chord bearing of S. 01-01-13 W., chord of 31.66 feet, length of 32.20 feet, radius of 50.44 feet to a point; thence S. 23-00-35 W., 303.55 feet to a point; thence with a curve to the right, chord bearing of S. 37-36-59 E., chord 30.26 feet, radius of 60.00 feet, length of 30.59 feet to a point; thence S. 72-46-20 W., 160.78 feet to the point of beginning. Said tract containing 17.876 acres.

Parcel 2:

A parcel of land being located in the City of Rock Hill, Ebenezer Township, York County, South Carolina, and being more particularly described as follows:

Starting at a point of commencement in the centerline intersection of the 200' right-of-way of Dave Lyle Boulevard and 100' right-of-way of Meeting Boulevard, thence N. 39-42-21 W., 130.04 feet, being the Point of Beginning. Thence with a curve to the right, chord bearing of N. 02-30-31 W., chord length of 195.74 feet, radius of 305.00 feet and length of 199.27 feet to a #4 rebar set; thence S. 17-18-42 E., 211.59 feet to a point in the center of Meeting Boulevard; thence S. 72-35-04 W., 50.00 feet to the Point of Beginning. Said tract containing 0.16 acres or 6,816 sq. ft.

Parcel 3:

Parcel H(a) on that certain plat filed of record in Book C267, page 9, in the records of York County, South Carolina, located in the City of Rock Hill, Ebenezer Township, York County, South Carolina, and also being described as follows:

Starting at a point of commencement in the centerline intersection of the 200' right-of-way of Dave Lyle Boulevard and 100' right-of-way of Meeting Boulevard, then N. 39-42-21 W., 130.04 feet, being the Point of Beginning. Thence along the northern most right-of-way of Dave Lyle Boulevard, two (2) courses and distances: (1) S. 72-35-04 W., 50.30 feet to a #4 rebar found; (2) S. 72-45-59 W., 240.00 feet to a #4 rebar found; thence N. 17-13-54 W., 200.22 feet to a #4 rebar set; thence N. 72-44-23 W., 27.99 feet to a #4 rebar set; thence N. 72-45-31 E., 270.02 feet to a #4 rebar set; thence with a curve to the left, chord bearing N. 57-14-16 E., chord length of 43.61 feet, radius of 100.25 feet and arc length of 43.96 feet to a #4 rebar set; thence S. 17-18-42 E., 22.44 feet to a #4 rebar set; thence with a curve to the left, chord bearing of S. 02-30-31 E., chord length of 195.74 feet, radius of 305.00 feet and length of 199.27 feet to the Point of Beginning.

Said tract containing 1.41 acres or 61,420 sq. ft.

TOGETHER WITH THE FOLLOWING:

Access easements contained in Easement and Operating Agreement by and between Rock Hill Zamias Limited Partnership and Ryan's Family Steak House, Inc., dated December 9, 1999 and recorded in the Office of the Clerk of Court for York County in Book 2961 at page 124.

Access easements contained in Easement and Operating Agreement by and between Rock Hill Zamias Limited Partnership and Chick-Fil-A, dated September 4, 2000 and recorded in the Office of the Clerk of Court for York County in Book 3272 at page 328.

Access easements contained in Easement and Operating Agreement by and between Rock Hill Zamias Limited Partnership and 493 South Herlong, L.L.C. dated February 26, 1998 and recorded in the Office of the Clerk of Court for York County in Book 2155 at page 342.

Access easements contained in Easement and Operating Agreement by and between Rock Hill Zamias Limited Partnership and Galleria Partners, LLC, dated February 3, 1998 and recorded in the Office of the Clerk of Court for York County in Book 2126 at page 279 and re-recorded in Book 2337 at page 280.

Access easements contained in Easements with Covenants and Restrictions Affecting Land between Wal-Mart Stores, Inc. and Rock Hill Zamias Limited Partnership dated May 9, 1991 and recorded in the Office of the Clerk of Court for York County in Book 249 at page 288; amended by First Amendment to Easements with Covenants and Restrictions Affecting Land, recorded in Book 3259 at page 307.

DERIVATION: This being a portion of the property conveyed to Borrower by Deed of Rock Hill Property SPE LLC, dated _____ and recorded on July 29, 2003 in the Office of the Clerk of Court for York County, South Carolina in Book 5509 beginning at Page 166.

6430611v.1 49265-21